No. 05-297C
(Senior Judge Margolis)

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

STERLING, WINCHESTER, & LONG, L.L.C.,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

APPENDIX TO
DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT AND
OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

JEFFREY S. BUCHOLTZ
Acting Assistant Attorney General

JEANNE E. DAVIDSON
Director

MAAME A.F. EWUSI-MENSAH
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
1100 L Street, N.W.
Attn: Classification Unit
8th Floor
Washington, D.C. 20530
Tel: (202) 353-0503
Fax: (202) 514-8624

Of Counsel:
MICHAEL F. KIELY
Attorney
Law Department
United States Postal Service
Washington, D.C. 20260-1127
Tel: (202) 268-4037

January 28, 2008

Attorneys for Defendant

# INDEX TO APPENDIX

**Exhibit 1**
Trademark License Agreement between USPS and SWL, executed Jan. 4-31, 2001 . . . . . . . . A1

**Exhibit 2**
SWL Unsolicited Proposal to USPS, Oct. 7, 1999 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A34

**Exhibit 3**
Letter from B. Tutt (USPS) to J.G. Long (SWL), Dec. 3, 1999 . . . . . . . . . . . . . . . . . . . . . . . A42

**Exhibit 4**
Letter from I. Kent (EMI) to B. Tower (USPS), Jul. 14, 2000 . . . . . . . . . . . . . . . . . . . . . . . . A43

**Exhibit 5**
Notes of M. Chick (EMI), Feb. 4, 2000 through Jan. 22, 2001 . . . . . . . . . . . . . . . . . . . . . . . A46

**Exhibit 6**
SWL Unsolicited Proposal to USPS, Mar. 8, 2000 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A53

**Exhibit 7**
SWL Trademark License Application to EMI, May 18, 2000 . . . . . . . . . . . . . . . . . . . . . . . . A91

**Exhibit 8**
Letter from J.G. Long (SWL) to L. Daniels (USPS), May 22, 2000 . . . . . . . . . . . . . . . . . . . A120

**Exhibit 9**
Letter from M. Chick (EMI) to J.G. Long (SWL), June 21, 2000 . . . . . . . . . . . . . . . . . . . . A122

**Exhibit 10**
Letter from R. Stemen (EMI) to J.G. Long (SWL), July 5, 2000 . . . . . . . . . . . . . . . . . . . . . A123

**Exhibit 11**
Letter from P. Gilbert and K. Strange (USPS) to J.G. Long (SWL), July 12, 2000 . . . . . . . A127

**Exhibit 12**
Letter from M. Chick (EMI) to J.G. Long (SWL), July 25, 2000
(enclosing executed Term Sheet) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A128

**Exhibit 13**
Email from J.G. Long (SWL) to A. Jaffer (USPS), July 13, 2000 . . . . . . . . . . . . . . . . . . . . A137

**Exhibit 14**
Letter from R. Stemen (EMI) to J.G. Long (SWL), July 31, 2000
(enclosing draft Trademark License Agreement) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A138

**Exhibit 15**
Memoranda from M. Reichmanis (counsel for SWL) to J.G. Long (SWL),
Aug. 11, 2000, Dec. 20, 2000 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A167

**Exhibit 16**
Letter from R. Mobley (counsel for SWL) to R. Stemen (EMI), Aug. 18, 2000 . . . . . . . . . A176

**Exhibit 17**
Letter from R. Stemen (EMI) to R. Mobley (counsel for SWL), Aug. 18, 2000 . . . . . . . . . A194

**Exhibit 18**
Letter from R. Stemen (EMI) to J.G. Long (SWL), Oct. 24, 2000,
(enclosing revised draft Trademark License Agreement)
(EMI copy & SWL copy) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A199, A233

**Exhibit 19**
Letter from J.G. Long (SWL) to R. Stemen (EMI), Oct. 27, 2000 . . . . . . . . . . . . . . . . . . . . A264

**Exhibit 20**
Letter from R. Stemen (EMI) to J.G. Long (SWL), Nov. 9, 2000 . . . . . . . . . . . . . . . . . . . . . A266

**Exhibit 21**
Draft Trademark License Agreement (J.G. Long markup), Nov. - Dec. 2000 . . . . . . . . . . . A269

**Exhibit 22**
Letter from R. Stemen (EMI) to J.G. Long (SWL), Dec. 6, 2000
(enclosing revised draft Trademark License Agreement) . . . . . . . . . . . . . . . . . . . . . . . . . . . A274

**Exhibit 23**
Letter from R. Stemen (EMI) to J.G. Long (SWL), Dec. 21, 2000 . . . . . . . . . . . . . . . . . . . . A312

**Exhibit 24**
Letter from R. Stemen (EMI) to J.G. Long (SWL), Dec. 28, 2000 . . . . . . . . . . . . . . . . . . . . A346

**Exhibit 25**
Letter from L. Ford (EMI) to J.G. Long (SWL), Feb. 7, 2001
(enclosing executed Trademark License Agreement) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A347

**Exhibit 26**
Letter from J.G. Long (SWL) to S. Anderson (Barnes & Noble), Mar. 30, 2001 . . . . . . . . . A381

**Exhibit 27**
Email Correspondence between J.G. Long (SWL) and I. Kent (EMI), Sep. 2001 . . . . . . . . A386

**Exhibit 28**
Congressional Complaint filed by SWL, Nov. 30, 2001 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A387

**Exhibit 29**
Letters from J.G. Long (SWL) to USPS Board of Governors, Mar. 1, 2002 . . . . . . . . . . . . A389

**Exhibit 30**
Certified Claim of SWL, Jul. 28, 2004 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A394

**Exhibit 31**
Agreement between USPS and EMI, Jan. 1, 2000 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A447

**Exhibit 32**
Glossary of Postal Terms . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A464

**Exhibit 33**
"Philatelic Centers," USPS Retail Operations Handbook . . . . . . . . . . . . . . . . . . . . . . . . . . . A469

**Exhibit 34**
"USA Philatelic Catalog," USPS Website . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A482

**Exhibit 35**
SWL Transcript of Telephone Call Between J.G. Long and S. Lloyd (SWL) and H. Diane Fagan (USPS), Mar. 2, 2001 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A483

**Exhibit 36**
Catalogs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A484

**Exhibit 37**
Excerpts from the Deposition of H. Diane Fagan, July 13, 2006 . . . . . . . . . . . . . . . . . . . . . A495

**Exhibit 38**
Excerpts from the Deposition of Cindy L. Tackett, July 27, 2007 . . . . . . . . . . . . . . . . . . . . A502

CONFIDENTIAL
FOR INTERNAL
REVIEW ONLY

USPS Contract No. 102592-01-U-1173

# LICENSE AGREEMENT

THIS AGREEMENT is made effective as of the 1st day of July 2000, by and between the UNITED STATES POSTAL SERVICE ("USPS"), an independent establishment of the United States government, and STERLING, WINCHESTER & LONG ("Licensee"), a South Carolina corporation with its principal place of business at 1022 Dunbarton Road, Williston, SC 29853-1718, and a mailing address of P.O. Box 211299, Martinez, GA 30907-1299.

In this Agreement, USPS grants to Licensee a license to use certain names, trademarks, service marks, trade dress and/or copyrights in connection with the manufacture, distribution, advertising, promotion and sale of certain goods, listed below, on the terms and conditions specified below and in the attached Exhibits A and B, incorporated herein by reference. Definitions of the various terms used below are listed in Exhibit B:

1. Licensed Properties: The Licensed Properties are the trademarks, service marks, trade dress and/or copyrights listed on Exhibits A and E to this Agreement.

2. Licensed Articles:

   An annual series of up to five (5) thematic U.S. Postal Service 12-month calendars, commencing with calendar year 2002. Licensee must obtain prior approval of the thematic groupings.

3. License Type: Non-exclusive; provided, however, that subject to the terms set forth herein, Licensee shall have the exclusive right to use the stamp designs listed on Exhibit E on the Licensed Articles. Nothing contained herein shall preclude the USPS from producing, or licensing others to produce, calendars utilizing stamp designs not listed on Exhibit E, or from using, or licensing others to use, the stamp designs listed on Exhibit E on items other than calendars.

4. Licensed Territory:

   United States, its territories and possessions.

1008

5. Channels of Distribution:

   Wholesale to bookstores, specialty stores, Philatelic catalogs, Philatelic centers and merchandise stores; Retail via Licensee's website, subject to the conditions set forth in Paragraph 18(a) below.

RECEIVED
JAN 17 2001

6. Initial Term: July 1, 2000 through December 31, 2004. Contract Period 1 shall commence July 1, 2000 and shall end December 31, 2002. Each consecutive twelve month period thereafter shall be deemed a Contract Period.

7. Renewal: See attached Exhibit D.

8. Royalty Rate:

Wholesale Sales: 8% of Net Sales of Licensed Articles bearing solely wholly-owned stamp designs and 6% of Net Sales of Licensed Articles bearing solely non-wholly owned stamp designs (i.e. Jointly-Owned Stamp Designs or stamp designs listed on Exhibit E as "status unknown"). A weighted royalty rate of between 6% and 8% of Net Sales shall apply to any Licensed Article bearing both wholly owned stamp designs and non-wholly owned stamp designs. Said rate shall be calculated based on the percentage that each category of stamp designs represents in relation to the total number of stamp designs used in that particular Licensed Article. For example, if a particular calendar contained 24 stamp designs, 6 of which were wholly owned and 18 of which were non-wholly owned, the applicable rate would be 6.5%, calculated as follows: (6/24 x 8%) + (18/24 x 6%) = 6.5%.

Retail Sales: 5% of Net Sales of all Licensed Articles.

The term "Net Sales" is defined in Exhibit B to this Agreement.

9. Guaranteed Minimum Royalty and Schedule: Licensee shall pay the following Guaranteed Minimum Royalties for the Initial Term:

| | |
|---|---|
| Contract Period 1 [7/1/00-12/31/02] | $50,000.00 |
| Contract Period 2 [1/1/03-12/31/03] | $ 50,000.00 |
| Contract Period 3 [1/1/04-12/31/04] | $ 50,000.00 |

The Guaranteed Minimum Royalty for Contract Period 1 shall be paid upon execution of this Agreement. The Guaranteed Minimum Royalty for Contract Periods 2 and 3 shall be paid in equal quarterly installments, as described in Section 4(c) of the attached Exhibit B.

10. Payments and Royalty Statements Shall Be Sent to:

USPS Licensing Program
PO Box 7247-7087
Philadelphia, PA 19710-7087

11. Notices to USPS Shall Be Sent to USPS and its Licensing Agent as Follows

USPS notices: U.S. Postal Service
Licensing Program/Stamp Development
475 L'Enfant Plaza SW, Rm 4474E
Washington, DC 20260-2437

Representative notice: Equity Management Inc.
4365 Executive Drive, Ste. 1000
San Diego, CA 92121
Attn: Manager of USPS Licensing Program

12. Notices to Licensee Shall Be Sent to:

Sterling, Winchester & Long
P.O. Box 211299
Martinez, GA 30907-1299
Attn. J.G. Long

13. Insurance: $1,000,000 U.S. with a deductible that does not exceed 10%.

14. Form of Copyright And Trademark Notices: See Exhibit A to this Agreement.

15. Marketing Dates:

| | |
|---|---|
| Deadline for prototypes to Licensor: | 7/31/00 |
| Deadline for initial manufacturing run: | 12/31/01 |
| Deadline for submission of advertising and promotion materials: | 12/31/01 |
| Initial sale to Distribution Channel: | 12/31/01 |

16. Standard Terms And Conditions: See Exhibit B to this Agreement, which is incorporated herein by reference.

17. Licensee Federal Tax Identification Number: 57-1099225.

18. Other Terms And Conditions:

(a) Prior to execution of this Agreement Licensee registered the following domain names containing Licensed Properties belonging to the USPS:

"uspscalendar2001.com"
"uspscalendar2002.com"
"uspscalendar2003.com"
"uspscalendar2004.com"
"uspscalendar2005.com"
"uspscalendar.com"
"uspsofficialcalendar.com"

Licensee hereby irrevocably assigns all rights, title and interest it has in said domain names to USPS and agrees to execute any additional documentation that might be necessary to formalize said assignment. USPS hereby grants to Licensee the exclusive right to use the domain names "uspscalendar2002.com," "uspscalendar2003.com," "uspscalendar2004.com" and "uspscalendar2005.com" during the term of this Agreement for the sole purpose of selling the Licensed Articles. Licensee may not use the domain names "uspsofficialcalendar.com" or "uspscalendar.com" at any time for any purpose. USPS shall not, during the Initial Term or any renewal term, use, or license others to use, the above listed domain names for any purpose.

Licensee represents and warrants that it has not registered any other domain names containing Licensed Properties belonging to the USPS and that it shall not register any other domain names containing Licensed Properties belonging to the USPS without USPS' prior written permission.

Upon EMI's receipt of satisfactory documentation of said registrations and the cost thereof, Licensee shall be entitled to recoup any registration fees actually incurred and paid prior to September 1, 2000 in the form of an offset against its Guaranteed Minimum Royalties in Contract Period 2. Any other expenses related to said domain names, including registration fees incurred or paid after September 1, 2000, and the cost of development and maintenance of any websites associated with those domain names, shall be the sole responsibility of Licensee. All webites shall be subject to the review requirements set forth in this Agreement and to any USPS policies or procedures governing websites.

(b) Licensee acknowledges that the USPS is unable to confirm that it is the sole owner of those stamp designs listed on Exhibit E as "status unknown," and that third parties may claim an ownership interest in certain of those stamp designs. In the event a third party asserts an ownership interest in any of the stamp designs listed on Exhibit E as "status unknown," it shall be Licensee's sole responsibility to attempt to obtain permission from the third party to use such stamp design. Any expense related to obtaining said permission, including payment of royalties, shall be borne solely by Licensee and shall not modify in any way Licensee's obligations under this Agreement. If Licensee is not able to obtain permission from the third party, Licensee shall immediately discontinue its

use of the subject stamp design, without modification of Licensee's obligations under this Agreement; provided, however, that Licensee shall have the right to request approval from USPS in accordance with the procedures set forth in Paragraph 18(c) below to substitute another stamp design in place of that stamp design it is unable to use.

Licensee further acknowledges that the exclusive nature of this Agreement is limited to those stamp designs that are wholly owned by USPS.

(c) Licensee shall have the right to supplement the stamp designs listed on Exhibit E with up to fourteen (14) additional stamp designs, which stamp designs will be selected in accordance with this provision. Licensee shall submit to USPS a list of those additional stamp designs it wishes to utilize, along with an indication of the thematic grouping in which it will be used. USPS will then have thirty (30) days in which to approve or deny the request, in its sole discretion. If, as a result of USPS denying Licensee's request in whole or in part, Licensee does not obtain approval of fourteen (14) stamp designs through the first request, Licensee shall be permitted to submit additional requests until it has received approval of fourteen (14) additional stamp designs or May 31, 2002, whichever is sooner.

In the event Licensee requests approval to use as part of the fourteen additional stamp designs any Jointly-Owned Stamp Designs, as that term is defined in Exhibit B, the request must be accompanied by proof, in a form acceptable to USPS, that Licensee has secured permission from the Joint Owner to use said stamp design. Any expense related to obtaining said permission, including payment of royalties, shall be borne solely by Licensee and shall not modify in any way Licensee's obligations under this Agreement. Licensee acknowledges that it shall be in the sole discretion of USPS to grant or deny a request to use a Jointly-Owned Stamp Design as part of the fourteen additional stamp designs, and that USPS shall not be obligated to grant such a request even if Licensee has secured permission from the Joint Owner to use said stamp design.

IN WITNESS WHEREOF, duly authorized representatives of USPS and Licensee have executed this Agreement, including the terms and conditions set forth in the attached Exhibits A and B.

| USPS | STERLING, WINCHESTER & LONG |
|---|---|
| By: H. Diane Fagan | By: J. G. Long |
| Name: H. Diane Fagan | Name: J. G. Long |
| Title: Contracting Officer | Title: Chief Managing Officer |
| Date: 1-31-01 | Date: 1-4-01 |

USPS

1012



A5

## EXHIBIT A -- LICENSED PROPERTIES

"Licensed Properties" shall mean the following United States Postal Service trademarks, service marks, trade dress and/or copyrights:

United States Postal Service® (USPS) Corporate Signature
Postal Seals (1782-1993 [® or ™])
Postmark USA™

Those USPS stamp designs listed on Exhibit E, including any supplement thereto approved in writing by USPS [© _____ (year first publ.)]

Each use of a Licensed Property shall be accompanied by the appropriate designation indicated above. Each Licensed Article shall bear the following notice: "Trademarks and copyrights used herein [or hereon] are properties of the United States Postal Service and are used under license to Sterling, Winchester & Long. All rights reserved." Licensee shall display the marks listed above only according to the specifications provided by USPS.

**Concurrence (Initial)** ________

## EXHIBIT B -- STANDARD TERMS AND CONDITIONS

These Standard Terms and Conditions shall be deemed fully incorporated in the License Agreement ("Underlying Agreement") to which this Exhibit B is attached, and these Standard Terms and Conditions and the Underlying Agreement shall hereinafter collectively be referred to as the Agreement. All terms used in these Standard Terms and Conditions shall, unless expressly provided to the contrary herein, have the same respective meanings as set forth in the Underlying Agreement. Unless expressly provided to the contrary herein, to the extent that any provision of these Standard Terms and Conditions conflicts with any provision of the Underlying Agreement, the Underlying Agreement shall control.

1. **Definitions:** For purposes of this Agreement, the following terms shall have the following specified meaning:

a. "Close-Out" means the sale of merchandise at a very low price in order to reduce inventory in a short time, which shall be permitted during the Sell-Off period under the terms and conditions specified herein.

b. "Collateral Materials" means packaging, cartons and containers, packing and wrapping material, tags and labels.

c. "Net Sales" mean the Licensee's gross sales, less only sales taxes and returns actually allowed by Licensee.

d. "Jointly-Owned Stamp Designs" means those United States postage stamp designs featuring trademarks, copyrights, or rights of publicity that are owned or controlled by USPS and a Joint-Owner(s).

e. "Joint-Owner(s)" means an entity, other than USPS or Licensee, recognized by USPS as owning rights in a stamp design.

f. "Premium" means any article used for the purpose of increasing the sale, promoting, or publicizing any other product or any service, including but not limited to incentives for consumers, sales forces, members of the trade, or fund-raising.

g. "Promotional Materials" means all advertising and sales materials, including but not limited to sales sheets, brochures, direct mail, and catalog layouts.

h. "Sell-Off Period" means the ninety (90) day period commencing after the termination of the Agreement, during which Licensee may dispose of excess inventories of Licensed Articles.

i. Unless otherwise stated herein, all references to "day(s)" shall refer to calendar days, not business days.

The terms identified in the Underlying Agreement shall have the meanings specified herein for purposes of this Agreement.

2. **Grant of License:**

a. Grant: Subject to the limitations set forth herein, USPS hereby grants to Licensee a non-transferable, non-exclusive license to design, manufacture, have manufactured, sell, distribute, and advertise Licensed Articles bearing the Licensed Properties in the Licensed Territory during the Contract Periods provided herein.

b. Limitations on Grant:

(1) Licensee shall not have the right to grant sublicenses of any or all of its rights under this Agreement unless it first obtains USPS' prior written consent to each sublicense, which consent shall not be unreasonably withheld.

(2) No license is granted hereunder for the use of the Licensed Properties for any purpose other than upon or in connection with the Licensed Articles.

(3) USPS licenses Licensee to use the USPS corporate signature identified in Licensed Properties only in connection with the sale of Licensed Articles displaying Licensing Properties that are stamp designs and only for the purpose of indicating that the use of the Licensed Properties are authorized by USPS.

(4) Except as set forth in the Underlying Agreement, nothing in this Agreement shall be construed to prevent USPS from granting any other licenses for the use of the Licensed Properties in any manner whatsoever.

(5) Licensee shall not sell or distribute the Licensed Articles in any country outside the Licensed Territory and will not knowingly sell the Licensed Articles to persons who intend or are likely (based on information known to Licensee) to resell them in any country outside the Licensed Territory. Notwithstanding the foregoing, Licensee may sell and ship Licensed Articles outside the Licensed Territory in response to orders placed via Licensee's website provided that no such individual order is for more than five (5) of any one Licensed Article.

(6) No license is granted hereunder for use of the Licensed Properties in connection with or on premium sales, close-outs, door-to-door, television sales (excluding home shopping television networks), infomercials, contest products, combination sales, or any similar methods of merchandising.

(7) USPS reserves any rights not expressly granted herein.

c. Licensee's Obligations:

(1) Licensee agrees to use its best efforts to sell, distribute and supply the Licensed Articles within the Licensed Territory. Licensee must begin the bona fide manufacture, distribution, and sale of the Licensed Articles on a Licensed Territory-wide basis on or before the date specified in the Underlying Agreement. Failure by the Licensee to timely engage in full and regular distribution and active marketing of the Licensed Articles is considered a material breach of this Agreement. If Licensed Articles are out of distribution in any country of the Licensed Territory for more than twelve (12) months, USPS may terminate the Agreement with respect to those specific Licensed Articles and country or countries of the Licensed Territories, at any time, in its sole discretion, and any and all rights in and to those Licensed Articles in those countries within the Licensed Territory revert immediately to USPS. If any rights with respect to some, but not all specific Licensed Articles or countries within the Licensed Territory shall revert to USPS pursuant to this paragraph, all of the remaining terms and conditions of this Agreement shall remain in full force and effect, including, but not limited to, payment of specified Royalty Payments and Guaranteed Minimum Annual Royalty.

(2) Licensee further undertakes to make and maintain adequate and reasonable arrangements for the distribution of Licensed Articles through the Channels of Distribution specified in the Underlying Agreement. Licensee agrees to maintain adequate inventories of the Licensed Articles as an essential part of its distribution program. All Close-outs shall be sold only through retail outlets and traditional and accepted dealers in such merchandise and upon such terms and conditions as USPS,

in its reasonable discretion, determines appropriate, and shall not be sold to any person or entity which Licensee knows, or has reason to know based on information known to Licensee, will export such Close-outs from the Licensed Territory.

3. **Term**: This Agreement shall be for the period set forth in the Underlying Agreement, unless sooner terminated in accordance with the terms and conditions set forth herein.

4. **Payment**:

a. Royalty Rate: Licensee agrees that it will pay USPS a non-refundable royalty equal to the percentage set forth in the Underlying Agreement on Licensee's Net Sales of Licensed Articles made during the Term of this Agreement, any extensions or renewals, and any Sell-off Period ("Royalty Payments").

b. Guaranteed Minimum Payment: Licensee agrees to pay USPS the Guaranteed Minimum Royalty set forth in the Underlying Agreement, according to the payment schedule set forth therein. The Guaranteed Minimum Royalty Payment is an advance against and is deducted from the Royalty Payments due during the Initial Term. No portion of the Guaranteed Minimum Royalty Payment is refundable under any circumstance. If this Agreement is terminated as a result of a material breach of the Agreement by Licensee, the greater of all Guaranteed Minimum Royalty Payments and/or earned Royalty Payments due for the remainder of the Initial Term of the Agreement and any agreed-upon renewals thereof shall immediately become due and payable.

c. Statements and Payments: On or before the fifteenth (15th) day of the month following each calendar quarter, Licensee shall submit a full, accurate, and detailed statement in the format outlined in Exhibit C, signed by an authorized officer of Licensee, and certified as accurate, and simultaneously shall make all payments thereon. Such statements and payments shall be made payable to the U.S. Postal Service Licensing Program at the address in the Underlying Agreement, with a copy to USPS's representative at the address in the Underlying Agreement. Interest shall be charged against Licensee at the rate of one and one-half percent (1½%) over the current prime rate (CitiBank) or the maximum rate permitted by law, whichever is lower, and shall accrue on each unpaid amount from the first day payment becomes due through the date of payment. Licensee hereby waives all claims to the return of any royalty payments once made, including but not limited to claims for refund of payments for returns of Licensed Articles in subsequent reporting periods. Licensee shall furnish such statements to USPS whether or not any Licensed Articles were sold during the Period.

d. Sales to the Postal Service: Licensee shall not be required to make royalty payments on sales of Licensed Articles to USPS, whether for promotional use or retail sale, but Licensee shall reduce the sales price paid by USPS by an amount equal to the royalty. Licensee shall identify all sales to USPS on its quarterly statements.

5. **<u>Approvals and Quality Control</u>**: USPS shall have the right to approve or disapprove the nature and quality of all products or services offered for sale under this Agreement, the appearance and use of all marks licensed under this Agreement, and the appearance and use of all advertising and promotion for the products or the marks covered by this Agreement, which approval shall not be unreasonably withheld.

a. <u>USPS Approval of Licensed Articles</u>: The styles, designs, packaging, contents, workmanship, and quality of all Licensed Articles and associate materials must be approved by USPS prior to the distribution or sale thereof. USPS maintains the right to take all reasonable actions which it deems necessary to ensure that Licensed Articles manufactured or sold hereunder are consistent with the high quality and reputation of the Licensed Properties.

b. <u>Licensee Compliance with Applicable Law</u>: All Licensed Articles shall be manufactured, sold, labeled, packaged, distributed, and advertised in accordance with all applicable laws and regulations.

c. <u>Delivery and Approval of Samples</u>:

(1) Licensee shall, before selling or distributing any Licensed Articles, furnish to USPS free of cost, for written approval, one each of concept art, final art, mock-ups, and prototypes of the Licensed Articles, and all designs which Licensee intends to use in connection with the Licensed Properties, to be followed by six (6) production samples of each Licensed Article, together with its Collateral Materials, and any additional samples as may be reasonably required. Licensee shall also submit all Promotional Materials for prior written approval by USPS. The Licensed Articles, Collateral Materials, and Promotional Materials shall be of a standard of quality,

appearance, and style approved in writing by USPS prior to any advertising, sales, distribution or use of same taking place. All approvals shall be solely at USPS' reasonable discretion, including that the item does not fit and/or reasonably support the imagery and equity of the Licensed Properties or the USPS.

(2) Any item submitted for approval shall be approved or disapproved within twenty (20) calendar days after receipt. USPS may extend the approval period an additional ten (10) calendar days by giving written notice to Licensee. Any disapproval shall include a written explanation of the reason(s) for the disapproval, and shall be without prejudice to Licensee's right to modify the item and re-submit it for review. If Licensee has not received approval or disapproval within the provided time frame, the submission shall be deemed disapproved. All approvals shall be solely at USPS' reasonable discretion, including that the item does not fit and/or reasonably support the imagery and equity of the Licensed Properties or the USPS.

(3) After samples of the Licensed Articles, Collateral Materials, and Promotional Materials have been approved pursuant to this paragraph, Licensee shall not depart therefrom without written consent by USPS. In the event there is a departure from the approved samples, USPS shall have the right in the reasonable exercise of its sole discretion to withdraw its approval of such Licensed Articles, Collateral Materials, or Promotional Materials or terminate this Agreement unless Licensee cures such breach within thirty (30) calendar days of written notice of same.

d. Use of Property: License shall not use any other trademark or design in combination with any Licensed Property on any Licensed Article without USPS' prior written approval. Licensed Articles shall not be sold or otherwise distributed by

Licensee under any mark other than the Licensed Properties. Licensee shall cause to appear on all Licensed Articles produced hereunder, and on their tags, packaging, and the like such legends, markings, disclaimers, and trademark and copyright notices as USPS may specify. Whenever Licensee reproduces the stamp designs set forth in Exhibits A and E, it must reproduce them in their entirety on the Licensed Articles and licensee shall make no alterations, additions, subtractions, or modifications to such stamp designs without USPS' prior written approval. If any such alterations, additions, subtractions, or modifications result in the creation of a new or derivative work within the meaning of copyright law, Licensee hereby assigns any and all rights to such works, including but not limited to any and all copyrights, to USPS.

6. **Confidentiality:** Any information or documents received or learned by Licensee in any form related to USPS's stamp program, future stamp images, or any postal programs or initiatives not publicly available, shall constitute Confidential Information. Until such time as Licensee releases a Licensed Article, the specific design features of the Licensed Articles shall constitute Confidential Information, but Licensee's identity and the general nature of the Licensed Articles shall not constitute Confidential Information. The parties are strictly prohibited from disclosing any Confidential Information. Failure to adhere to this requirement is a material breach of contract.

7. **Records:** Licensee agrees to keep accurate books of account and records covering all transactions relating to this Agreement. USPS and its duly authorized representatives shall have the right at all reasonable hours to examine such books of account and records in Licensee's possession or under its control with respect to the subject matter and terms of this Agreement, and shall have free and full access thereto

for such purposes and for the purpose of making copies thereof. All such books of account and records shall be kept available for at least three (3) years after the termination of this Agreement. Licensee further agrees, in order to facilitate inspection of its books and records with respect to amounts due, that it will designate a symbol or number that will be used exclusively in connection with Licensed Articles and with no other articles which Licensee may manufacture, sell or distribute. In the event that USPS or USPS' duly authorized representatives shall discover a discrepancy in favor of USPS of six percent (6%) or more on any Royalty Statement, Licensee shall pay to USPS the reasonable cost of such examination. The fee for said examination shall be Five Hundred Dollars ($500) per day, but in no event shall Licensee be charged in excess of Three Thousand Dollars ($3000) for any individual examination.

8. **Intellectual Property Rights:**

a. Licensee recognizes the great value of the goodwill associated with the Licensed Properties and acknowledges that all rights therein and goodwill attached thereto belong exclusively to USPS, and that all use of the Licensed Properties will inure to the benefit of USPS.

b. USPS may seek, in its own name and at its own expense, appropriate trademark and/or copyright protection for the Licensed Properties. USPS shall retain all right, title, and interests in the Licensed Properties, including any modifications or improvements made to the Licensed Properties by Licensee, but expressly excluding any calendar design developed by Licensee for use with the Licensed Articles provided that such design does not incorporate or include the Licensed Properties or any

designation, insignia or mark which is the same as or confusingly similar to the Licensed Properties.

c. In the event Licensee requests that USPS obtain copyright, trademark, or other such protection for a particular item or in a particular country where USPS had not heretofore obtained such protection, USPS agrees to take reasonable steps to obtain such protection, provided, however, that Licensee shall reimburse USPS for the costs of filing, prosecuting, and maintaining same. Nonetheless, USPS shall own such copyright, trademark, or other such protection for a particular item or in a particular country and License shall make any assignments of rights to USPS necessary to transfer ownership of such copyrights, trademarks or other protection to USPS.

d. Licensee agrees that, during the term of this Agreement or thereafter, Licensee will not contest, harm, misuse, or bring into disrepute any of USPS's rights, in and to the Licensed Properties, or contest the validity of this Agreement. Licensee acknowledges and agrees that USPS would not have an adequate remedy at law and would be irreparably harmed in the event Licensee were to misuse, harm, or bring into disrepute any of USPS' Licensed Properties or if Licensee were to breach any term of this Agreement concerning the proper use of the Licensed Properties.. Accordingly, it is agreed that, in the event of any breach or threatened breach of this paragraph or any term or condition of this Agreement concerning the proper use of the Licensed Properties, USPS, in addition to any other remedies at law or in equity, shall be entitled to equitable relief, including but not limited to immediate injunctive relief without the requirement of posting a bond or other security and without resorting to Arbitration herein.

9. **Termination:**

a. Without prejudice to any other rights, and in addition to any termination rights provided elsewhere in this Agreement, USPS shall have the right to terminate this Agreement upon written notice to Licensee at any time if:

(1) Licensee shall fail to make any payment due hereunder, which such payment is not in dispute, or to deliver any of the statements herein referred to, and if such default shall continue for a period of ten (10) calendar days after written notice of such default is given in accordance with Section 17, below;

(2) Licensee shall fail to perform any other material term or condition of this Agreement and, unless otherwise provided herein, does not cure such failure within thirty (30) calendar days after written notice is given in accordance with Section 17, below; or

(3) Licensee files a petition in bankruptcy, or is adjudicated a bankrupt, or if a petition in bankruptcy is filed against Licensee, or if Licensee becomes insolvent, or makes an assignment for the benefit of its creditors or an arrangement pursuant to any bankruptcy law, or if Licensee discontinues its business, or if a receiver is appointed for Licensee or its business. In the event this Agreement so terminates, neither Licensee nor its receivers, representatives, trustees, agents, administrators, successors, and/or assigns shall have any right to manufacture, distribute, sell, exploit or in any way deal with any of the Licensed Articles except with and pursuant to USPS' prior written consent.

b. Licensee shall have the right to terminate this Agreement upon thirty (30) days prior written notice to USPS given in accordance with Section 17, below, if USPS

shall fail to perform any material term or condition of this Agreement unless, within the notice period, USPS cures the breach or provides Licensee with notification that the breach cannot reasonably be cured within that period and provides reasonable assurances that the breach will be cured in a period acceptable to Licensee.

c. Termination of this license under the provisions of this paragraph shall be without prejudice to any rights that either party may otherwise have against the other party.

d. Upon the termination of this Agreement by USPS, notwithstanding anything to the contrary herein, all royalties on sales theretofore made shall become immediately due and payable and no Royalty Payments and Guaranteed Minimum Royalties shall be repayable, and any balances owed on Guaranteed Minimum Royalties shall be immediately due and payable. Notwithstanding any termination or expiration of this Agreement, USPS shall have and hereby reserves all rights and remedies which it has or which are granted to it by operation of law, to enjoin the unlawful or unauthorized use of the Licensed Properties.

10. **Disposal of Stock/Sell-Off Period:**

a. After expiration or termination of this Agreement, Licensee shall have no further right to manufacture, advertise, distribute, sell, or otherwise deal in any Licensed Articles except as hereinafter provided.

b. It is specifically understood that Licensee shall not sell or dispose of any such Licensed Articles in job lots at reduced prices, other than is customary in the ordinary course of business.

c. After expiration or termination of this Agreement, the parties shall follow the procedures set forth below:

(1) Licensee shall prepare a complete, written inventory list and submit same to USPS within ten (10) days of the expiration or termination of this Agreement. Such list must include orders on hand, work in process, and finished Licensed Articles.

(2) USPS shall have thirty (30) days thereafter to decide whether to purchase any or all inventory at the lower of Licensee's cost or fair market value. If USPS exercises such right of purchase, Licensee shall deliver the inventory referred to in USPS' notice of purchase within ten (10) days after USPS' said notice with the exception of inventory necessary to fulfill orders on hand. USPS shall pay Licensee for such delivered inventory as is in marketable condition within thirty (30) days after its receipt thereof.

(3) If USPS does not elect to purchase any or all of the inventory as set forth above, Licensee, on a non-exclusive basis, may dispose of Licensed Articles which are on hand or in process at the time of such expiration or termination, for a period of not more than ninety (90) days thereafter, provided all royalty payments with respect to that ninety (90) day period are made in accordance with provisions herein. Licensee shall have no right to dispose of Licensed Articles if this Agreement is terminated under Paragraphs 9.a.1, 9.a.3 or 9.a.4 herein.

d. Except as specifically provided in this Agreement, on the expiration or termination of this Agreement, all of the rights of Licensee under this Agreement shall terminate herewith and shall revert immediately to USPS. All royalties on sales made shall become immediately due and payable, and Licensee shall discontinue all use of

the Licensed Properties and shall promptly transfer to USPS, free of charge, all registrations, filings and rights with regard to the Licensed Property which Licensee may have possessed at any time. The underlying rights, including but not limited to any and all trademarks and copyrights to all artwork, photographs, drawings, illustrations, forms, patterns and similar items developed by Licensee in the manufacture, sale or distribution of Licensed Articles, are the property of USPS.

11. **Dispute Resolution:** If a dispute arises out of or relates to this Agreement, or the breach thereof, and if the dispute cannot be settled through direct discussions, the parties agree first to endeavor to settle the dispute in an amicable manner by negotiation between the parties at the level of contracting officer. If the dispute cannot be settled at that level within 30 calendar days of the start of such negotiations, then the parties may, by mutual agreement, conduct a non-binding mediation proceeding under such rules and procedures as they may agree upon. Thereafter, any unresolved controversy or claims arising out of or relating to the Agreement, or the breach thereof, may be brought by a party in the appropriate judicial forum as further defined herein.

12. **Consent To Jurisdiction:** With respect to any suite, action or other proceeding relating to the Agreement that has not been resolved by negotiation or mediation (collectively "Proceedings"), the parties each irrevocably submit to the exclusive personal jurisdiction of the United States District Court for the District of Columbia and waive any objection that it may have at any time to the laying of venue of any Proceedings brought in such court, waive any claims that such Proceedings have been brought in an inconvenient forum and further waive claims the right to object, with

respect to such Proceedings, that such court does not have personal jurisdiction over such party.

13. **Choice Of Law:** This Agreement shall be governed by and construed in accordance with principles of federal common law, or if there is found to be no such common law, then the law of the State of New York. Further, the parties each agree and acknowledge that neither the provisions of the USPS Purchasing Manual nor the Contract Disputes Act of 1978, 41 USC §601 et seq., shall apply to this Agreement, and the parties waive any and all express and implied remedies, recourse or administrative procedures provided or created thereby.

14. **Indemnification:** Excluding claims based upon use of those Licensed Properties identified by USPS in Exhibit E as being wholly owned, Licensee agrees to defend, indemnify and hold USPS and/or any of its agents and assignees harmless against any and all claims, demands, causes of action, liability, loss, damage, judgments or expense (including reasonable attorneys' fees and court costs) arising out of Licensee's design, manufacture, distribution, shipment, labeling, sale, distribution, advertisement, or promotion of the Licensed Articles or the labeling, packaging, advertising and promotional materials for the Licensed Articles. USPS shall have the right to defend any such claim or suit through counsel of its own choice.

15. **Insurance:** Licensee shall, throughout the term of this Agreement, including extensions, and for a period of two (2) years thereafter, obtain and maintain at its own cost and expense a third-party liability insurance policy with a recognized insurance carrier acceptable to USPS (such acceptance not to be unreasonably withheld), naming USPS and Equity Management Inc. ("EMI") as "Additional Named Insureds" or the like,

including a waiver of subrogation in favor of USPS and EMI. The amount of coverage shall be in accordance with the amount set forth in the Underlying Agreement. This insurance shall provide for at least sixty (60) days prior written notice to USPS and Licensee of the cancellation or any material change or modification in the terms and conditions of the policy. Licensee shall, not more than thirty (30) days after the signing of this Agreement and, thereafter, from time to time upon reasonable request by USPS, promptly furnish to USPS the requisite certificates of insurance, or, upon USPS's request, certified copies of said insurance policies, satisfactory to USPS, as to the maintenance of the insurance described above. Licensee shall not distribute or sell the Licensed Articles prior to receipt by USPS of such evidence of insurance.

16. **Renewal:** Until three (3) months prior to the expiration of the Initial Term of the Agreement, Licensee shall have the option to renew this Agreement for the First Renewal Term provided in the Underlying Agreement. Any renewal pursuant to this paragraph is subject to the following conditions: (i) this Agreement has not been terminated in accordance with the provisions hereof, and (ii) Licensee has met the conditions set forth in Exhibit D.

17. **Notices:** All notices and statements to be given and all payments to be made hereunder, shall be given or made at the respective addresses of the parties as set forth in the Underlying Agreement unless notification of a change of address is given in writing. Any notice shall be sent by registered or certified mail, and shall be deemed to have been given on the third business day after it is mailed.

18. **Joint Ventures:** Nothing herein contained shall be construed to place the parties in the relationship of partners or joint venturers or agents, and neither party shall have

the power to obligate or bind the other party in any manner whatsoever. Licensee warrants that no person or selling agency has been employed or retained to solicit or secure this Agreement upon an agreement or understanding for a commission, percentage, brokerage or contingent fee, excepting bona fide employees or bona fide established commercial or selling agencies maintained by Licensee for the purpose of securing business. For breach or violation of this warranty, USPS shall have the right to terminate this Agreement without liability or in its discretion, to recover the full amount of such commission, percentage, brokerage or contingent fee. No member of, or delegate to Congress, or resident commissioner, shall be admitted to any share or part of this Agreement or to any benefit that may arise therefrom; but this prohibition shall not be construed to extend to this Agreement if made with a corporation for its general benefit.

19. **Enforcement of Licensed Properties:**

a. Licensee agrees to cooperate with and assist USPS in protecting and enforcing USPS' rights to the Licensed Properties. Licensee shall promptly inform USPS of any infringement or other violations of the Licensed Properties that come to its attention. USPS shall have the sole right at its own expense to determine whether or not any action shall be taken on account of any such infringement or violations. USPS shall receive all amounts awarded as damages, profits, settlement proceeds or otherwise in connection with such claims or suits.

b. Licensee agrees not to contest or otherwise challenge or attack USPS' rights in the Licensed Properties or the validity of the license granted herein during the term of this Agreement and thereafter. Licensee further agrees not to do anything either by act of omission or commission that might impair, jeopardize, violate or infringe the Licensed Properties, or to misuse or bring into dispute the Licensed Properties.

c. Licensee shall not use any of the Licensed Properties as part of its company name, corporate name or trade name, and shall not attempt to register any of the Licensed Properties or confusingly similar marks or substantially similar designs in the Licensed Territory or elsewhere during the term of this Agreement or thereafter, or aid or abet anyone else in doing so.

d. The administrative and judicial defense of the Licensed Properties in the Licensed Territory shall be undertaken solely by USPS. Licensee agrees to furnish USPS or its designated legal representative with all proof and commercial, technical or other information or assistance required and which Licensee is able to furnish, as well as such other assistance as USPS or its lawyers may reasonably require for this purpose. Licensee shall, if requested by USPS, join USPS in the aforementioned administrative and judicial defense of the Licensed Properties, the cost of which shall be borne exclusively by USPS.

e. Licensee agrees to cooperate with USPS in any effort that USPS may deem advisable to record Licensee as a registered user or the like. Upon expiration or termination of this Agreement for any reason, Licensee shall similarly cooperate with USPS in expunging any such recordations that may exist. All expenses associated with such recording and expungement of recordations shall be borne by USPS.

20. No Assignment: This Agreement shall be binding upon and inure to USPS and its successors and assigns, but may not be assigned, transferred, or delegated by Licensee in whole or in part with respect to any right or obligation herein without the prior written consent of USPS, which consent shall not be unreasonably withheld. Any assignment without USPS consent shall be void. A transfer of the legal and/or beneficial ownership, whether by operation of law or otherwise, of more than 25% of the voting equity of Licensee (other than transfers of voting equity among the present shareholders or owners of Licensee) shall be deemed an assignment or transfer of the license hereunder that shall require the prior written consent of USPS.

21. Force Majeure: It is understood and agreed that in the event that an act of the government, or war conditions, or fire, flood or labor trouble in the factory of Licensee or in the factory of those manufacturing Licensed Articles, prevents the performance by Licensee of the provisions of this Agreement, then such nonperformance by Licensee shall not be considered as grounds for breach of this Agreement and such nonperformance shall be excused while the conditions herein prevail and for two (2) months thereafter.

22. **Miscellaneous:** This Agreement constitutes the entire Agreement and understanding between the parties hereto and terminates and supersedes any prior Agreement or understanding relating to the subject matter hereof between USPS and Licensee. USPS and Licensee are not relying upon any statements, warranties, or representations except those contained in this Agreement. The paragraph and other headings contained herein are for reference purposes only and will not affect the meaning of interpretation of this Agreement. None of the provisions of this agreement can be waived or modified except in writing signed by both parties, and there are no representations, promises, agreements, warranties, covenants or undertakings other than those contained herein.

23. **No Reliance On Other Representations**: The parties have not relied on any representations, promises, warranties, covenants, statements, or undertakings by the other party or its counsel other than those contained in this Agreement.

24. **Time Is Of The Essence**: Time is of the essence in this Agreement.

**Concurrence (Initial)** ____________

## EXHIBIT C -- FORM OF ROYALTY STATEMENTS

EQUITY MANAGEMENT INC.

SALES AND ROYALTY REPORT

**To:** Equity Management Inc.
Attn: Contract Administration
4365 Executive Dr., Suite 1000
San Diego, CA 92121

**From:** (Licensee) ____________________

**Equity:** (Licensor) ____________________

**Licensed Territory:** ____________________
(Report required for each country in which the Licensed Products were sold)

**Quarter:** From: ____________ To: ____________

| (a) Item No. | (b) Description | (c) Unit Price | (d) Units Sold | (e) Total Unit Sales |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| (f) | Totals | | | |

(g) Royalty Rate ________%; Total Earned Royalties $ ________
(h) Unapplied Advance at Quarter Start $ ________
(i) Difference; Subtract (h) from Line (g) $ ________
(j) Annual Guaranteed Royalties (divided by 4) $ ________
(k) Payment Accompanying this Report $ ________
(pay greater of Line (i) or (j)) ________

The above Report is certified to be true and correct by the above named Licensee

By: ____________________
Name: ____________________
Title: ____________________
Date: ____________________

USPS

1035

## EXHIBIT D -- RENEWAL TERMS

Type of Renewal: Automatic

Renewal Hurdle Minimum:

Licensee's Net Sales during the four quarters beginning 10/1/03 and ending 9/30/04 must generate a minimum of $60,000 in earned royalties in order for Licensee to qualify for an automatic renewal.

Number of Renewals: One

Renewal Term: Three Years

Special Renewal Conditions: Not Applicable

Renewal Term Earned Royalty Percentages: 8% of Net Sales.

Guaranteed Minimum Royalties:

The following Guaranteed Minimum Royalties for the Renewal Term shall be paid in equal quarterly installments:

| | | |
|---|---|---|
| Contract Period 4 | 1/1/05 – 12/31/05 | The greater of $60,000 or 75% of the royalties due for Contract Period 3. |
| Contract Period 5 | 1/1/06 – 12/31/06 | The greater of $70,000 or 75% of the royalties due for Contract Period 3. |
| Contract Period 6 | 1/1/07 – 12/31/07 | The greater of $80,000 or 75% of the royalties due for Contract Period 3. |

Renewal Licensed Properties:

Licensee shall submit to USPS by no later than July 1, 2004, a list of the 270 wholly-owned stamp designs that Licensee desires to use on the Licensed Articles during the Renewal Term. Said list must be in the form of the list set forth in Exhibit E. Approval of the list is in the sole discretion of the USPS. USPS shall notify Licensee of its decision concerning the list within 90 days of receipt thereof.

EXHIBIT E - STAMP DESIGNS

| Scott Catalog Number | Description | STATUS |
|---|---|---|
| 118 | Columbus Landing | Unknown |
| 121 | Shield, Eagle & Flag | Unknown |
| 805 | Martha Washington | Unknown |
| 873 | Booker T. Washington | Unknown |
| 902 | Thirteenth Amendment | Unknown |
| 929 | IWO Jima | Unknown |
| 948 | 100th Anniversary USP Stamp | Unknown |
| 967 | Clara Barton | Unknown |
| 972 | Indian Centennial | Unknown |
| 973 | Rough Riders | Unknown |
| 974 | Juliette Gordon Low | Unknown |
| 1051 | Susan B. Antony | Unknown |
| 1052 | Patrick Henry | Unknown |
| 1063 | Lewis & Clark Expedition | Unknown |
| 1074 | Booker T. Washington Home | Unknown |
| 1093 | School Teachers | Unknown |
| 1099 | Religious Freedom | Unknown |
| 1113 | Lincoln | Unknown |
| 1119 | Freedom of the Press | Unknown |
| 1154 | Pony Express | Unknown |
| 1155 | Employ the Handicapped | Unknown |
| 1178 | Fort Sumter | Unknown |
| 1179 | Shiloh | Unknown |
| 1180 | Gettysburg | Unknown |
| 1182 | Appomattox | Unknown |
| 1213 | George Washington | Unknown |
| 1236 | Eleanor Roosevelt | Unknown |
| 1239 | International Red Cross | Unknown |
| 1264 | Winston Churchill | Unknown |
| 1267 | Salvation Army | Unknown |
| 1285 | Albert Einstein | Unknown |
| 1290 | Frederick Douglass | Unknown |
| 1312 | The Bill of Rights | Unknown |
| 1344 | Register and Vote | Unknown |
| 1372 | W.C. Handy | Unknown |
| 1385 | Hope for the Crippled | Unknown |
| 1421 | Disabled American Veterans | Unknown |
| 1422 | US Serviceman | Unknown |
| 1438 | Prevent Drug Abuse | Unknown |
| 1439 | Care | Unknown |
| 1463 | PTA | Unknown |
| 1483 | Boston Tea Party (4) | Unknown |
| 1486 | Henry Ossawa Tanner | Unknown |

1037

1

Concurrence (Initial)

EXHIBIT E - STAMP DESIGNS

| | | |
|---|---|---|
| 1549 | Retarded Children | Unknown |
| 1554 | Paul L. Dunbar | Unknown |
| 1560 | Salem Poor | Unknown |
| 1595 | Liberty Bell | Unknown |
| 1686 | The Surrender of Lord Cornwalls at Yorktown | Unknown |
| 1687 | The Declaration of Independence, 4 July 1776 | Unknown |
| 1688 | Washington Crossing the Delaware | Unknown |
| 1689 | Washington Reviewing His Ragged Army | Unknown |
| 1726 | Members of Continental Congress | Unknown |
| 1744 | Harriet Tubman | Wholly Owned |
| 1787 | Seeing Eye Dog | Wholly Owned |
| 1788 | Special Olympics | Unknown |
| 1802 | Vietnam Veterans | Wholly Owned |
| 1804 | Benjamin Banneker | Unknown |
| 1824 | Helen Keller | Unknown |
| 1860 | Ralph Bunche | Unknown |
| 1865 | Charles Drew | Unknown |
| 1875 | Whitney Moore Young | Unknown |
| 1910 | American Red Cross | Unknown |
| 1926 | Edna St. Vincent | Unknown |
| 1927 | Alcoholism | Wholly Owned |
| 2039 | Voluntarism | Wholly Owned |
| 2044 | Scott Joplin | Unknown |
| 2073 | Carter G. Woodson | Unknown |
| 2103 | Hispanic Americans | Wholly Owned |
| 2109 | Vietnam Veterans | Wholly Owned |
| 2137 | Mary Mclead Bethume | Unknown |
| 2152 | Korean War Veteras | Unknown |
| 2153 | Social Security Act | Wholly Owned |
| 2154 | WWI Veterans | Wholly Owned |
| 2159 | Public Education | Wholly Owned |
| 2164 | Help End Hunger | Wholly Owned |
| 2168 | Margaret Mitchell | Unknown |
| 2169 | Mary Lyon | Unknown |
| 2203 | Sojourner Truth | Wholly Owned |
| 2211 | Duke Ellington | Unknown |
| 2216 | Presidents - sheet of 9 | Wholly Owned |
| 2217 | Presidents - sheet of 9 | Wholly Owned |
| 2218 | Presidents - sheet of 9 | Wholly Owned |
| 2219 | Presidents - sheet of 9 | Wholly Owned |
| 2223 | Matthew Henson | Wholly Owned |
| 2224 | Statue of Liberty | Unknown |
| 2249 | Pointe Du Sable | Wholly Owned |
| 2275 | United Way | Unknown |
| 2336 | Delaware | Wholly Owned |
| 2337 | Pennsylvania | Wholly Owned |
| 2338 | New Jersey | Wholly Owned |

1038



Concurrence (Initial)

EXHIBIT E - STAMP DESIGNS

| | | |
|---|---|---|
| 2339 | Georgia | Wholly Owned |
| 2340 | Connecticut | Wholly Owned |
| 2341 | Massachusetts | Wholly Owned |
| 2342 | Maryland | Wholly Owned |
| 2343 | South Carolina | Wholly Owned |
| 2344 | New Hampshire | Wholly Owned |
| 2345 | Virgina | Wholly Owned |
| 2346 | New York | Wholly Owned |
| 2347 | North Carolina | Wholly Owned |
| 2348 | Rhode Island | Wholly Owned |
| 2360 | Constitution Signing | Wholly Owned |
| 2371 | James Weldon Johnson | Unknown |
| 2567 | Jan E. Matzellger | Unknown |
| 2616 | World Columbian | Wholly Owned |
| 2620 | Seeking Queen Isabella's Support | Wholly Owned |
| 2624 | First Sighting of Land | Wholly Owned |
| 2625 | Claiming a New World | Wholly Owned |
| 2626 | Seeking Royal Support | Wholly Owned |
| 2627 | Royal Favor Restored | Wholly Owned |
| 2628 | Reporting Discoveries | Wholly Owned |
| 2629 | Christopher Columbus | Wholly Owned |
| 2765 | WWII Turning the Tide | Wholly Owned |
| 2818 | Buffalo Soldiers | Wholly Owned |
| 3081 | Breast Cancer Awareness | Wholly Owned |
| 3121 | Benjamin O. Davis, Sr. (only as stamp)+C59 | Wholly Owned |
| 3125 | Helping Children Learn | Wholly Owned |
| 3136 | Dinosaurs | Wholly Owned |
| 3139 | Ben Franklin | Wholly Owned |
| 3175 | Kwanzaa | Wholly Owned |
| 3315 | Prostate Cancer | Wholly Owned |
| 1631a | Fife Player | Unknown |
| 2359a | Const. Bicentennial Issue | Wholly Owned |
| 2623a | First Voyage of Christopher Columbus | Wholly Owned |
| 2782a | 4 Sheet National Postal Museum | Wholly Owned |
| 2869q | Jim Beckwourth | Wholly Owned |
| 2966 | Prisoners | Wholly Owned |
| 2975b | Robert E. Lee | Wholly Owned |
| 2975c | Clara Barton | Wholly Owned |
| 2975d | Ulysses S. Grant | Wholly Owned |
| 2975e | Battle of Shiloh | Wholly Owned |
| 2975f | Jefferson Davis | Wholly Owned |
| 2975h | Frederick Douglass | Wholly Owned |
| 2975j | Abraham Lincoln | Wholly Owned |
| 2975k | Harriet Tubman | Wholly Owned |
| 2975m | Joseph E. Johnston | Wholly Owned |
| 2975o | Mary Chesnut | Wholly Owned |
| 2975p | Battle of Chancecellorville | Wholly Owned |

1039

Concurrence (Initial)

EXHIBIT E - STAMP DESIGNS

| | | |
|---|---|---|
| 2975q | William T. Sherman | Wholly Owned |
| 2975s | Stonewall Jackson | Wholly Owned |
| 2975t | Battle of Gettysburg | Wholly Owned |
| 3011a | Christmas | Wholly Owned |
| 3183b | Fed Res. System Eagle | Wholly Owned |
| 3183c | Dr. George Washington Carver | Wholly Owned |
| 3183i | Uncle Sam | Wholly Owned |
| 3183o | Child Labor Reform | Wholly Owned |
| 3185d | Eleanor Roosevelt | Wholly Owned |
| 3187f | School Desegregation Public | Wholly Owned |
| | Insects & Spiders (13) | Wholly Owned |
| E4 | Messenger Running | Unknown |
| E20 | Special Delivery | Unknown |

1040



Concurrence (Initial)

# October 1999

# UNSOLICITED PROPOSAL

## Proposal

To develop an Official U.S. Postal Services Calendar collections and Accessories for commercial sale through the U.S. Postal Service (USPS) Departments, Post Offices, account representatives and through the USPS Official merchandise web site.

## Introduction:

The proposed Official U.S. Postal Service Calendar Collection will consist of five distinctive categories representing the U.S. Postal Service history. The first five categories will consist of 1) USPS Historical Collection, 2) National and State, 3) Black Heritage, 4) USPS Commemorative Stamps including a Children's Edition and 5) The Centuries/Decade Collection. All calendar series will include special events, historical portraits, and significant dates, buildings, and individuals that have served the USPS or that have been honored as a U.S. postal stamp. The calendar collection will be professionally developed with the USPS seal and a six-digit number identifying production sequence and authentication. Each month will highlight significant USPS dates, events, as well as holidays. The calendar collection will have a ten-year reproduction period with a continuing series number starting from the last calendar printed ten years earlier.

Each category collection will have its own exclusive design features representing USPS contributions. The front calendar cover will depict one of the five distinctive categories. The back section of the calendar contains a wealth of historical information, such as "Did You Know", VIP's, significant dates and

events, Address and Phone Number section, Post Offices data listed by states and regions.

## Calendar Collections:

1) **Historical Collection**: This collection will feature 12 months of historical photos including the early years, before it was called the U.S. Post Office or the West was won. Each photograph will display a significant event, building, or individual that contributed to the history of the Postal Service and will include a written account of its history and importance in shaping the USPS. Utilizing the USPS historical archive to gain the most accurate information, the Historical Collection will provide consumers of all ages with an education on the origin of the USPS and its significant contributions in shaping America.

2) **National & State Collections**: The National collections will be distinctively presented with national USPS factors from the earlier periods up today's USPS national contributions with the State collection following suite as an independent representation of USPS state heritage. The National calendar will feature 12 months of events, buildings, stamps and individuals that have contributed to the USPS from a national respective. Every chapter of the USPS hortory as told through people, places and things that represent the national pride and respect that comes will the USPS. The State collection will capture and remind American citizens of their state contributions to the USPS. The calendar will manifest state monuments of past and present, buildings and even battlefields where USPS men and women risked their lives, and sometime death delivering the mail to American soldiers. The focus of the State calendar is to be all inclusive of the United States as one nation yet individually contributing to the development of the USPS.

3) **Black Heritage Collection:** The Black Heritage collection will be one of the most sought after collections from the five Calendar series. The 12 month calendar will feature historical portraits and documented records of African Americans who have been honored by the USPS in their series of Black Heritage stamps, listed in the USPS National register and those less known African American who have made significant contributions to the USPS

4) **Stamp Collection**: The Stamp Collection calendar will feature 12 commemorative USPS portrait stamps. Each portrait will include the history behind each selected stamp, how and when it came to be a commemorative US stamp. The Stamp Collection will be suitable for framing or as a limited edition stamps series for postal historians. The Collection will include important people, events, places and/or subjects of national appeal or significance to the USPS. Stamps of unexpected value and significance known only to Collectors to spectacular national heritage. Each year there will be at least three categories in limited editions of Official Commemorative Stamp Calendars for sale.

5) **The Centuries/Decade Collection:** The Century Collection will cover across section of important people and events that contributed and impacted the USPS. Each decade within the featured century (1700, 1800, 1900, etc.) will bring out the USPS history for that decade through documented accounts and thought provoking photos. This collection will pull its audience into the century/decade with a desire to take notice and learn more.

I.

## II. MARKETING APPROACH

The vision to create and develop an Official United States Calendar came from visiting three Post Offices within the local metro area. The idea was sparked by the need, while in each Post Office, to identify days of the month for letter/package arrival, certification, postmark and other days, but could not find a calendar nowhere in any of the local facilities. From that the idea was born that the USPS could benefit from adding to their products and service an official calendar. The objective is to educated Americans and the free world about significant USPS contributions, communicate through art and photos, increase the USPS image as a high quality dedicated public services organization and most of all increase sales revenue.

For over three months a team of observers visited 50 US Post Offices throughout the southeast to see if there was a US postal calendar displayed in each Post Office and secondly, to observe customer activity (customer traffic, purchasing habits and heterogeneous grouping). In 82 percent of the USPS facilities visited, no calendars were visible for public use. In 18 percent of the Post Offices visited there was a variety of local commercial calendars, which included drug store advertisement to farming equipment sales calendars. There was no consistency or an identified purpose in those calendars representing the USPS.

After analyzing preliminary market data, Sterling, Winchester & Long conducted a more defined market study to ascertain customer desire and sales data. A ten-question questionnaire was develop to survey the individuals and businesses (see attachment I). The market analysis delineated potential customers that would purchase an Official USPS Calendar into four categories: 1) Families with school age children, 2) Historians and Collectors 3) Individuals and ethic groups, Commercial Businesses and Non-profit organizations and 4) Internet users that purchase products over the web. With the identification of market demographic research information was collected through telephone and face to face interviews and through the Internet.

All participants were asked the ten survey questions. The purpose of the market study was to determine if there was an interest for the subject product, USPS consumer habits and the price range consumers were willing to pay.

To gain a better understanding of consumer post office visits and purchase activity a five question survey was conducted with Post Masters and attendance in cities covering three southeastern states.

**(1)**

# Market Projection Analysis

The market survey analysis focused on customer frequency visits to their local Post Office, purchasing behavior (at local Post Office and on the web), consumer interest in an Official USPS Calendar and what value would consumers place on such a product.

Of the 250 individual surveyed 48 percent visited their local or a Post Office 2 to 3 times a week, 19.5 percent said that they visited the local Post Office 4 or more times a week. When asked what day of the week you are most likely to visit the Post Office 51 percent said Saturday and 38 percent said Monday was the most likely day they visited the Post Office. Only 33 percent of the individuals surveyed had made a merchandise display item purchase, such as Superman or Walt Disney Products.

Survey question 7 " From the four USPS items listed below, (1. USPS Key Chain and Pen, 2. Superman or Walt Disney Products, 3. Official US Postal Calendar and 4. US Postal Service Monthly Magazine) which one would you purchase if available to the public" defines the purpose of conducting the market survey. Of the 250 individuals polled 153 or 61.4 percent selected item 3. **Official US Postal Calendar,** indicating that they would buy an Official US Postal Calendar if available. Without the benefit of having a visual picture of what an Official US Postal Calendar would look like 31 percent said that they would pay $10.00 or less and 18 percent indicated that they would pay $10.00 or more for such an official calendar.

Extrapolating from the market study information, the number of Post Offices in the US (28,000) and the estimated customer visitors per day, it is estimated that18,480,000 (Point of Sale (POS)) calendars would be sold during a twelve week peak period (Nov.15th thru. Feb. 15th). Taking a conservative approach, injecting a 15 percent error rate in the data provided and considering production volume (Limited Additions), 65 percent of the estimated POS number was used as a bases calculating annual revenue projections.

A recent independent study of home internet use by Price Water House revealed that 43 percent of US homes were internet users, a 60 percent increase from last year internet home usage. From the population we surveyed, 33 percent said that they would use the Internet to purchase USPS products. When the survey results were delineated by geographic location the Internet usage and willingness to purchase USPS products over the web percentage increase in large populated metro areas.

Based on preliminary market data (internet usage and an estimated 12,012,000 POS calendars sold in 2000), and the implementation of an aggressive calendar sales campaign, using the POS as a base, it is projected that 23.5 percent or 2,822,820 calendar will be sold over the Web in year 2000 (12/99 thru. 4/99). In addition to calendars hardback sales, electric USPS calendars and related Accessories will be sold over the Web.

Because of the limited time remaining introduce, market and produce the USPS year 2000 calendar, and considering that most commercial businesses have already

budgeted and ordered year 2000 office calendars, Account Officer sales should be moderate at an estimated 100,000 for the year. After the market has been fully saturated with the product, Account Officer sales should increase by 50 percent in year 2001 and continue to rise thereafter.

HEADQUARTERS PURCHASING
UNSOLICITED PROPOSAL PROGRAM

UNITED STATES
POSTAL SERVICE

December 3, 1999

Mr. Long
Sterling Winchester & Long
P O Box 211299
Martinez GA 30907-9998

Dear Mr. Long:

Thank you for your interest in our Unsolicited Proposal Program. We are unable to accept your proposal as it is currently submitted. Enclosed is the material that will assist you in your efforts to do business with the Postal Service.

The Postal Service requires that a signed Confidential Disclosure Waiver accompany all proposals. Publication 131, Submitting Unsolicited Proposals to the Postal Service will give you a better understanding of the program. If after reading the information, you determine you have an unsolicited proposal, submit it in the format outlined in the pamphlet. The Confidential Disclosure Waiver, attached to the pamphlet, must be completed and returned with your proposal.

Unsolicited proposals by definition of the Postal Service are offers to sell the Postal Service the rights to ideas, concepts, products, processes or technology. They are considered unsolicited because they are not submitted in response to a solicitation or request for proposals.

Thank you for your interest in the US Postal Service.

Barbara L. Tutt
Unsolicited Proposals Coordinator

Enclosure 268-4145

01/09/02 10:00 FAX 858 558 2504 EQUITY MANAGEMENT 001

*********************
*** TX REPORT ***
*********************

TRANSMISSION OK

| | |
|---|---|
| TX/RX NO | 0885 |
| CONNECTION TEL | 12148197125ppp4044 |
| SUBADDRESS | |
| CONNECTION ID | USPS DALLAS P&MS |
| ST. TIME | 01/09 10:00 |
| USAGE T | 00'35 |
| PGS. SENT | 2 |
| RESULT | OK |

# EQUITY MANAGEMENT INC.®

## FACSIMILE

*4365 Executive Drive, Suite 1000*
*San Diego, CA 92121*

*858 558-2500 x 112*
*858 558-2507 FAX*

| ATTENTION | COMPANY | FAX NUMBER |
|---|---|---|
| Ms. Robin Pacheco<br>Contracting Officer | USPS<br>Dallas, Texas | 214.819.7125 |

Total pages: 2, including this page

Date: January 9, 2002

From: Robin M. Stemen
Associate Counsel

**Re: Sterling, Winchester & Long/Millennium Calendar 2000 Unsolicited Proposal**

Please see attached copy of the above-referenced letter dated July 14, 2000.

II Exhibit for identification No. 29
Frauke Kuo, N.P.
Date: 4/26/06
Deponent: R. STEMEN

2113 SWL 29

PLAINTIFF'S EXHIBIT 29

# EQUITY MANAGEMENT INC.®

## FACSIMILE

*4365 Executive Drive, Suite 1000*
*San Diego, CA 92121*

*858 558-2500 x 112*
*858 558-2507 FAX*

| ATTENTION | COMPANY | FAX NUMBER |
|---|---|---|
| Ms. Robin Pacheco<br>Contracting Officer | USPS<br>Dallas, Texas | 214.819.7125 |

Total pages: **2**, including this page

Date: January 9, 2002

From: Robin M. Stemen
Associate Counsel

**Re: Sterling, Winchester & Long/Millennium Calendar 2000 Unsolicited Proposal**

Please see attached copy of the above-referenced letter dated July 14, 2000.

**2114**

IMPORTANT NOTICE: THIS INFORMATION IS CONFIDENTIAL AND PRIVILEGED

This communication, which includes all the pages which are part of this transmission, is intended for the use of the individual or entity to which it was intended to be delivered. It may contain information that is privileged, proprietary, confidential and exempt from disclosure under applicable law. If the recipient or reader of this communication is not the intended recipient, or the employee or agent responsible for delivery of the communication to the intended recipient, you are hereby notified that any use, application, revelation, disclosure, dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by telephone, destroy all copies and return the original communication to us at the above address via mail or courier delivery.

**Thank you!** For information regarding this fax please call the number above.

7/18/00 Betsy - FYI - This is a deal for which we submitted a Terms Sheet just this morning. IK

(F)

UNITED STATES POSTAL SERVICE

July 14, 2000

TO: Ilene Kent
Vice President, Licensing Manager
EMI

FROM: Betsy Tower EST
Licensing Specialist, Office of Brand Management
USPS

SUBJECT: Millennium Calendar 2000 Unsolicited proposal

I have an urgent request for a response to an unsolicited proposal. Attached please find a proposal from Sterling, Winchester & Long, a small consulting and development company, to develop a calendar for USPS. This proposal was submitted to two USPS departments, but unfortunately, neither office addressed the proposal. Finally Mr. Long wrote to a member of the USPS Board of Governors, documenting all Long's contacts with appropriate personnel at USPS and expressing concern about how long it was taking for USPS to review the proposal. Governor Daniels wrote to us, asking us to provide a proper review and response.

Upon receiving Governor Daniels' request, Thad wrote to Mr. Long and told him the following:

> "...All Postal Service stamps issued after 1977 are protected by copyright owned by the USPS. The corporate signature of the USPS is a registered trademark with the United States Patent and Trademark Office. The Postal Service actively protects its copyrights and trademarks, as well as its other intellectual property. Furthermore, a number of the stamp images used in the "Project 2001" proposal that your organization submitted to the USPS, are jointly owned with several estates. Accordingly, only the Postal Service, and those with permission to use these copyrights and trademarks, may reproduce these stamps and/or the corporate logos.
>
> "Organizations who wish to sell products bearing the Postal Service copyrighted images or marks must obtain a license from the Postal Service. Equity Management, Incorporated (EMI) is the official licensing agency for the Postal Service. We are therefore sending your proposal to EMI for their review.

Please give this an expedited review and get back to me as soon as possible with a recommendation on the suitability of Millennium Calendar 2000 as a potential licensee. I was hoping to respond to Mr. Long by next Wednesday, July 19, 2000.

Please let me know if you need anything else on this.

Enclosure

cc: T. Dilley

475 L'Enfant Plaza SW
Washington DC 20260

Window: Notes/History Tab
Contact: J.G. Long - Sterling, Winchester Long
Types: Notes, Histories
Dates: All
Users: All
Database: MChick99.dbf

1870

| Date | Time | Type | Regarding | Record Manager |
|---|---|---|---|---|
| 1/22/01 | 3:45 PM | Note | JG ret'd my call & gave me a new # (706-262-2002). He said that that is the new # for the company. He also said that the fax # would be changing shortly as well, so I told him to advise me when it does. I told him that I no longer needed to s/w him b/c Robin s/w Sanford & she's working w/him to get the required information. So, that was that. (I e-maield JG's new # to Robin | Marcie Chick |
| 1/22/01 | 9:50 AM | Note | Rec'd vm from Robin Stemen saying that she'll get back to Albert regarding this b/c she got a cal from USPS about this as well & she thinks that the best thing to do is for her to s/w Sanford for financial information, so she'd take it from here. She also requested the original SWL TLA & package that they submitted to us....I forwarded the bound package, which included the TLA, to her per her request. | Marcie Chick |
| 1/22/01 | 9:15 AM | Note | Albert asked me if we had any financial info. on SWL & if we had a write up on all the key players of the company (the owners), etc. He said that USPS is asking for this info. & that we just did this because it was simply a deal & we just need to know how the company is going to finance this & if they have investors, or what. So, tried calling JG on all 3 #s that I have, but rec'd no answer & no answering services for any so e-mailed him asking him to call me instead. | Marcie Chick |
| 12/28/00 | 3:42 PM | Note | Another revised Agmt. was sent to l'ee for signature (change of address). | Marcie Chick |
| 12/21/00 | 3:38 PM | Note | Revised/Red-line draft Agmt. was sent to JG. | Marcie Chick |
| 12/12/00 | 5:45 PM | Note | Rec'd e-mail from JG saying that he rec'd Agmt. & they are reveiwing it & he will get back to Robin by the first of next week. | Marcie Chick |
| 12/12/00 | 4:04 PM | Note | Called JG, per Robin, to confirm that he rec'd the Agmt, but got his vm, so l/m asking him to call to confirm that he rec'd it. | Marcie Chick |
| 12/4/00 | 11:23 AM | Note | Called & left vm for JG telling him that we accept his proposal in his Dec. 1 e-mail & that Robin will draft the Agmt. & have it out to him by Wednesday evening. (Per Dana, this is ok.) | Marcie Chick |
| 11/21/00 | 2:51 PM | Note | E-mailed JG confirming our conversation (OK on prior to 1978 & U stamps, but there is some risk involved). Also asked him for a new list to replace the stamps identified as JO. | Marcie Chick |
| 11/17/00 | 3:29 PM | Note | JG called & I advised him that we would grant him rights to use stamps prior to 1978 & those identified as Us, with the understanding that there is some risk involved. He asked me to send him this in writing. Fine. | Marcie Chick |
| 11/17/00 | 10:20 AM | Note | Attempted to call JG with the good news on Us & prior to 1978, but got his vm, so l/m for him to call me. | Marcie Chick |
| 11/16/00 | 3:45 PM | Note | S/w Robin & eff about this & we have decided that we will grant him rights to WO, Us, and prior to 1978, with the understanding that there MAY be joint/third party owners so there is some risk involved. Per Robin (& as in his Agmt.), he does not get any JO b/c he contract is an exclusive. | Marcie Chick |
| 11/16/00 | 3:10 PM | Note | Went over the list w/JG & explained that the first page includes stamps that were published prior to 1978 (prior to the time that USPS copywrited the images or kept records). Also told him about the Us - missing information, so there is a risk involved here as well. Per Robin Stemen, we are only able to grant him the rights to those that can definitely be identgied as WO! JG was somewhat upset, understandably so, as he thought there were only 2 categories of stamps (WO & JO), but now finds out that there are those prior to 1978 & Us!! He said that those prior to 1978 are very important to his calendars & he wants to know why he can't use those stamps in writing. Told him I'd look into this & get bakc w/him, as I'd like to get this worked out. | Marcie Chick |
| 11/16/00 | 2:38 PM | Note | Rec'd list from Ilene in the O/N identifying the stamps as JO, WO, or otherwise, so called & l/m for JG to call me so that we could go ove them...told him I'd like to fax the list to him & asked him to call w/a fax #. | Marcie Chick |
| 10/24/00 | 5:15 PM | To-do Done | Call again if Ilene hasn't ret'd my call re:JO list! Can I give to JG? E-mailed Ilene asking if I could give JG the JO listing...asked her to advise ASAP. | Marcie Chick |
| 10/24/00 | 9:36 AM | Note | Called & got Ilene's vm, so l/m asking if I could send JG the JO list & if I'd have to remove the contact info. on it....asked her to call. | Marcie Chick |
| 10/24/00 | 9:36 AM | Note | Robin e-mailed me back saying that the revised Agmt. would be O/N to JG today & that she didn't get JG's e-mail b/c he had her e-mail address incorrect. Said I'd f/u w/Ilene on the JO list | Marcie Chick |
| 10/23/00 | 3:46 PM | Note | E-mailed Robin telling her that JG called & wondered when he'd have JO list & revised Agmt. Asked Robin if she wanted me to get involved & handle the JO list. | Marcie Chick |
| 10/23/00 | 3:44 PM | Note | JG called & wondered when he'd have the revised Agmt. b/c Robin promised him he'd have it today. I said she was out sick, but that I'd f/u w/her on it. He also wondered when he could expect the JO list that he requested last week. Again said I'd look into it & get back w/him. | Marcie Chick |
| 10/16/00 | 9:35 AM | Note | Per Robin Stemen, I called & informed JG that Robin would not be able to respond to his 10/11/00 e-mail until Wed., Oct. 18, as she will be in mtgs. w/USPS on Mon. & Tues....he seemed fine with that. | Marcie Chick |
| 10/6/00 | 12:40 PM | Note | Rec'd vm from JG saying that he rec'd the revisions to the Agmt. from Robin on Tuesday. He is reviewing the revisions & said that he'd respond to us on Monday, Oct. 9th. (706-231-5558) | Marcie Chick |
| 9/14/00 | 10:45 AM | Note | Rec'd message from Sanford Lloyd, J.G.'s partner, saying that JG had to get out of town for a while (about a week) & that I could call Sanford if I needed anything @706-722-6105. (Per Robin, we decided not to call Sanford & that we'd wait for JG to call us upon his return.) | Marcie Chick |