11. Notices to USPS Shall Be Sent to USPS and its Licensing Agent as Follows

| | |
|---|---|
| USPS notice: | U.S. Postal Service<br>Licensing Program/Stamp Development<br>475 L'Enfant Plaza SW, Rm 4474E<br>Washington, DC 20260-2437 |
| Representative notice: | Equity Management Inc.<br>4365 Executive Drive, Ste. 1000<br>San Diego, CA 92121<br>Attn: Manager of USPS Licensing Program |

12. Notices to Licensee Shall Be Sent to:

Sterling, Winchester & Long
1022 Dunbarton Road
Williston, SC 29853-1718
Attn. J.G. Long

13. Insurance: $1,000,000 U.S. with a deductible that does not exceed 10%.

14. Form of Copyright And Trademark Notices: See Exhibit A to this Agreement.

15. Marketing Dates:

| | |
|---|---|
| Deadline for prototypes to Licensor: | 7/31/00 |
| Deadline for initial manufacturing run: | 12/31/01 |
| Deadline for submission of advertising and promotion materials: | 12/31/01 |
| Initial sale to Distribution Channel: | 12/31/01 |

16. Standard Terms And Conditions: See Exhibit B to this Agreement, which is incorporated herein by reference.

17. Licensee Federal Tax Identification Number: 57-1099225

18. Other Terms And Conditions:

(a) Prior to execution of this Agreement Licensee registered the following domain names containing Licensed Properties belonging to the USPS:

"uspscalendar2001.com"
"uspscalendar2002.com"

"uspscalendar2003.com"
"uspscalendar2004.com"
"uspscalendar2005.com"
"uspscalendar.com"
"uspsofficialcalendar.com"

Licensee hereby irrevocably assigns all rights, title and interest it has in said domain names to USPS and agrees to execute any additional documentation that might be necessary to formalize said assignment. USPS hereby grants to Licensee the exclusive right to use the domain names "uspscalendar2002.com," "uspscalendar2003.com," "uspscalendar2004.com" and "uspscalendar2005.com" during the term of this Agreement for the sole purpose of selling the Licensed Articles. Licensee may not use the domain names "uspsofficialcalendar.com" or "uspscalendar.com" at any time for any purpose. USPS shall not, during the Initial Term or any renewal term, use, or license others to use, the above listed domain names for any purpose.

Licensee represents and warrants that it has not registered any other domain names containing Licensed Properties belonging to the USPS and that it shall not register any other domain names containing Licensed Properties belonging to the USPS without USPS' prior written permission.

Upon EMI's receipt of satisfactory documentation of said registrations and the cost thereof, Licensee shall be entitled to recoup any registration fees actually incurred and paid prior to September 1, 2000 in the form of an offset against its Guaranteed Minimum Royalties in Contract Period 2. Any other expenses related to said domain names, including registration fees incurred or paid after September 1, 2000, and the cost of development and maintenance of any websites associated with those domain names, shall be the sole responsibility of Licensee. All webites shall be subject to the review requirements set forth in this Agreement and to any USPS policies or procedures governing websites.

(b) Licensee acknowledges that the USPS is unable to confirm that it is the sole owner of ~~all of the~~those stamp designs listed on Exhibit E as "status unknown," and that third parties may claim an ownership interest in certain of those stamp designs. In the event a third party asserts an ownership interest in any of the stamp designs listed on Exhibit E as "status unknown," it shall be Licensee's sole responsibility to attempt to obtain permission from the third party to use such stamp design. Any expense related to obtaining said permission, including payment of royalties, shall be borne solely by Licensee and shall not modify in any way Licensee's obligations under this Agreement. If Licensee is not able to obtain permission from the third party, Licensee shall immediately discontinue its use of the subject stamp design, without modification of Licensee's obligations under this Agreement; provided, however, that Licensee shall have the right to request approval from USPS in accordance with the procedures set forth in Paragraph 18(c) below to substitute another ~~wholly-~~

~~owned~~ stamp design in place of that stamp design it is unable to use.

Licensee further acknowledges that the exclusive nature of this Agreement is limited to those stamp designs that are wholly owned by USPS.

(c) Licensee shall have the right to supplement the stamp designs listed on Exhibit E with up to fourteen (14) additional ~~wholly owned~~ stamp designs, which stamp designs will be selected in accordance with this provision. Licensee shall submit to USPS a list of those additional stamp designs it wishes to utilize, along with an indication of the thematic grouping in which it will be used. USPS will then have thirty (30) days in which to approve or deny the request, in its sole discretion. If, as a result of USPS denying Licensee's request in whole or in part, Licensee does not obtain approval of fourteen (14) stamp designs through the first request, Licensee shall be permitted to submit additional requests until it has received approval of fourteen (14) additional ~~wholly owned~~ stamp designs or May 31, 2002, whichever is sooner.

In the event Licensee requests approval to use as part of the fourteen additional stamp designs any Jointly-Owned Stamp Designs, as that term is defined in Exhibit B, the request must be accompanied by proof, in a form acceptable to USPS, that Licensee has secured permission from the Joint Owner to use said stamp design. Any expense related to obtaining said permission, including payment of royalties, shall be borne solely by Licensee and shall not modify in any way Licensee's obligations under this Agreement. Licensee acknowledges that it shall be in the sole discretion of USPS to grant or deny any request to use a Jointly-Owned Stamp Design as part of the fourteen additional stamp designs referenced herein, and that USPS shall not be obligated to grant such a request even if Licensee has secured permission from the Joint Owner to use said stamp design.

IN WITNESS WHEREOF, duly authorized representatives of USPS and Licensee have executed this Agreement, including the terms and conditions set forth in the attached Exhibits A and B.

| USPS | STERLING, WINCHESTER & LONG |
|---|---|
| By:____________________ | By:____________________ |
| Name: ____________________ | Name: ____________________ |
| Title: ____________________ | Title: ____________________ |
| Date: ____________________ | Date: ____________________ |

# EXHIBIT A -- LICENSED PROPERTIES

"Licensed Properties" shall mean the following United States Postal Service trademarks, service marks, trade dress and/or copyrights:

United States Postal Service® (USPS) Corporate Signature
Postal Seals (1782-1993 [® or ™])
Postmark USA™

Those USPS stamp designs listed on Exhibit E, including any supplement thereto approved in writing by USPS [© ____ (year first publ.)]

Each use of a Licensed Property shall be accompanied by the appropriate designation indicated above. Each Licensed Article shall bear the following notice: "Trademarks and copyrights used herein [or hereon] are properties of the United States Postal Service and are used under license to Sterling, Winchester & Long. All rights reserved." Licensee shall display the marks listed above only according to the specifications provided by USPS.

Concurrence (Initial) __________

EXHIBIT B -- STANDARD TERMS AND CONDITIONS

These Standard Terms and Conditions shall be deemed fully incorporated in the License Agreement ("Underlying Agreement") to which this Exhibit B is attached, and these Standard Terms and Conditions and the Underlying Agreement shall hereinafter collectively be referred to as the Agreement. All terms used in these Standard Terms and Conditions shall, unless expressly provided to the contrary herein, have the same respective meanings as set forth in the Underlying Agreement. Unless expressly provided to the contrary herein, to the extent that any provision of these Standard Terms and Conditions conflicts with any provision of the Underlying Agreement, the Underlying Agreement shall control.

1. Definitions: For purposes of this Agreement, the following terms shall have the following specified meaning:

a. "Close-Out" means the sale of merchandise at a very low price in order to reduce inventory in a short time, which shall be permitted during the Sell-Off period under the terms and conditions specified herein.

b. "Collateral Materials" means packaging, cartons and containers, packing and wrapping material, tags and labels.

c. "Net Sales" mean the Licensee's gross sales, less only sales taxes and returns actually allowed by Licensee.

d. "Jointly-Owned Stamp Designs" means those United States postage stamp designs featuring trademarks, copyrights, or rights of publicity that are owned or controlled by USPS and a Joint-Owner(s).

e. "Joint-Owner(s)" means an entity, other than USPS or Licensee, recognized by USPS as owning rights in a stamp design.

f. "Premium" means any article used for the purpose of increasing the sale, promoting, or publicizing any other product or any service, including but not limited to incentives for consumers, sales forces, members of the trade, or fund-raising.

g. "Promotional Materials" means all advertising and sales materials, including but not limited to sales sheets, brochures, direct mail, and catalog layouts.

h. "Sell-Off Period" means the ninety (90) day period commencing after the termination of the Agreement, during which Licensee may dispose of excess inventories of Licensed Articles.

i. Unless otherwise stated herein, all references to "day(s)" shall refer to calendar days, not business days.

The terms identified in the Underlying Agreement shall have the meanings specified herein for purposes of this Agreement.

2. Grant of License:

a. Grant: Subject to the limitations set forth herein, USPS hereby grants to Licensee a non-transferable, non-exclusive license to design, manufacture, have manufactured, sell, distribute, and advertise Licensed Articles bearing the Licensed Properties in the Licensed Territory during the Contract Periods provided herein.

b. Limitations on Grant:

(1) Licensee shall not have the right to grant sublicenses of any or all of its rights under this Agreement unless it first obtains USPS' prior written consent to each sublicense, which consent shall not be unreasonably withheld.

(2) No license is granted hereunder for the use of the Licensed Properties for any purpose other than upon or in connection with the Licensed Articles.

(3) USPS licenses Licensee to use the USPS corporate signature identified in Licensed Properties only in connection with the sale of Licensed Articles displaying Licensing Properties that are stamp designs and only for the purpose of indicating that the use of the Licensed Properties are authorized by USPS.

(4) Except as set forth in the Underlying Agreement, nothing in this Agreement shall be construed to prevent USPS from granting any other licenses for the use of the Licensed Properties in any manner whatsoever.

(5) Licensee shall not sell or distribute the Licensed Articles in any country outside the Licensed Territory and will not knowingly sell the Licensed Articles to persons who intend or are likely (based on information known to Licensee) to resell them in any country outside the Licensed Territory. Notwithstanding the foregoing, Licensee may sell and ship Licensed Articles outside the Licensed Territory in response to orders placed via Licensee's website provided that no such individual order is for more than five (5) of any one Licensed Article.

(6) No license is granted hereunder for use of the Licensed Properties in connection with or on premium sales, close-outs, door-to-door, television sales (excluding home shopping television networks), infomercials, contest products, combination sales, or any similar methods of merchandising.

(7) USPS reserves any rights not expressly granted herein.

c. Licensee's Obligations:

(1) Licensee agrees to use its best efforts to sell, distribute and supply the Licensed Articles within the Licensed Territory. Licensee must begin the bona fide manufacture, distribution, and sale of the Licensed Articles on a Licensed Territory-wide basis on or before the date specified in the Underlying Agreement. Failure by the Licensee to timely engage in full and regular distribution and active marketing of the Licensed Articles is considered a material breach of this Agreement. If Licensed Articles are out of distribution in any country of the Licensed Territory for more than twelve (12) months, USPS may terminate the Agreement with respect to those specific Licensed Articles and country or countries of the Licensed Territories, at any time, in its sole discretion, and any and all rights in and to those Licensed Articles in those countries within the Licensed Territory revert immediately to USPS. If any rights with respect to some, but not all specific Licensed Articles or countries within the Licensed Territory shall revert to USPS pursuant to this paragraph, all of the remaining terms and conditions of this Agreement shall remain in full force and effect, including, but not limited to, payment of specified Royalty Payments and Guaranteed Minimum Annual Royalty.

(2) Licensee further undertakes to make and maintain adequate and reasonable arrangements for the distribution of Licensed Articles through the Channels of Distribution specified in the Underlying Agreement. Licensee agrees to maintain adequate inventories of the Licensed Articles as an essential part of its distribution program. All Close-outs shall be sold only through retail outlets and traditional and accepted dealers in such merchandise and upon such terms and conditions as USPS,

in its reasonable discretion, determines appropriate, and shall not be sold to any person or entity which Licensee knows, or has reason to know based on information known to Licensee, will export such Close-outs from the Licensed Territory.

3. Term: This Agreement shall be for the period set forth in the Underlying Agreement, unless sooner terminated in accordance with the terms and conditions set forth herein.

4. Payment:

a. Royalty Rate: Licensee agrees that it will pay USPS a non-refundable royalty equal to the percentage set forth in the Underlying Agreement on Licensee's Net Sales of Licensed Articles made during the Term of this Agreement, any extensions or renewals, and any Sell-off Period ("Royalty Payments").

b. Guaranteed Minimum Payment: Licensee agrees to pay USPS the Guaranteed Minimum Royalty set forth in the Underlying Agreement, according to the payment schedule set forth therein. The Guaranteed Minimum Royalty Payment is an advance against and is deducted from the Royalty Payments due during the Initial Term. No portion of the Guaranteed Minimum Royalty Payment is refundable under any circumstance. If this Agreement is terminated as a result of a material breach of the Agreement by Licensee, the greater of all Guaranteed Minimum Royalty Payments and/or earned Royalty Payments due for the remainder of the Initial Term of the Agreement and any agreed-upon renewals thereof shall immediately become due and payable.

c. Statements and Payments: On or before the fifteenth (15th) day of the month following each calendar quarter, Licensee shall submit a full, accurate, and detailed statement in the format outlined in Exhibit C, signed by an authorized officer of Licensee, and certified as accurate, and simultaneously shall make all payments thereon. Such statements and payments shall be made payable to the U.S. Postal Service Licensing Program at the address in the Underlying Agreement, with a copy to USPS's representative at the address in the Underlying Agreement. Interest shall be charged against Licensee at the rate of one and one-half percent (1½%) over the current prime rate (CitiBank) or the maximum rate permitted by law, whichever is lower, and shall accrue on each unpaid amount from the first day payment becomes due through the date of payment. Licensee hereby waives all claims to the return of any royalty payments once made, including but not limited to claims for refund of payments for returns of Licensed Articles in subsequent reporting periods. Licensee shall furnish such statements to USPS whether or not any Licensed Articles were sold during the Period.

d. Sales to the Postal Service: Licensee shall not be required to make royalty payments on sales of Licensed Articles to USPS, whether for promotional use or retail sale, but Licensee shall reduce the sales price paid by USPS by an amount equal to the royalty. Licensee shall identify all sales to USPS on its quarterly statements.

5. **Approvals and Quality Control**: USPS shall have the right to approve or disapprove the nature and quality of all products or services offered for sale under this Agreement, the appearance and use of all marks licensed under this Agreement, and the appearance and use of all advertising and promotion for the products or the marks

covered by this Agreement, which approval shall not be unreasonably withheld.

a. USPS Approval of Licensed Articles: The styles, designs, packaging, contents, workmanship, and quality of all Licensed Articles and associate materials must be approved by USPS prior to the distribution or sale thereof. USPS maintains the right to take all reasonable actions which it deems necessary to ensure that Licensed Articles manufactured or sold hereunder are consistent with the high quality and reputation of the Licensed Properties.

b. Licensee Compliance with Applicable Law: All Licensed Articles shall be manufactured, sold, labeled, packaged, distributed, and advertised in accordance with all applicable laws and regulations.

c. Delivery and Approval of Samples:

(1) Licensee shall, before selling or distributing any Licensed Articles, furnish to USPS free of cost, for written approval, one each of concept art, final art, mock-ups, and prototypes of the Licensed Articles, and all designs which Licensee intends to use in connection with the Licensed Properties, to be followed by six (6) production samples of each Licensed Article, together with its Collateral Materials, and any additional samples as may be reasonably required. Licensee shall also submit all Promotional Materials for prior written approval by USPS. The Licensed Articles, Collateral Materials, and Promotional Materials shall be of a standard of quality, appearance, and style approved in writing by USPS prior to any advertising, sales, distribution or use of same taking place. All approvals shall be solely at USPS' reasonable discretion, including that the item does not fit and/or reasonably support the imagery and equity of the Licensed Properties or the USPS.

(2) Any item submitted for approval shall be approved or disapproved within twenty (20) calendar days after receipt. USPS may extend the approval period an additional ten (10) calendar days by giving written notice to Licensee. Any disapproval shall include a written explanation of the reason(s) for the disapproval, and shall be without prejudice to Licensee's right to modify the item and re-submit it for review. If Licensee has not received approval or disapproval within the provided time frame, the submission shall be deemed disapproved. All approvals shall be solely at USPS' reasonable discretion, including that the item does not fit and/or reasonably support the imagery and equity of the Licensed Properties or the USPS.

(3) After samples of the Licensed Articles, Collateral Materials, and Promotional Materials have been approved pursuant to this paragraph, Licensee shall not depart therefrom without written consent by USPS. In the event there is a departure from the approved samples, USPS shall have the right in the reasonable exercise of its sole discretion to withdraw its approval of such Licensed Articles, Collateral Materials, or Promotional Materials or terminate this Agreement unless Licensee cures such breach within thirty (30) calendar days of written notice of same.

d. Use of Property: License shall not use any other trademark or design in combination with any Licensed Property on any Licensed Article without USPS' prior written approval. Licensed Articles shall not be sold or otherwise distributed by Licensee under any mark other than the Licensed Properties. Licensee shall cause to appear on all Licensed Articles produced hereunder, and on their tags, packaging, and the like such legends, markings, disclaimers, and trademark and copyright notices as USPS may specify. Whenever Licensee reproduces the stamp designs set forth in

Exhibits A and E, it must reproduce them in their entirety on the Licensed Articles and licensee shall make no alterations, additions, subtractions, or modifications to such stamp designs without USPS' prior written approval. If any such alterations, additions, subtractions, or modifications result in the creation of a new or derivative work within the meaning of copyright law, Licensee hereby assigns any and all rights to such works, including but not limited to any and all copyrights, to USPS.

6. Confidentiality: Any information or documents received or learned by Licensee in any form related to USPS's stamp program, future stamp images, or any postal programs or initiatives not publicly available, shall constitute Confidential Information. Until such time as Licensee releases a Licensed Article, the specific design features of the Licensed Articles shall constitute Confidential Information, but Licensee's identity and the general nature of the Licensed Articles shall not constitute Confidential Information. The parties are strictly prohibited from disclosing any Confidential Information. Failure to adhere to this requirement is a material breach of contract.

7. Records: Licensee agrees to keep accurate books of account and records covering all transactions relating to this Agreement. USPS and its duly authorized representatives shall have the right at all reasonable hours to examine such books of account and records in Licensee's possession or under its control with respect to the subject matter and terms of this Agreement, and shall have free and full access thereto for such purposes and for the purpose of making copies thereof. All such books of account and records shall be kept available for at least three (3) years after the termination of this Agreement. Licensee further agrees, in order to facilitate inspection of its books and records with respect to amounts due, that it will designate a symbol or

number that will be used exclusively in connection with Licensed Articles and with no other articles which Licensee may manufacture, sell or distribute. In the event that USPS or USPS' duly authorized representatives shall discover a discrepancy in favor of USPS of six percent (6%) or more on any Royalty Statement, Licensee shall pay to USPS the reasonable cost of such examination. The fee for said examination shall be Five Hundred Dollars ($500) per day, but in no event shall Licensee be charged in excess of Three Thousand Dollars ($3000) for any individual examination.

8. <u>Intellectual Property Rights</u>:

a. Licensee recognizes the great value of the goodwill associated with the Licensed Properties and acknowledges that all rights therein and goodwill attached thereto belong exclusively to USPS, and that all use of the Licensed Properties will inure to the benefit of USPS.

b. USPS may seek, in its own name and at its own expense, appropriate trademark and/or copyright protection for the Licensed Properties. USPS shall retain all right, title, and interests in the Licensed Properties, including any modifications or improvements made to the Licensed Properties by Licensee, but expressly excluding any calendar design developed by Licensee for use with the Licensed Articles provided that such design does not incorporate or include the Licensed Properties or any designation, insignia or mark which is the same as or confusingly similar to the Licensed Properties.

c. In the event that Licensee requests that USPS obtain copyright, trademark, or other such protection for a particular item or in a particular country where

USPS had not heretofore obtained such protection, USPS agrees to take reasonable steps to obtain such protection, provided, however, that Licensee shall reimburse USPS for the costs of filing, prosecuting, and maintaining same. Nonetheless, USPS shall own such copyright, trademark, or other such protection for a particular item or in a particular country and License shall make any assignments of rights to USPS necessary to transfer ownership of such copyrights, trademarks or other protection to USPS.

d. Licensee agrees that, during the term of this Agreement or thereafter, Licensee will not contest, harm, misuse, or bring into disrepute any of USPS's rights, in and to the Licensed Properties, or contest the validity of this Agreement. Licensee acknowledges and agrees that USPS would not have an adequate remedy at law and would be irreparably harmed in the event Licensee were to misuse, harm, or bring into disrepute any of USPS' Licensed Properties or if Licensee were to breach any term of this Agreement concerning the proper use of the Licensed Properties. Accordingly, it is agreed that, in the event of any breach or threatened breach of this paragraph or any term or condition of this Agreement concerning the proper use of the Licensed Properties, USPS, in addition to any other remedies at law or in equity, shall be entitled to equitable relief, including but not limited to immediate injunctive relief without the requirement of posting a bond or other security and without resorting to Arbitration herein.

9. Termination:

a. Without prejudice to any other rights, and in addition to any termination rights provided elsewhere in this Agreement, USPS shall have the right to terminate this Agreement upon written notice to Licensee at any time if:

(1) Licensee shall fail to make any payment due hereunder, which such payment is not in dispute, or to deliver any of the statements herein referred to, and if such default shall continue for a period of ten (10) calendar days after written notice of such default is given in accordance with Section 17, below;

(2) Licensee shall fail to perform any other material term or condition of this Agreement and, unless otherwise provided herein, does not cure such failure within thirty (30) calendar days after written notice is given in accordance with Section 17, below; or

(3) Licensee files a petition in bankruptcy, or is adjudicated a bankrupt, or if a petition in bankruptcy is filed against Licensee, or if Licensee becomes insolvent, or makes an assignment for the benefit of its creditors or an arrangement pursuant to any bankruptcy law, or if Licensee discontinues its business, or if a receiver is appointed for Licensee or its business. In the event this Agreement so terminates, neither Licensee nor its receivers, representatives, trustees, agents, administrators, successors, and/or assigns shall have any right to manufacture, distribute, sell, exploit or in any way deal with any of the Licensed Articles except with and pursuant to USPS' prior written consent.

b. Licensee shall have the right to terminate this Agreement upon thirty (30)

days prior written notice to USPS given in accordance with Section 17, below, if USPS shall fail to perform any material term or condition of this Agreement unless, within the notice period, USPS cures the breach or provides Licensee with notification that the breach cannot reasonably be cured within that period and provides reasonable assurances that the breach will be cured in a period acceptable to Licensee.

c. Termination of this license under the provisions of this paragraph shall be without prejudice to any rights which either party may otherwise have against the other party.

d. Upon the termination of this Agreement by USPS, notwithstanding anything to the contrary herein, all royalties on sales theretofore made shall become immediately due and payable and no Royalty Payments and Guaranteed Minimum Royalties shall be repayable, and any balances owed on Guaranteed Minimum Royalties shall be immediately due and payable. Notwithstanding any termination or expiration of this Agreement, USPS shall have and hereby reserves all rights and remedies which it has or which are granted to it by operation of law, to enjoin the unlawful or unauthorized use of the Licensed Properties.

10. <u>Disposal of Stock/Sell-Off Period</u>:

a. After expiration or termination of this Agreement, Licensee shall have no further right to manufacture, advertise, distribute, sell, or otherwise deal in any Licensed Articles except as hereinafter provided.

b. It is specifically understood that Licensee shall not sell or dispose of any such Licensed Articles in job lots at reduced prices, other than is customary in the ordinary course of business.

c. After expiration or termination of this Agreement, the parties shall follow the procedures set forth below:

(1) Licensee shall prepare a complete, written inventory list and submit same to USPS within ten (10) days of the expiration or termination of this Agreement. Such list must include orders on hand, work in process, and finished Licensed Articles.

(2) USPS shall have thirty (30) days thereafter to decide whether to purchase any or all inventory at the lower of Licensee's cost or fair market value. If USPS exercises such right of purchase, Licensee shall deliver the inventory referred to in USPS' notice of purchase within ten (10) days after USPS' said notice with the exception of inventory necessary to fulfill orders on hand. USPS shall pay Licensee for such delivered inventory as is in marketable condition within thirty (30) days after its receipt thereof.

(3) If USPS does not elect to purchase any or all of the inventory as set forth above, Licensee, on a non-exclusive basis, may dispose of Licensed Articles which are on hand or in process at the time of such expiration or termination, for a period of not more than ninety (90) days thereafter, provided all royalty payments with respect to that ninety (90) day period are made in accordance with provisions herein. Licensee shall have no right to dispose of Licensed Articles if this Agreement is terminated under Paragraphs 9.a.1, 9.a.3 or 9.a.4 herein.

d. Except as specifically provided in this Agreement, on the expiration or termination of this Agreement, all of the rights of Licensee under this Agreement shall terminate herewith and shall revert immediately to USPS. All royalties on sales made shall become immediately due and payable, and Licensee shall discontinue all use of the Licensed Properties and shall promptly transfer to USPS, free of charge, all registrations, filings and rights with regard to the Licensed Property which Licensee may have possessed at any time. The underlying rights, including but not limited to any and all trademarks and copyrights to all artwork, photographs, drawings, illustrations, forms, patterns and similar items developed by Licensee in the manufacture, sale or distribution of Licensed Articles, are the property of USPS.

11. __Dispute Resolution:__ If a dispute arises out of or relates to this Agreement, or the breach thereof, and if the dispute cannot be settled through direct discussions, the parties agree first to endeavor to settle the dispute in an amicable manner by negotiation between the parties at the level of contracting officer. If the dispute cannot be settled at that level within 30 calendar days of the start of such negotiations, then the parties may, by mutual agreement, conduct a non-binding mediation proceeding under such rules and procedures as they may agree upon. Thereafter, any unresolved controversy or claims arising out of or relating to the Agreement, or the breach thereof, may be brought by a party in the appropriate judicial forum as further defined herein.

12. __Consent To Jurisdiction:__ With respect to any suite, action or other proceeding relating to the Agreement that has not been resolved by negotiation or mediation (collectively "Proceedings"), the parties each irrevocably submit to the exclusive personal jurisdiction of the United States District Court for the District of Columbia and

waive any objection that it may have at any time to the laying of venue of any Proceedings brought in such court, waive any claims that such Proceedings have been brought in an inconvenient forum and further waive claims the right to object, with respect to such Proceedings, that such court does not have personal jurisdiction over such party.

13. <u>Choice Of Law:</u> This Agreement shall be governed by and construed in accordance with principles of federal common law, or if there is found to be no such common law, then the law of the State of New York. Further, the parties each agree and acknowledge that neither the provisions of the USPS Purchasing Manual nor the Contract Disputes Act of 1978, 41 USC §601 et seq., shall apply to this Agreement, and the parties waive any and all express and implied remedies, recourse or administrative procedures provided or created thereby.

14. <u>Indemnification</u>: Excluding claims based upon use of those Licensed Properties identified by USPS in Exhibit E as being wholly owned, Licensee agrees to defend, indemnify and hold USPS and/or any of its agents and assignees harmless against any and all claims, demands, causes of action, liability, loss, damage, judgments or expense (including reasonable attorneys' fees and court costs) arising out of Licensee's design, manufacture, distribution, shipment, labeling, sale, distribution, advertisement, or promotion of the Licensed Articles or the labeling, packaging, advertising and promotional materials for the Licensed Articles. USPS shall have the right to defend any such claim or suit through counsel of its own choice.

15. <u>Insurance</u>: Licensee shall, throughout the term of this Agreement, including extensions, and for a period of two (2) years thereafter, obtain and maintain at its own

cost and expense a third-party liability insurance policy with a recognized insurance carrier acceptable to USPS (such acceptance not to be unreasonably withheld), naming USPS and Equity Management Inc.("EMI") as "Additional Named Insureds" or the like, including a waiver of subrogation in favor of USPS and EMI. The amount of coverage shall be in accordance with the amount set forth in the Underlying Agreement. This insurance shall provide for at least sixty (60) days prior written notice to USPS and Licensee of the cancellation or any material change or modification in the terms and conditions of the policy. Licensee shall, not more than thirty (30) days after the signing of this Agreement and, thereafter, from time to time upon reasonable request by USPS, promptly furnish to USPS the requisite certificates of insurance, or, upon USPS's request, certified copies of said insurance policies, satisfactory to USPS, as to the maintenance of the insurance described above. Licensee shall not distribute or sell the Licensed Articles prior to receipt by USPS of such evidence of insurance.

16. **Renewal:** Until three (3) months prior to the expiration of the Initial Term of the Agreement, Licensee shall have the option to renew this Agreement for the First Renewal Term provided in the Underlying Agreement. Any renewal pursuant to this paragraph is subject to the following conditions: (i) this Agreement has not been terminated in accordance with the provisions hereof, and (ii) Licensee has met the conditions set forth in Exhibit D.

17. **Notices:** All notices and statements to be given and all payments to be made hereunder, shall be given or made at the respective addresses of the parties as set forth in the Underlying Agreement unless notification of a change of address is given in writing. Any notice shall be sent by registered or certified mail, and shall be deemed to

have been given on the third business day after it is mailed.

18. <u>Joint Ventures</u>: Nothing herein contained shall be construed to place the parties in the relationship of partners or joint venturers or agents, and neither party shall have the power to obligate or bind the other party in any manner whatsoever. Licensee warrants that no person or selling agency has been employed or retained to solicit or secure this Agreement upon an agreement or understanding for a commission, percentage, brokerage or contingent fee, excepting bona fide employees or bona fide established commercial or selling agencies maintained by Licensee for the purpose of securing business. For breach or violation of this warranty, USPS shall have the right to terminate this Agreement without liability or in its discretion, to recover the full amount of such commission, percentage, brokerage or contingent fee. No member of, or delegate to Congress, or resident commissioner, shall be admitted to any share or part of this Agreement or to any benefit that may arise therefrom; but this prohibition shall not be construed to extend to this Agreement if made with a corporation for its general benefit.

19. <u>Enforcement of Licensed Properties</u>:

a. Licensee agrees to cooperate with and assist USPS in protecting and enforcing USPS' rights to the Licensed Properties. Licensee shall promptly inform USPS of any infringement or other violations of the Licensed Properties that come to its attention. USPS shall have the sole right at its own expense to determine whether or not any action shall be taken on account of any such infringement or violations. USPS shall receive all amounts awarded as damages, profits, settlement proceeds or otherwise in connection with such claims or suits.

b. Licensee agrees not to contest or otherwise challenge or attack USPS' rights in the Licensed Properties or the validity of the license granted herein during the term of this Agreement and thereafter. Licensee further agrees not to do anything either by act of omission or commission which might impair, jeopardize, violate or infringe the Licensed Properties, or to misuse or bring into dispute the Licensed Properties.

c. Licensee shall not use any of the Licensed Properties as part of its company name, corporate name or trade name, and shall not attempt to register any of the Licensed Properties or confusingly similar marks or substantially similar designs in the Licensed Territory or elsewhere during the term of this Agreement or thereafter, or aid or abet anyone else in doing so.

d. The administrative and judicial defense of the Licensed Properties in the Licensed Territory shall be undertaken solely by USPS. Licensee agrees to furnish USPS or its designated legal representative with all proof and commercial, technical or other information or assistance required and which Licensee is able to furnish, as well as such other assistance as USPS or its lawyers may reasonably require for this purpose. Licensee shall, if requested by USPS, join USPS in the aforementioned administrative and judicial defense of the Licensed Properties, the cost of which shall be borne exclusively by USPS.

e. Licensee agrees to cooperate with USPS in any effort that USPS may deem advisable to record Licensee as a registered user or the like. Upon expiration or termination of this Agreement for any reason, Licensee shall similarly cooperate with USPS in expunging any such recordations that may exist. All expenses associated with such recording and expungement of recordations shall be borne by USPS.

20. <u>No Assignment</u>: This Agreement shall be binding upon and inure to USPS and its successors and assigns, but may not be assigned, transferred, or delegated by Licensee in whole or in part with respect to any right or obligation herein without the prior written consent of USPS, which consent shall not be unreasonably withheld. Any assignment without USPS consent shall be void. A transfer of the legal and/or beneficial ownership, whether by operation of law or otherwise, of more than 25% of the voting equity of Licensee (other than transfers of voting equity among the present shareholders or owners of Licensee) shall be deemed an assignment or transfer of the license hereunder that shall require the prior written consent of USPS.

21. <u>Force Majeure</u>: It is understood and agreed that in the event that an act of the government, or war conditions, or fire, flood or labor trouble in the factory of Licensee or in the factory of those manufacturing Licensed Articles, prevents the performance by Licensee of the provisions of this Agreement, then such nonperformance by Licensee shall not be considered as grounds for breach of this Agreement and such nonperformance shall be excused while the conditions herein prevail and for two (2) months thereafter.

22. Miscellaneous: This Agreement constitutes the entire Agreement and understanding between the parties hereto and terminates and supersedes any prior Agreement or understanding relating to the subject matter hereof between USPS and Licensee. USPS and Licensee are not relying upon any statements, warranties, or representations except those contained in this Agreement. The paragraph and other headings contained herein are for reference purposes only and will not affect the meaning of interpretation of this Agreement. None of the provisions of this agreement can be waived or modified except in writing signed by both parties, and there are no representations, promises, agreements, warranties, covenants or undertakings other than those contained herein.

23. No Reliance On Other Representations: The parties have not relied on any representations, promises, warranties, covenants, statements, or undertakings by the other party or its counsel other than those contained in this Agreement.

24. Time Is Of The Essence: Time is of the essence in this Agreement.

Concurrence (Initial) __________

EXHIBIT C -- FORM OF ROYALTY STATEMENTS
EQUITY MANAGEMENT INC.

SALES AND ROYALTY REPORT

**To:** Equity Management Inc.
Attn: Contract Administration
4365 Executive Dr., Suite 1000
San Diego, CA 92121

**From:** (Licensee) ______________________________

**Equity:** (Licensor) ______________________________

**Licensed Territory:** ______________________________
(Report required for each country in which the Licensed Products were sold)

**Quarter:** From: ______________ To: ______________

| (a) Item No. | (b) Description | (c) Unit Price | (d) Units Sold | (e) Total Unit Sales |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| (f) | Totals | | | |

(g) Royalty Rate ________%; Total Earned Royalties $ __________
(h) Unapplied Advance at Quarter Start $ __________
(i) Difference; Subtract (h) from Line (g) $ __________
(j) Annual Guaranteed Royalties (divided by 4) $ __________
(k) Payment Accompanying this Report $ __________
(pay greater of Line (i) or (j)) __________

The above Report is certified to be true and correct by the above named Licensee

By: ______________________
Name: ______________________
Title: ______________________
Date: ______________________

USPS



652

A342

## EXHIBIT D -- RENEWAL TERMS

Type of Renewal: Automatic

Renewal Hurdle Minimum:

Licensee's Net Sales during the four quarters beginning 10/1/03 and ending 9/30/04 must generate a minimum of $60,000 in earned royalties in order for Licensee to qualify for an automatic renewal.

Number of Renewals: One

Renewal Term: Three Years

Special Renewal Conditions: Not Applicable

Renewal Term Earned Royalty Percentages: 8% of Net Sales.

Guaranteed Minimum Royalties:

The following Guaranteed Minimum Royalties for the Renewal Term shall be paid in equal quarterly installments:

| | | |
|---|---|---|
| Contract Period 4 | 1/1/05 – 12/31/05 | The greater of $60,000 or 75% of the royalties due for Contract Period 3. |
| Contract Period 5 | 1/1/06 – 12/31/06 | The greater of $70,000 or 75% of the royalties due for Contract Period 3. |
| Contract Period 6 | 1/1/07 – 12/31/07 | The greater of $80,000 or 75% of the royalties due for Contract Period 3. |

Renewal Licensed Properties:

Licensee shall submit to USPS by no later than July 1, 2004, a list of the 270 wholly-owned stamp designs that Licensee desires to use on the Licensed Articles during the Renewal Term. Said list must be in the form of the list set forth in Exhibit E. Approval of the list is in the sole discretion of the USPS. USPS shall notify Licensee of its decision concerning the list within 90 days of receipt thereof.

*********************
*** TX REPORT ***
*********************

TRANSMISSION OK

| | |
|---|---|
| TX/RX NO | 2003 |
| CONNECTION TEL | 17068680216ppp4044 |
| SUBADDRESS | |
| CONNECTION ID | |
| ST. TIME | 12/21 09:29 |
| USAGE T | 00'35 |
| PGS. SENT | 1 |
| RESULT | OK |

# EQUITY MANAGEMENT INC.®

## FACSIMILE

4365 Executive Drive, Suite 1000
San Diego, CA 92121

858 558-2500 x 112
858 558-2507 FAX

| ATTENTION | COMPANY | FAX NUMBER |
|---|---|---|
| J.G. Long | | (706) 868-0216 |

Total pages: 1, including this page

Date: December 21, 2000

From: Robin M. Stemen, Esq.
Associate Counsel

J.G.,

As I have explained to Sanford, the reason for the July effective date is that that is when the exchange of information concerning this project began. It is necessary to keep that date in order to maximize protection of the USPS trademarks and copyrights.

Robin

654

## Marcie Chick

**From:** J G Long - SW & L [SWL@Long.net]
**Sent:** Saturday, December 23, 2000 8:20 PM
**To:** jolian@equitymanagementinc.com
**Cc:** dsmith@equitymanagementinc.com; rstemen@equitymanagementinc.com; Marcie Chick
**Subject:** Agreement Effective Date

Jeff, we are very much ready to put this agreement to rest by signature. However, we would like a clear explanation from EMI/USPS on why it is necessary to use July 1 as an effective date when the agreement will signed six months later. We are not accustom to entering into a new relationship having an effective date before the agreement is settled.

On last Thursday Mr. Loyd raised my concerns on this matter and asked that EMI provide an explanation in writing as to why July 1 and not the signature date as the effective date. On Friday Ms. Stemen provided, in writing, the following:

**" As I have explained to Sanford, the reason for the July effective date is that is when the exchange of information concerning this project began. It is necessary to keep that date in order to maximize protection of the USPS trademarks and copyrights."**

Our counsel has advised us to request a more detail explanation along the following lines:

1) Maximize protection against who & what?

2) In what way?

3) How will this maximization protection for the USPS impact SW&L.

4) By protecting the USPS rights will this leave SW&L exposed during the six months?

We would also like to maximize SW&L protection from unforeseen liability by getting a reasonable and clear explanation for the July 1 effective date or going with what is legally prudent and practical, the signature date. If the agreement read: "entered into on July 1 and effective as of the date of signatures" SW&L would have no problem with that.

Your cooperation and response is greatly appreciated.

JGLong

# EQUITY MANAGEMENT INC.®

OFFICES IN: SAN DIEGO · DETROIT · CHICAGO · NEW YORK

SAN DIEGO OFFICE:
4365 EXECUTIVE DRIVE, SUITE 1000
SAN DIEGO, CA 92121
(858) 558-2500
FAX (858) 558-2507

December 28, 2000

Via Overnight Mail

EL714267691US

Mr. J.G. Long
Sterling, Winchester & Long
P.O. Box 211299
Martinez, GA 30907-1299

Re: United States Postal Service License Agreement

Dear Mr. Long:

Pursuant to a telephone conversation with Mr. Loyd today, I have revised the agreement to change the address to which notices will be sent and to add lines for initials to Exhibit E. As with all previous changes, these changes have not yet been reviewed or approved by the USPS and are therefore subject to change.

Mr. Loyd informed me that, despite your inquiry concerning the effective date of the agreement, you are now prepared to execute the agreement. Accordingly, please sign and initial each of the enclosed agreements where indicated and return them to me by no later than January 5, 2001. I will then forward them to the USPS for review and counter-signature and will provide you with a fully executed copy as soon as it is available.

Sincerely,

Robin M. Stemen
Associate Counsel

Encl.

cc: Ilene Kent (w/o encl.)
Marcie Chick (w/o encl.)
Jeff Olian (w/o encl.)

656

# EQUITY MANAGEMENT INC.®

OFFICES IN: SAN DIEGO · DETROIT · CHICAGO · NEW YORK

SAN DIEGO OFFICE:
4365 EXECUTIVE DRIVE, SUITE 1000
SAN DIEGO, CA 92121
(858) 558-2500
FAX (858) 558-2507

February 7, 2001

J.G. Long
Sterling, Winchester & Long
Post Office Box 211299
Martinez, GA 30907

Re: Sterling, Winchester & Long/United States Postal Service Trademark License Agreement

Dear Mr. Long:

Enclosed for your file is a fully executed original of the above-referenced Trademark License Agreement. USPS Licensing Program information and artwork will be mailed to you separately. In the interim, this letter will provide you with important contact information.

Please send royalty reports and payments to: USPS Licensing Program, PO Box 7247-7087, Philadelphia, PA 19710-7087. All checks must be made payable to "United States Postal Service." Enclosed is a copy of our Sales and Royalty Reporting Form, which is Exhibit C to the Trademark License Agreement. Please retain this form for use in submitting royalty reports and payments.

Please direct information requests to our Licensing/Business Management Department as follows: USPS Licensing Manager, Equity Management Inc., 3 Park Avenue, 31st Floor, New York, NY 10016, or via facsimile at (212) 685-7224.

We look forward to a mutually beneficial licensing relationship with your company. Please do not hesitate to contact the undersigned or Ilene Kent (EMI, New York) if you have any questions.

Sincerely,

Lori L. Ford
Legal Administrator

Enclosures

961

cc: Ilene Kent
Desiree Markham
Marcie Chick

CONFIDENTIAL
FOR INTERNAL
REVIEW ONLY

USPS Contract No. 102592-01-U-1173

# LICENSE AGREEMENT

THIS AGREEMENT is made effective as of the 1st day of July 2000, by and between the UNITED STATES POSTAL SERVICE ("USPS"), an independent establishment of the United States government, and STERLING, WINCHESTER & LONG ("Licensee"), a South Carolina corporation with its principal place of business at 1022 Dunbarton Road, Williston, SC 29853-1718, and a mailing address of P.O. Box 211299, Martinez, GA 30907-1299.

In this Agreement, USPS grants to Licensee a license to use certain names, trademarks, service marks, trade dress and/or copyrights in connection with the manufacture, distribution, advertising, promotion and sale of certain goods, listed below, on the terms and conditions specified below and in the attached Exhibits A and B, incorporated herein by reference. Definitions of the various terms used below are listed in Exhibit B:

1. Licensed Properties: The Licensed Properties are the trademarks, service marks, trade dress and/or copyrights listed on Exhibits A and E to this Agreement.

2. Licensed Articles:

   An annual series of up to five (5) thematic U.S. Postal Service 12-month calendars, commencing with calendar year 2002. Licensee must obtain prior approval of the thematic groupings.

3. License Type: Non-exclusive; provided, however, that subject to the terms set forth herein, Licensee shall have the exclusive right to use the stamp designs listed on Exhibit E on the Licensed Articles. Nothing contained herein shall preclude the USPS from producing, or licensing others to produce, calendars utilizing stamp designs not listed on Exhibit E, or from using, or licensing others to use, the stamp designs listed on Exhibit E on items other than calendars.

4. Licensed Territory:

   United States, its territories and possessions.

5. Channels of Distribution:

   Wholesale to bookstores, specialty stores, Philatelic catalogs, Philatelic centers and merchandise stores; Retail via Licensee's website, subject to the conditions set forth in Paragraph 18(a) below.

RECEIVED
JAN 17 2001

6. Initial Term: July 1, 2000 through December 31, 2004. Contract Period 1 shall commence July 1, 2000 and shall end December 31, 2002. Each consecutive twelve month period thereafter shall be deemed a Contract Period.

7. Renewal: See attached Exhibit D.

8. Royalty Rate:

Wholesale Sales: 8% of Net Sales of Licensed Articles bearing solely wholly-owned stamp designs and 6% of Net Sales of Licensed Articles bearing solely non-wholly owned stamp designs (i.e. Jointly-Owned Stamp Designs or stamp designs listed on Exhibit E as "status unknown"). A weighted royalty rate of between 6% and 8% of Net Sales shall apply to any Licensed Article bearing both wholly owned stamp designs and non-wholly owned stamp designs. Said rate shall be calculated based on the percentage that each category of stamp designs represents in relation to the total number of stamp designs used in that particular Licensed Article. For example, if a particular calendar contained 24 stamp designs, 6 of which were wholly owned and 18 of which were non-wholly owned, the applicable rate would be 6.5%, calculated as follows: (6/24 x 8%) + (18/24 x 6%) = 6.5%.

Retail Sales: 5% of Net Sales of all Licensed Articles.

The term "Net Sales" is defined in Exhibit B to this Agreement.

9. Guaranteed Minimum Royalty and Schedule: Licensee shall pay the following Guaranteed Minimum Royalties for the Initial Term:

| | |
|---|---|
| Contract Period 1 [7/1/00-12/31/02] | $50,000.00 |
| Contract Period 2 [1/1/03-12/31/03] | $ 50,000.00 |
| Contract Period 3 [1/1/04-12/31/04] | $ 50,000.00 |

The Guaranteed Minimum Royalty for Contract Period 1 shall be paid upon execution of this Agreement. The Guaranteed Minimum Royalty for Contract Periods 2 and 3 shall be paid in equal quarterly installments, as described in Section 4(c) of the attached Exhibit B.

10. Payments and Royalty Statements Shall Be Sent to:

USPS Licensing Program
PO Box 7247-7087
Philadelphia, PA 19710-7087

11. Notices to USPS Shall Be Sent to USPS and its Licensing Agent as Follows

| | |
|---|---|
| USPS notices: | U.S. Postal Service<br>Licensing Program/Stamp Development<br>475 L'Enfant Plaza SW, Rm 4474E<br>Washington, DC 20260-2437 |
| Representative notice: | Equity Management Inc.<br>4365 Executive Drive, Ste. 1000<br>San Diego, CA 92121<br>Attn: Manager of USPS Licensing Program |

12. Notices to Licensee Shall Be Sent to:

Sterling, Winchester & Long
P.O. Box 211299
Martinez, GA 30907-1299
Attn. J.G. Long

13. Insurance: $1,000,000 U.S. with a deductible that does not exceed 10%.

14. Form of Copyright And Trademark Notices: See Exhibit A to this Agreement.

15. Marketing Dates:

| | |
|---|---|
| Deadline for prototypes to Licensor: | 7/31/00 |
| Deadline for initial manufacturing run: | 12/31/01 |
| Deadline for submission of advertising and promotion materials: | 12/31/01 |
| Initial sale to Distribution Channel: | 12/31/01 |

16. Standard Terms And Conditions: See Exhibit B to this Agreement, which is incorporated herein by reference.

17. Licensee Federal Tax identification Number: 57-1099225.

18. Other Terms And Conditions:

(a) Prior to execution of this Agreement Licensee registered the following domain names containing Licensed Properties belonging to the USPS:

"uspscalendar2001.com"
"uspscalendar2002.com"
"uspscalendar2003.com"
"uspscalendar2004.com"
"uspscalendar2005.com"
"uspscalendar.com"
"uspsofficialcalendar.com"

Licensee hereby irrevocably assigns all rights, title and interest it has in said domain names to USPS and agrees to execute any additional documentation that might be necessary to formalize said assignment. USPS hereby grants to Licensee the exclusive right to use the domain names "uspscalendar2002.com," "uspscalendar2003.com," "uspscalendar2004.com" and "uspscalendar2005.com" during the term of this Agreement for the sole purpose of selling the Licensed Articles. Licensee may not use the domain names "uspsofficialcalendar.com" or "uspscalendar.com" at any time for any purpose. USPS shall not, during the Initial Term or any renewal term, use, or license others to use, the above listed domain names for any purpose.

Licensee represents and warrants that it has not registered any other domain names containing Licensed Properties belonging to the USPS and that it shall not register any other domain names containing Licensed Properties belonging to the USPS without USPS' prior written permission.

Upon EMI's receipt of satisfactory documentation of said registrations and the cost thereof, Licensee shall be entitled to recoup any registration fees actually incurred and paid prior to September 1, 2000 in the form of an offset against its Guaranteed Minimum Royalties in Contract Period 2. Any other expenses related to said domain names, including registration fees incurred or paid after September 1, 2000, and the cost of development and maintenance of any websites associated with those domain names, shall be the sole responsibility of Licensee. All webites shall be subject to the review requirements set forth in this Agreement and to any USPS policies or procedures governing websites.

(b) Licensee acknowledges that the USPS is unable to confirm that it is the sole owner of those stamp designs listed on Exhibit E as "status unknown," and that third parties may claim an ownership interest in certain of those stamp designs. In the event a third party asserts an ownership interest in any of the stamp designs listed on Exhibit E as "status unknown," it shall be Licensee's sole responsibility to attempt to obtain permission from the third party to use such stamp design. Any expense related to obtaining said permission, including payment of royalties, shall be borne solely by Licensee and shall not modify in any way Licensee's obligations under this Agreement. If Licensee is not able to obtain permission from the third party, Licensee shall immediately discontinue its

use of the subject stamp design, without modification of Licensee's obligations under this Agreement; provided, however, that Licensee shall have the right to request approval from USPS in accordance with the procedures set forth in Paragraph 18(c) below to substitute another stamp design in place of that stamp design it is unable to use.

Licensee further acknowledges that the exclusive nature of this Agreement is limited to those stamp designs that are wholly owned by USPS.

(c) Licensee shall have the right to supplement the stamp designs listed on Exhibit E with up to fourteen (14) additional stamp designs, which stamp designs will be selected in accordance with this provision. Licensee shall submit to USPS a list of those additional stamp designs it wishes to utilize, along with an indication of the thematic grouping in which it will be used. USPS will then have thirty (30) days in which to approve or deny the request, in its sole discretion. If, as a result of USPS denying Licensee's request in whole or in part, Licensee does not obtain approval of fourteen (14) stamp designs through the first request, Licensee shall be permitted to submit additional requests until it has received approval of fourteen (14) additional stamp designs or May 31, 2002, whichever is sooner.

In the event Licensee requests approval to use as part of the fourteen additional stamp designs any Jointly-Owned Stamp Designs, as that term is defined in Exhibit B, the request must be accompanied by proof, in a form acceptable to USPS, that Licensee has secured permission from the Joint Owner to use said stamp design. Any expense related to obtaining said permission, including payment of royalties, shall be borne solely by Licensee and shall not modify in any way Licensee's obligations under this Agreement. Licensee acknowledges that it shall be in the sole discretion of USPS to grant or deny a request to use a Jointly-Owned Stamp Design as part of the fourteen additional stamp designs, and that USPS shall not be obligated to grant such a request even if Licensee has secured permission from the Joint Owner to use said stamp design.

IN WITNESS WHEREOF, duly authorized representatives of USPS and Licensee have executed this Agreement, including the terms and conditions set forth in the attached Exhibits A and B.

| USPS | STERLING, WINCHESTER & LONG |
|---|---|
| By: H. Diane Fagan | By: J G Long |
| Name: H. Diane Fagan | Name: J. G. Long |
| Title: Contracting Officer | Title: Chief Managing Office |
| Date: 1-31-01 | Date: 1-4-01 |

## EXHIBIT A -- LICENSED PROPERTIES

"Licensed Properties" shall mean the following United States Postal Service trademarks, service marks, trade dress and/or copyrights:

United States Postal Service® (USPS) Corporate Signature
Postal Seals (1782-1993 [® or ™])
Postmark USA™

Those USPS stamp designs listed on Exhibit E, including any supplement thereto approved in writing by USPS [© ____ (year first publ.)]

Each use of a Licensed Property shall be accompanied by the appropriate designation indicated above. Each Licensed Article shall bear the following notice: "Trademarks and copyrights used herein [or hereon] are properties of the United States Postal Service and are used under license to Sterling, Winchester & Long. All rights reserved." Licensee shall display the marks listed above only according to the specifications provided by USPS.

**Concurrence (Initial)** ____

## EXHIBIT B -- STANDARD TERMS AND CONDITIONS

These Standard Terms and Conditions shall be deemed fully incorporated in the License Agreement ("Underlying Agreement") to which this Exhibit B is attached, and these Standard Terms and Conditions and the Underlying Agreement shall hereinafter collectively be referred to as the Agreement. All terms used in these Standard Terms and Conditions shall, unless expressly provided to the contrary herein, have the same respective meanings as set forth in the Underlying Agreement. Unless expressly provided to the contrary herein, to the extent that any provision of these Standard Terms and Conditions conflicts with any provision of the Underlying Agreement, the Underlying Agreement shall control.

1. **Definitions:** For purposes of this Agreement, the following terms shall have the following specified meaning:

a. "Close-Out" means the sale of merchandise at a very low price in order to reduce inventory in a short time, which shall be permitted during the Sell-Off period under the terms and conditions specified herein.

b. "Collateral Materials" means packaging, cartons and containers, packing and wrapping material, tags and labels.

c. "Net Sales" mean the Licensee's gross sales, less only sales taxes and returns actually allowed by Licensee.

d. "Jointly-Owned Stamp Designs" means those United States postage stamp designs featuring trademarks, copyrights, or rights of publicity that are owned or controlled by USPS and a Joint-Owner(s).

e. "Joint-Owner(s)" means an entity, other than USPS or Licensee, recognized by USPS as owning rights in a stamp design.

f. "Premium" means any article used for the purpose of increasing the sale, promoting, or publicizing any other product or any service, including but not limited to incentives for consumers, sales forces, members of the trade, or fund-raising.

g. "Promotional Materials" means all advertising and sales materials, including but not limited to sales sheets, brochures, direct mail, and catalog layouts.

h. "Sell-Off Period" means the ninety (90) day period commencing after the termination of the Agreement, during which Licensee may dispose of excess inventories of Licensed Articles.

i. Unless otherwise stated herein, all references to "day(s)" shall refer to calendar days, not business days.

The terms identified in the Underlying Agreement shall have the meanings specified herein for purposes of this Agreement.

2. **Grant of License:**

a. Grant: Subject to the limitations set forth herein, USPS hereby grants to Licensee a non-transferable, non-exclusive license to design, manufacture, have manufactured, sell, distribute, and advertise Licensed Articles bearing the Licensed Properties in the Licensed Territory during the Contract Periods provided herein.

b. Limitations on Grant:

(1) Licensee shall not have the right to grant sublicenses of any or all of its rights under this Agreement unless it first obtains USPS' prior written consent to each sublicense, which consent shall not be unreasonably withheld.

(2) No license is granted hereunder for the use of the Licensed Properties for any purpose other than upon or in connection with the Licensed Articles.

(3) USPS licenses Licensee to use the USPS corporate signature identified in Licensed Properties only in connection with the sale of Licensed Articles displaying Licensing Properties that are stamp designs and only for the purpose of indicating that the use of the Licensed Properties are authorized by USPS.

(4) Except as set forth in the Underlying Agreement, nothing in this Agreement shall be construed to prevent USPS from granting any other licenses for the use of the Licensed Properties in any manner whatsoever.

(5) Licensee shall not sell or distribute the Licensed Articles in any country outside the Licensed Territory and will not knowingly sell the Licensed Articles to persons who intend or are likely (based on information known to Licensee) to resell them in any country outside the Licensed Territory. Notwithstanding the foregoing, Licensee may sell and ship Licensed Articles outside the Licensed Territory in response to orders placed via Licensee's website provided that no such individual order is for more than five (5) of any one Licensed Article.

(6) No license is granted hereunder for use of the Licensed Properties in connection with or on premium sales, close-outs, door-to-door, television sales (excluding home shopping television networks), infomercials, contest products, combination sales, or any similar methods of merchandising.

(7) USPS reserves any rights not expressly granted herein.

c. Licensee's Obligations:

(1) Licensee agrees to use its best efforts to sell, distribute and supply the Licensed Articles within the Licensed Territory. Licensee must begin the bona fide manufacture, distribution, and sale of the Licensed Articles on a Licensed Territory-wide basis on or before the date specified in the Underlying Agreement. Failure by the Licensee to timely engage in full and regular distribution and active marketing of the Licensed Articles is considered a material breach of this Agreement. If Licensed Articles are out of distribution in any country of the Licensed Territory for more than twelve (12) months, USPS may terminate the Agreement with respect to those specific Licensed Articles and country or countries of the Licensed Territories, at any time, in its sole discretion, and any and all rights in and to those Licensed Articles in those countries within the Licensed Territory revert immediately to USPS. If any rights with respect to some, but not all specific Licensed Articles or countries within the Licensed Territory shall revert to USPS pursuant to this paragraph, all of the remaining terms and conditions of this Agreement shall remain in full force and effect, including, but not limited to, payment of specified Royalty Payments and Guaranteed Minimum Annual Royalty.

(2) Licensee further undertakes to make and maintain adequate and reasonable arrangements for the distribution of Licensed Articles through the Channels of Distribution specified in the Underlying Agreement. Licensee agrees to maintain adequate inventories of the Licensed Articles as an essential part of its distribution program. All Close-outs shall be sold only through retail outlets and traditional and accepted dealers in such merchandise and upon such terms and conditions as USPS,

in its reasonable discretion, determines appropriate, and shall not be sold to any person or entity which Licensee knows, or has reason to know based on information known to Licensee, will export such Close-outs from the Licensed Territory.

3. Term: This Agreement shall be for the period set forth in the Underlying Agreement, unless sooner terminated in accordance with the terms and conditions set forth herein.

4. **Payment:**

a. Royalty Rate: Licensee agrees that it will pay USPS a non-refundable royalty equal to the percentage set forth in the Underlying Agreement on Licensee's Net Sales of Licensed Articles made during the Term of this Agreement, any extensions or renewals, and any Sell-off Period ("Royalty Payments").

b. Guaranteed Minimum Payment: Licensee agrees to pay USPS the Guaranteed Minimum Royalty set forth in the Underlying Agreement, according to the payment schedule set forth therein. The Guaranteed Minimum Royalty Payment is an advance against and is deducted from the Royalty Payments due during the Initial Term. No portion of the Guaranteed Minimum Royalty Payment is refundable under any circumstance. If this Agreement is terminated as a result of a material breach of the Agreement by Licensee, the greater of all Guaranteed Minimum Royalty Payments and/or earned Royalty Payments due for the remainder of the Initial Term of the Agreement and any agreed-upon renewals thereof shall immediately become due and payable.

c. Statements and Payments: On or before the fifteenth (15th) day of the month following each calendar quarter, Licensee shall submit a full, accurate, and detailed statement in the format outlined in Exhibit C, signed by an authorized officer of Licensee, and certified as accurate, and simultaneously shall make all payments thereon. Such statements and payments shall be made payable to the U.S. Postal Service Licensing Program at the address in the Underlying Agreement, with a copy to USPS's representative at the address in the Underlying Agreement. Interest shall be charged against Licensee at the rate of one and one-half percent (1½%) over the current prime rate (CitiBank) or the maximum rate permitted by law, whichever is lower, and shall accrue on each unpaid amount from the first day payment becomes due through the date of payment. Licensee hereby waives all claims to the return of any royalty payments once made, including but not limited to claims for refund of payments for returns of Licensed Articles in subsequent reporting periods. Licensee shall furnish such statements to USPS whether or not any Licensed Articles were sold during the Period.

d. Sales to the Postal Service: Licensee shall not be required to make royalty payments on sales of Licensed Articles to USPS, whether for promotional use or retail sale, but Licensee shall reduce the sales price paid by USPS by an amount equal to the royalty. Licensee shall identify all sales to USPS on its quarterly statements.

5. **Approvals and Quality Control:** USPS shall have the right to approve or disapprove the nature and quality of all products or services offered for sale under this Agreement, the appearance and use of all marks licensed under this Agreement, and the appearance and use of all advertising and promotion for the products or the marks covered by this Agreement, which approval shall not be unreasonably withheld.

a. USPS Approval of Licensed Articles: The styles, designs, packaging, contents, workmanship, and quality of all Licensed Articles and associate materials must be approved by USPS prior to the distribution or sale thereof. USPS maintains the right to take all reasonable actions which it deems necessary to ensure that Licensed Articles manufactured or sold hereunder are consistent with the high quality and reputation of the Licensed Properties.

b. Licensee Compliance with Applicable Law: All Licensed Articles shall be manufactured, sold, labeled, packaged, distributed, and advertised in accordance with all applicable laws and regulations.

c. Delivery and Approval of Samples:

(1) Licensee shall, before selling or distributing any Licensed Articles, furnish to USPS free of cost, for written approval, one each of concept art, final art, mock-ups, and prototypes of the Licensed Articles, and all designs which Licensee intends to use in connection with the Licensed Properties, to be followed by six (6) production samples of each Licensed Article, together with its Collateral Materials, and any additional samples as may be reasonably required. Licensee shall also submit all Promotional Materials for prior written approval by USPS. The Licensed Articles, Collateral Materials, and Promotional Materials shall be of a standard of quality,

appearance, and style approved in writing by USPS prior to any advertising, sales, distribution or use of same taking place. All approvals shall be solely at USPS' reasonable discretion, including that the item does not fit and/or reasonably support the imagery and equity of the Licensed Properties or the USPS.

(2) Any item submitted for approval shall be approved or disapproved within twenty (20) calendar days after receipt. USPS may extend the approval period an additional ten (10) calendar days by giving written notice to Licensee. Any disapproval shall include a written explanation of the reason(s) for the disapproval, and shall be without prejudice to Licensee's right to modify the item and re-submit it for review. If Licensee has not received approval or disapproval within the provided time frame, the submission shall be deemed disapproved. All approvals shall be solely at USPS' reasonable discretion, including that the item does not fit and/or reasonably support the imagery and equity of the Licensed Properties or the USPS.

(3) After samples of the Licensed Articles, Collateral Materials, and Promotional Materials have been approved pursuant to this paragraph, Licensee shall not depart therefrom without written consent by USPS. In the event there is a departure from the approved samples, USPS shall have the right in the reasonable exercise of its sole discretion to withdraw its approval of such Licensed Articles, Collateral Materials, or Promotional Materials or terminate this Agreement unless Licensee cures such breach within thirty (30) calendar days of written notice of same.

d. Use of Property: License shall not use any other trademark or design in combination with any Licensed Property on any Licensed Article without USPS' prior written approval. Licensed Articles shall not be sold or otherwise distributed by

Licensee under any mark other than the Licensed Properties. Licensee shall cause to appear on all Licensed Articles produced hereunder, and on their tags, packaging, and the like such legends, markings, disclaimers, and trademark and copyright notices as USPS may specify. Whenever Licensee reproduces the stamp designs set forth in Exhibits A and E, it must reproduce them in their entirety on the Licensed Articles and licensee shall make no alterations, additions, subtractions, or modifications to such stamp designs without USPS' prior written approval. If any such alterations, additions, subtractions, or modifications result in the creation of a new or derivative work within the meaning of copyright law, Licensee hereby assigns any and all rights to such works, including but not limited to any and all copyrights, to USPS.

6. **Confidentiality:** Any information or documents received or learned by Licensee in any form related to USPS's stamp program, future stamp images, or any postal programs or initiatives not publicly available, shall constitute Confidential Information. Until such time as Licensee releases a Licensed Article, the specific design features of the Licensed Articles shall constitute Confidential Information, but Licensee's identity and the general nature of the Licensed Articles shall not constitute Confidential Information. The parties are strictly prohibited from disclosing any Confidential Information. Failure to adhere to this requirement is a material breach of contract.

7. **Records:** Licensee agrees to keep accurate books of account and records covering all transactions relating to this Agreement. USPS and its duly authorized representatives shall have the right at all reasonable hours to examine such books of account and records in Licensee's possession or under its control with respect to the subject matter and terms of this Agreement, and shall have free and full access thereto

for such purposes and for the purpose of making copies thereof. All such books of account and records shall be kept available for at least three (3) years after the termination of this Agreement. Licensee further agrees, in order to facilitate inspection of its books and records with respect to amounts due, that it will designate a symbol or number that will be used exclusively in connection with Licensed Articles and with no other articles which Licensee may manufacture, sell or distribute. In the event that USPS or USPS' duly authorized representatives shall discover a discrepancy in favor of USPS of six percent (6%) or more on any Royalty Statement, Licensee shall pay to USPS the reasonable cost of such examination. The fee for said examination shall be Five Hundred Dollars ($500) per day, but in no event shall Licensee be charged in excess of Three Thousand Dollars ($3000) for any individual examination.

8. **Intellectual Property Rights:**

a. Licensee recognizes the great value of the goodwill associated with the Licensed Properties and acknowledges that all rights therein and goodwill attached thereto belong exclusively to USPS, and that all use of the Licensed Properties will inure to the benefit of USPS.

b. USPS may seek, in its own name and at its own expense, appropriate trademark and/or copyright protection for the Licensed Properties. USPS shall retain all right, title, and interests in the Licensed Properties, including any modifications or improvements made to the Licensed Properties by Licensee, but expressly excluding any calendar design developed by Licensee for use with the Licensed Articles provided that such design does not incorporate or include the Licensed Properties or any

designation, insignia or mark which is the same as or confusingly similar to the Licensed Properties.

c. In the event Licensee requests that USPS obtain copyright, trademark, or other such protection for a particular item or in a particular country where USPS had not heretofore obtained such protection, USPS agrees to take reasonable steps to obtain such protection, provided, however, that Licensee shall reimburse USPS for the costs of filing, prosecuting, and maintaining same. Nonetheless, USPS shall own such copyright, trademark, or other such protection for a particular item or in a particular country and License shall make any assignments of rights to USPS necessary to transfer ownership of such copyrights, trademarks or other protection to USPS.

d. Licensee agrees that, during the term of this Agreement or thereafter, Licensee will not contest, harm, misuse, or bring into disrepute any of USPS's rights, in and to the Licensed Properties, or contest the validity of this Agreement. Licensee acknowledges and agrees that USPS would not have an adequate remedy at law and would be irreparably harmed in the event Licensee were to misuse, harm, or bring into disrepute any of USPS' Licensed Properties or if Licensee were to breach any term of this Agreement concerning the proper use of the Licensed Properties. Accordingly, it is agreed that, in the event of any breach or threatened breach of this paragraph or any term or condition of this Agreement concerning the proper use of the Licensed Properties, USPS, in addition to any other remedies at law or in equity, shall be entitled to equitable relief, including but not limited to immediate injunctive relief without the requirement of posting a bond or other security and without resorting to Arbitration herein.

9. **Termination:**

a. Without prejudice to any other rights, and in addition to any termination rights provided elsewhere in this Agreement, USPS shall have the right to terminate this Agreement upon written notice to Licensee at any time if:

(1) Licensee shall fail to make any payment due hereunder, which such payment is not in dispute, or to deliver any of the statements herein referred to, and if such default shall continue for a period of ten (10) calendar days after written notice of such default is given in accordance with Section 17, below;

(2) Licensee shall fail to perform any other material term or condition of this Agreement and, unless otherwise provided herein, does not cure such failure within thirty (30) calendar days after written notice is given in accordance with Section 17, below; or

(3) Licensee files a petition in bankruptcy, or is adjudicated a bankrupt, or if a petition in bankruptcy is filed against Licensee, or if Licensee becomes insolvent, or makes an assignment for the benefit of its creditors or an arrangement pursuant to any bankruptcy law, or if Licensee discontinues its business, or if a receiver is appointed for Licensee or its business. In the event this Agreement so terminates, neither Licensee nor its receivers, representatives, trustees, agents, administrators, successors, and/or assigns shall have any right to manufacture, distribute, sell, exploit or in any way deal with any of the Licensed Articles except with and pursuant to USPS' prior written consent.

b. Licensee shall have the right to terminate this Agreement upon thirty (30) days prior written notice to USPS given in accordance with Section 17, below, if USPS

shall fail to perform any material term or condition of this Agreement unless, within the notice period, USPS cures the breach or provides Licensee with notification that the breach cannot reasonably be cured within that period and provides reasonable assurances that the breach will be cured in a period acceptable to Licensee.

c. Termination of this license under the provisions of this paragraph shall be without prejudice to any rights that either party may otherwise have against the other party.

d. Upon the termination of this Agreement by USPS, notwithstanding anything to the contrary herein, all royalties on sales theretofore made shall become immediately due and payable and no Royalty Payments and Guaranteed Minimum Royalties shall be repayable, and any balances owed on Guaranteed Minimum Royalties shall be immediately due and payable. Notwithstanding any termination or expiration of this Agreement, USPS shall have and hereby reserves all rights and remedies which it has or which are granted to it by operation of law, to enjoin the unlawful or unauthorized use of the Licensed Properties.

10. <u>Disposal of Stock/Sell-Off Period</u>:

a. After expiration or termination of this Agreement, Licensee shall have no further right to manufacture, advertise, distribute, sell, or otherwise deal in any Licensed Articles except as hereinafter provided.

b. It is specifically understood that Licensee shall not sell or dispose of any such Licensed Articles in job lots at reduced prices, other than is customary in the ordinary course of business.

c. After expiration or termination of this Agreement, the parties shall follow the procedures set forth below:

(1) Licensee shall prepare a complete, written inventory list and submit same to USPS within ten (10) days of the expiration or termination of this Agreement. Such list must include orders on hand, work in process, and finished Licensed Articles.

(2) USPS shall have thirty (30) days thereafter to decide whether to purchase any or all inventory at the lower of Licensee's cost or fair market value. If USPS exercises such right of purchase, Licensee shall deliver the inventory referred to in USPS' notice of purchase within ten (10) days after USPS' said notice with the exception of inventory necessary to fulfill orders on hand. USPS shall pay Licensee for such delivered inventory as is in marketable condition within thirty (30) days after its receipt thereof.

(3) If USPS does not elect to purchase any or all of the inventory as set forth above, Licensee, on a non-exclusive basis, may dispose of Licensed Articles which are on hand or in process at the time of such expiration or termination, for a period of not more than ninety (90) days thereafter, provided all royalty payments with respect to that ninety (90) day period are made in accordance with provisions herein. Licensee shall have no right to dispose of Licensed Articles if this Agreement is terminated under Paragraphs 9.a.1, 9.a.3 or 9.a.4 herein.

d. Except as specifically provided in this Agreement, on the expiration or termination of this Agreement, all of the rights of Licensee under this Agreement shall terminate herewith and shall revert immediately to USPS. All royalties on sales made shall become immediately due and payable, and Licensee shall discontinue all use of

the Licensed Properties and shall promptly transfer to USPS, free of charge, all registrations, filings and rights with regard to the Licensed Property which Licensee may have possessed at any time. The underlying rights, including but not limited to any and all trademarks and copyrights to all artwork, photographs, drawings, illustrations, forms, patterns and similar items developed by Licensee in the manufacture, sale or distribution of Licensed Articles, are the property of USPS.

11. **Dispute Resolution:** If a dispute arises out of or relates to this Agreement, or the breach thereof, and if the dispute cannot be settled through direct discussions, the parties agree first to endeavor to settle the dispute in an amicable manner by negotiation between the parties at the level of contracting officer. If the dispute cannot be settled at that level within 30 calendar days of the start of such negotiations, then the parties may, by mutual agreement, conduct a non-binding mediation proceeding under such rules and procedures as they may agree upon. Thereafter, any unresolved controversy or claims arising out of or relating to the Agreement, or the breach thereof, may be brought by a party in the appropriate judicial forum as further defined herein.

12. **Consent To Jurisdiction:** With respect to any suite, action or other proceeding relating to the Agreement that has not been resolved by negotiation or mediation (collectively "Proceedings"), the parties each irrevocably submit to the exclusive personal jurisdiction of the United States District Court for the District of Columbia and waive any objection that it may have at any time to the laying of venue of any Proceedings brought in such court, waive any claims that such Proceedings have been brought in an inconvenient forum and further waive claims the right to object, with

respect to such Proceedings, that such court does not have personal jurisdiction over such party.

13. **Choice Of Law:** This Agreement shall be governed by and construed in accordance with principles of federal common law, or if there is found to be no such common law, then the law of the State of New York. Further, the parties each agree and acknowledge that neither the provisions of the USPS Purchasing Manual nor the Contract Disputes Act of 1978, 41 USC §601 et seq., shall apply to this Agreement, and the parties waive any and all express and implied remedies, recourse or administrative procedures provided or created thereby.

14. **Indemnification:** Excluding claims based upon use of those Licensed Properties identified by USPS in Exhibit E as being wholly owned, Licensee agrees to defend, indemnify and hold USPS and/or any of its agents and assignees harmless against any and all claims, demands, causes of action, liability, loss, damage, judgments or expense (including reasonable attorneys' fees and court costs) arising out of Licensee's design, manufacture, distribution, shipment, labeling, sale, distribution, advertisement, or promotion of the Licensed Articles or the labeling, packaging, advertising and promotional materials for the Licensed Articles. USPS shall have the right to defend any such claim or suit through counsel of its own choice.

15. **Insurance:** Licensee shall, throughout the term of this Agreement, including extensions, and for a period of two (2) years thereafter, obtain and maintain at its own cost and expense a third-party liability insurance policy with a recognized insurance carrier acceptable to USPS (such acceptance not to be unreasonably withheld), naming USPS and Equity Management Inc. ("EMI") as "Additional Named Insureds" or the like,

including a waiver of subrogation in favor of USPS and EMI. The amount of coverage shall be in accordance with the amount set forth in the Underlying Agreement. This insurance shall provide for at least sixty (60) days prior written notice to USPS and Licensee of the cancellation or any material change or modification in the terms and conditions of the policy. Licensee shall, not more than thirty (30) days after the signing of this Agreement and, thereafter, from time to time upon reasonable request by USPS, promptly furnish to USPS the requisite certificates of insurance, or, upon USPS's request, certified copies of said insurance policies, satisfactory to USPS, as to the maintenance of the insurance described above. Licensee shall not distribute or sell the Licensed Articles prior to receipt by USPS of such evidence of insurance.

16. **Renewal:** Until three (3) months prior to the expiration of the Initial Term of the Agreement, Licensee shall have the option to renew this Agreement for the First Renewal Term provided in the Underlying Agreement. Any renewal pursuant to this paragraph is subject to the following conditions: (i) this Agreement has not been terminated in accordance with the provisions hereof, and (ii) Licensee has met the conditions set forth in Exhibit D.

17. **Notices:** All notices and statements to be given and all payments to be made hereunder, shall be given or made at the respective addresses of the parties as set forth in the Underlying Agreement unless notification of a change of address is given in writing. Any notice shall be sent by registered or certified mail, and shall be deemed to have been given on the third business day after it is mailed.

18. **Joint Ventures:** Nothing herein contained shall be construed to place the parties in the relationship of partners or joint venturers or agents, and neither party shall have

the power to obligate or bind the other party in any manner whatsoever. Licensee warrants that no person or selling agency has been employed or retained to solicit or secure this Agreement upon an agreement or understanding for a commission, percentage, brokerage or contingent fee, excepting bona fide employees or bona fide established commercial or selling agencies maintained by Licensee for the purpose of securing business. For breach or violation of this warranty, USPS shall have the right to terminate this Agreement without liability or in its discretion, to recover the full amount of such commission, percentage, brokerage or contingent fee. No member of, or delegate to Congress, or resident commissioner, shall be admitted to any share or part of this Agreement or to any benefit that may arise therefrom; but this prohibition shall not be construed to extend to this Agreement if made with a corporation for its general benefit.

19. <u>Enforcement of Licensed Properties</u>:

a. Licensee agrees to cooperate with and assist USPS in protecting and enforcing USPS' rights to the Licensed Properties. Licensee shall promptly inform USPS of any infringement or other violations of the Licensed Properties that come to its attention. USPS shall have the sole right at its own expense to determine whether or not any action shall be taken on account of any such infringement or violations. USPS shall receive all amounts awarded as damages, profits, settlement proceeds or otherwise in connection with such claims or suits.

b. Licensee agrees not to contest or otherwise challenge or attack USPS' rights in the Licensed Properties or the validity of the license granted herein during the term of this Agreement and thereafter. Licensee further agrees not to do anything either by act of omission or commission that might impair, jeopardize, violate or infringe the Licensed Properties, or to misuse or bring into dispute the Licensed Properties.

c. Licensee shall not use any of the Licensed Properties as part of its company name, corporate name or trade name, and shall not attempt to register any of the Licensed Properties or confusingly similar marks or substantially similar designs in the Licensed Territory or elsewhere during the term of this Agreement or thereafter, or aid or abet anyone else in doing so.

d. The administrative and judicial defense of the Licensed Properties in the Licensed Territory shall be undertaken solely by USPS. Licensee agrees to furnish USPS or its designated legal representative with all proof and commercial, technical or other information or assistance required and which Licensee is able to furnish, as well as such other assistance as USPS or its lawyers may reasonably require for this purpose. Licensee shall, if requested by USPS, join USPS in the aforementioned administrative and judicial defense of the Licensed Properties, the cost of which shall be borne exclusively by USPS.

e. Licensee agrees to cooperate with USPS in any effort that USPS may deem advisable to record Licensee as a registered user or the like. Upon expiration or termination of this Agreement for any reason, Licensee shall similarly cooperate with USPS in expunging any such recordations that may exist. All expenses associated with such recording and expungement of recordations shall be borne by USPS.

20. <u>No Assignment</u>: This Agreement shall be binding upon and inure to USPS and its successors and assigns, but may not be assigned, transferred, or delegated by Licensee in whole or in part with respect to any right or obligation herein without the prior written consent of USPS, which consent shall not be unreasonably withheld. Any assignment without USPS consent shall be void. A transfer of the legal and/or beneficial ownership, whether by operation of law or otherwise, of more than 25% of the voting equity of Licensee (other than transfers of voting equity among the present shareholders or owners of Licensee) shall be deemed an assignment or transfer of the license hereunder that shall require the prior written consent of USPS.

21. <u>Force Majeure</u>: It is understood and agreed that in the event that an act of the government, or war conditions, or fire, flood or labor trouble in the factory of Licensee or in the factory of those manufacturing Licensed Articles, prevents the performance by Licensee of the provisions of this Agreement, then such nonperformance by Licensee shall not be considered as grounds for breach of this Agreement and such nonperformance shall be excused while the conditions herein prevail and for two (2) months thereafter.

22. **Miscellaneous:** This Agreement constitutes the entire Agreement and understanding between the parties hereto and terminates and supersedes any prior Agreement or understanding relating to the subject matter hereof between USPS and Licensee. USPS and Licensee are not relying upon any statements, warranties, or representations except those contained in this Agreement. The paragraph and other headings contained herein are for reference purposes only and will not affect the meaning of interpretation of this Agreement. None of the provisions of this agreement can be waived or modified except in writing signed by both parties, and there are no representations, promises, agreements, warranties, covenants or undertakings other than those contained herein.

23. **No Reliance On Other Representations**: The parties have not relied on any representations, promises, warranties, covenants, statements, or undertakings by the other party or its counsel other than those contained in this Agreement.

24. **Time Is Of The Essence**: Time is of the essence in this Agreement.

**Concurrence (Initial)**.

**EXHIBIT C -- FORM OF ROYALTY STATEMENTS**
EQUITY MANAGEMENT INC.

SALES AND ROYALTY REPORT

**To:** Equity Management Inc.
Attn: Contract Administration
4365 Executive Dr., Suite 1000
San Diego, CA 92121

**From:** (Licensee) ______________________________

**Equity:** (Licensor) ______________________________

**Licensed Territory:** ______________________________
(Report required for each country in which the Licensed Products were sold)

**Quarter:** From: ______________ To: ______________

| ( a ) Item No. | ( b ) Description | ( c ) Unit Price | ( d ) Units Sold | ( e ) Total Unit Sales |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| ( f ) | Totals | | | |

( g ) Royalty Rate _________%; Total Earned Royalties $ __________
( h ) Unapplied Advance at Quarter Start $ __________
( i ) Difference; Subtract (h) from Line (g) $ __________
( j ) Annual Guaranteed Royalties (divided by 4) $ __________
( k ) Payment Accompanying this Report $ __________
(pay greater of Line (i) or (j)) __________

The above Report is certified to be true and correct by the above named Licensee

By: ______________________
Name: ______________________
Title: ______________________
Date: ______________________

## EXHIBIT D -- RENEWAL TERMS

Type of Renewal: Automatic

Renewal Hurdle Minimum:

Licensee's Net Sales during the four quarters beginning 10/1/03 and ending 9/30/04 must generate a minimum of $60,000 in earned royalties in order for Licensee to qualify for an automatic renewal.

Number of Renewals: One

Renewal Term: Three Years

Special Renewal Conditions: Not Applicable

Renewal Term Earned Royalty Percentages: 8% of Net Sales.

Guaranteed Minimum Royalties:

The following Guaranteed Minimum Royalties for the Renewal Term shall be paid in equal quarterly installments:

| | | |
|---|---|---|
| Contract Period 4 | 1/1/05 – 12/31/05 | The greater of $60,000 or 75% of the royalties due for Contract Period 3. |
| Contract Period 5 | 1/1/06 – 12/31/06 | The greater of $70,000 or 75% of the royalties due for Contract Period 3. |
| Contract Period 6 | 1/1/07 – 12/31/07 | The greater of $80,000 or 75% of the royalties due for Contract Period 3. |

Renewal Licensed Properties:

Licensee shall submit to USPS by no later than July 1, 2004, a list of the 270 wholly-owned stamp designs that Licensee desires to use on the Licensed Articles during the Renewal Term. Said list must be in the form of the list set forth in Exhibit E. Approval of the list is in the sole discretion of the USPS. USPS shall notify Licensee of its decision concerning the list within 90 days of receipt thereof.

EXHIBIT E - STAMP DESIGNS

| Scott Catalog Number | Description | STATUS |
|---|---|---|
| 118 | Columbus Landing | Unknown |
| 121 | Shield, Eagle & Flag | Unknown |
| 805 | Martha Washington | Unknown |
| 873 | Booker T. Washington | Unknown |
| 902 | Thirteenth Amendment | Unknown |
| 929 | IWO Jima | Unknown |
| 948 | 100th Anniversary USP Stamp | Unknown |
| 967 | Clara Barton | Unknown |
| 972 | Indian Centennial | Unknown |
| 973 | Rough Riders | Unknown |
| 974 | Juliette Gordon Low | Unknown |
| 1051 | Susan B. Antony | Unknown |
| 1052 | Patrick Henry | Unknown |
| 1063 | Lewis & Clark Expedition | Unknown |
| 1074 | Booker T. Washington Home | Unknown |
| 1093 | School Teachers | Unknown |
| 1099 | Religious Freedom | Unknown |
| 1113 | Lincoln | Unknown |
| 1119 | Freedom of the Press | Unknown |
| 1154 | Pony Express | Unknown |
| 1155 | Employ the Handicapped | Unknown |
| 1178 | Fort Sumter | Unknown |
| 1179 | Shiloh | Unknown |
| 1180 | Gettysburg | Unknown |
| 1182 | Appomattox | Unknown |
| 1213 | George Washington | Unknown |
| 1236 | Eleanor Roosevelt | Unknown |
| 1239 | International Red Cross | Unknown |
| 1264 | Winston Churchill | Unknown |
| 1267 | Salvation Army | Unknown |
| 1285 | Albert Einstein | Unknown |
| 1290 | Frederick Douglass | Unknown |
| 1312 | The Bill of Rights | Unknown |
| 1344 | Register and Vote | Unknown |
| 1372 | W.C. Handy | Unknown |
| 1385 | Hope for the Crippled | Unknown |
| 1421 | Disabled American Veterans | Unknown |
| 1422 | US Serviceman | Unknown |
| 1438 | Prevent Drug Abuse | Unknown |
| 1439 | Care | Unknown |
| 1463 | PTA | Unknown |
| 1483 | Boston Tea Party (4) | Unknown |
| 1486 | Henry Ossawa Tanner | Unknown |

991



Concurrence (Initial)

EXHIBIT E - STAMP DESIGNS

| | | |
|---|---|---|
| 1549 | Retarded Children | Unknown |
| 1554 | Paul L. Dunbar | Unknown |
| 1560 | Salem Poor | Unknown |
| 1595 | Liberty Bell | Unknown |
| 1686 | The Surrender of Lord Cornwalls at Yorktown | Unknown |
| 1687 | The Declaration of Independence, 4 July 1776 | Unknown |
| 1688 | Washington Crossing the Delaware | Unknown |
| 1689 | Washington Reviewing His Ragged Army | Unknown |
| 1726 | Members of Continental Congress | Unknown |
| 1744 | Harriet Tubman | Wholly Owned |
| 1787 | Seeing Eye Dog | Wholly Owned |
| 1788 | Special Olympics | Unknown |
| 1802 | Vietnam Veterans | Wholly Owned |
| 1804 | Benjamin Banneker | Unknown |
| 1824 | Helen Keller | Unknown |
| 1860 | Ralph Bunche | Unknown |
| 1865 | Charles Drew | Unknown |
| 1875 | Whitney Moore Young | Unknown |
| 1910 | American Red Cross | Unknown |
| 1926 | Edna St. Vincent | Unknown |
| 1927 | Alcoholism | Wholly Owned |
| 2039 | Voluntarism | Wholly Owned |
| 2044 | Scott Joplin | Unknown |
| 2073 | Carter G. Woodson | Unknown |
| 2103 | Hispanic Americans | Wholly Owned |
| 2109 | Vietnam Veterans | Wholly Owned |
| 2137 | Mary Mclead Bethume | Unknown |
| 2152 | Korean War Veteras | Unknown |
| 2153 | Social Security Act | Wholly Owned |
| 2154 | WWI Veterans | Wholly Owned |
| 2159 | Public Education | Wholly Owned |
| 2164 | Help End Hunger | Wholly Owned |
| 2168 | Margaret Mitchell | Unknown |
| 2169 | Mary Lyon | Unknown |
| 2203 | Sojourner Truth | Wholly Owned |
| 2211 | Duke Ellington | Unknown |
| 2216 | Presidents - sheet of 9 | Wholly Owned |
| 2217 | Presidents - sheet of 9 | Wholly Owned |
| 2218 | Presidents - sheet of 9 | Wholly Owned |
| 2219 | Presidents - sheet of 9 | Wholly Owned |
| 2223 | Matthew Henson | Wholly Owned |
| 2224 | Statue of Liberty | Unknown |
| 2249 | Pointe Du Sable | Wholly Owned |
| 2275 | United Way | Unknown |
| 2336 | Delaware | Wholly Owned |
| 2337 | Pennsylvania | Wholly Owned |
| 2338 | New Jersey | Wholly Owned |

992



Concurrence (Initial)

EXHIBIT E - STAMP DESIGNS

| | | |
|---|---|---|
| 2339 | Georgia | Wholly Owned |
| 2340 | Connecticut | Wholly Owned |
| 2341 | Massachusetts | Wholly Owned |
| 2342 | Maryland | Wholly Owned |
| 2343 | South Carolina | Wholly Owned |
| 2344 | New Hampshire | Wholly Owned |
| 2345 | Virgina | Wholly Owned |
| 2346 | New York | Wholly Owned |
| 2347 | North Carolina | Wholly Owned |
| 2348 | Rhode Island | Wholly Owned |
| 2360 | Constitution Signing | Wholly Owned |
| 2371 | James Weldon Johnson | Unknown |
| 2567 | Jan E. Matzellger | Unknown |
| 2616 | World Columbian | Wholly Owned |
| 2620 | Seeking Queen Isabella's Support | Wholly Owned |
| 2624 | First Sighting of Land | Wholly Owned |
| 2625 | Claiming a New World | Wholly Owned |
| 2626 | Seeking Royal Support | Wholly Owned |
| 2627 | Royal Favor Restored | Wholly Owned |
| 2628 | Reporting Discoveries | Wholly Owned |
| 2629 | Christopher Columbus | Wholly Owned |
| 2765 | WWII Turning the Tide | Wholly Owned |
| 2818 | Buffalo Soldiers | Wholly Owned |
| 3081 | Breast Cancer Awareness | Wholly Owned |
| 3121 | Benjamin O. Davis, Sr. (only as stamp)+C59 | Wholly Owned |
| 3125 | Helping Children Learn | Wholly Owned |
| 3136 | Dinosaurs | Wholly Owned |
| 3139 | Ben Franklin | Wholly Owned |
| 3175 | Kwanzaa | Wholly Owned |
| 3315 | Prostate Cancer | Wholly Owned |
| 1631a | Fife Player | Unknown |
| 2359a | Const. Bicentennial Issue | Wholly Owned |
| 2623a | First Voyage of Christopher Columbus | Wholly Owned |
| 2782a | 4 Sheet National Postal Museum | Wholly Owned |
| 2869q | Jim Beckwourth | Wholly Owned |
| 2966 | Prisoners | Wholly Owned |
| 2975b | Robert E. Lee | Wholly Owned |
| 2975c | Clara Barton | Wholly Owned |
| 2975d | Ulysses S. Grant | Wholly Owned |
| 2975e | Battle of Shiloh | Wholly Owned |
| 2975f | Jefferson Davis | Wholly Owned |
| 2975h | Frederick Douglass | Wholly Owned |
| 2975j | Abraham Lincoln | Wholly Owned |
| 2975k | Harriet Tubman | Wholly Owned |
| 2975m | Joseph E. Johnston | Wholly Owned |
| 2975o | Mary Chesnut | Wholly Owned |
| 2975p | Battle of Chancecellorville | Wholly Owned |

993



Concurrence (Initials)

EXHIBIT E - STAMP DESIGNS

| | | |
|---|---|---|
| 2975q | William T. Sherman | Wholly Owned |
| 2975s | Stonewall Jackson | Wholly Owned |
| 2975t | Battle of Gettysburg | Wholly Owned |
| 3011a | Christmas | Wholly Owned |
| 3183b | Fed Res. System Eagle | Wholly Owned |
| 3183c | Dr. George Washington Carver | Wholly Owned |
| 3183i | Uncle Sam | Wholly Owned |
| 3183o | Child Labor Reform | Wholly Owned |
| 3185d | Eleanor Roosevelt | Wholly Owned |
| 3187f | School Desegregation Public | Wholly Owned |
| | Insects & Spiders (13) | Wholly Owned |
| E4 | Messenger Running | Unknown |
| E20 | Special Delivery | Unknown |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

994



Concurrence (Initial)

*Sterling, Winchester & Long*

*P.O. Box 211299*
*Martinez, Ga. 30907*
(706) 262-2002
*swl@long.net*

753 Broad Street
Suite 603
*Augusta, Ga. 30907*
*(706) 261-5664 Fax*
swl-llc.com

March 30, 2001

Mr. Steve Anderson
Barnes and Noble Inc.
Calendar Department
122 5th Ave
New York, N.Y 10011

Dear Mr. Anderson:

We are submitting the "USPS Calendar 2002" product information to you for vendor consideration. Under an exclusive rights licensing agreement with the United States Postal Service (USPS), SW& L has developed the first USPS calendar collection series for sale, beginning in 2002, through retail markets.

The 2002 USPS licensed calendar collection will consist of as many as four of the following ten thematic series: 1) Signature Series; 2) National & State 3) Black Heritage; 4) Commemorative Stamps; 5) Kids World; 6) Great American Woman; 7) The Civil War; 8) Celebrate the Century; 9) Legends of Baseball and 10) Insects and Spiders.

All of the artwork, historical information, significant dates and events in the collection will be related to USPS history. Each thematic calendar will be designed to communicate its distinctive message about the history of the USPS and its contributions to America over the past 200 years. Each calendar cover will display the quality of artwork and subject matter contained throughout the calendar.

The back section of the calendar will contain a wealth of historical information relevant to postal service history. This section of the calendar also will feature an area to record address and telephone number record and a directory of major USPS office locations. The calendar collection will be professionally developed with the USPS seal and trademark and a seven-digit production sequence and authentication number to identify each calendar.

Marketing and sales retail distribution channels include book and specialty stores. The calendar will also be distributed through the "uspscalendar2002.com" licensee's website, the USPS Philatelic Catalog, and more than 300 Philatelic Centers throughout the United States and its territories and possessions.

Enclosed you should find information addressing those areas you requested, a draft copy of our "**Black Heritage**" USPS calendar and the front cover of three others in the 2002 collection.

Please note that the product presentation is in draft form and does not fully represent color texture and packaging of the product in its "deliverable for sale" state.

Ms. Rosens, should you or your staff have any questions, please contact our office by phone at (706) 262-2002 or e-mail: (swl@long.net).

We thank you for this opportunity and we look forward to hearing from you soon.

Sincerely,

Karen A. Ellis
Product Distribution Manager

Enclosed:
cc: File – Project 2002
JGL

**PROFESSIONAL CONSULTING GROUP**

**Product Distribution**

**Calendar Series 2002 Categories**

1) **Black Heritage**
2) **Celebrate The Century**
3) **Insects & Spiders**
4) **Signature Series**

Each category will have its own exclusive design features representing USPS contributions. Each calendar cover will depict the quality of artwork and subject matter contained within each month. The back section of the calendar will contain a wealth of historical information, such as "Did You Know", VIP's, current and past Postmaster Generals, significant dates and events.

1) **Black Heritage Collection**: This collection will feature a series of four black heritage calendars with historical information dating back to the 1700s. Each series will introduce a segment of historical contributions to the USPS. Each year the featured series will approach the rich heritage of African Americans, to include the realities of life from slavery through their significant contributions of the 21st century. The calendar will feature stamps with black heritage content from the USPS National Archives of African Americans who served their country through their service with the USPS.

2) **Celebrate The Century Collection:** This collection will begin with the 2002 introductory edition, which is destined to be one of the most sought after calendar series. The 2002 calendar will showcase a diverse America through the United States Postal Service, from the beginning of American mail service to the end of the 1900s.

3) **Insects & Spiders:** This calendar highlights a commemorative collection of stamps that feature insects and spiders. Insects are an intricate part of a history that have been around for more than 350 million years. Today their numbers reign supreme. Spiders, in comparison are a lesser group, with only about 30,000 species known to man. Commissioned by the USPS, Steve Buchanan created the artwork

for this balance of nature. To the Arthropods Phylum Researcher and other insect lovers, this calendar brings their world closer to reality of life.

4) **Special Edition: Signature Series:** The signature series collection serves as the birth of the USPS Calendar creation and represents the creator's original ideas. This calendar goes farther than introducing USPS through its stamp products and their history. It escorts the viewer into the USPS history as a great American institution. Each month of the Signature Series will feature significant post office buildings, monuments and postal service employees who have made significant contributions to the USPS.

## Requested Information

**Pricing:**

| USPS Calendar Collection | Retail Sale | Suggested Volume |
|---|---|---|
| Signature Series | $13.50 - $14.99 | % Discount |
| Black Heritage | $13.50 - $14.99 | % Discount |
| Insects & Spiders | $13.50 - $14.99 | % Discount |
| Celebrate the Century | $13.50 - $14.99 | % Discount |

**Shipping Date:** On or before July 25, 2001

**Special Regions:** Channels of distribution include the entire United States and all other US territories where USPS products are sold.

**Product Differentiation**

- **United States Postal Calendar**: This is the first USPS calendar series collection. From its beginnings in 1652, a calendar has never been produced for sale.
- **USPS Commemorative Stamps**: The feature page for each month will highlight a stamp and its significant history. All commemorative stamps featured in the 2002 series will be suitable for framing or just as a keepsake for years to come.

- **Historical Content:** Each of the individual calendars will contend a wealth of useable history about the Post Offices, Postal Employees, Postal Stamps, Postal Seals, Laws and Legislation effecting the Postal Service, current and past Postmasters and Postmaster Generals, significant dates, VIP's in the Postal Service and a complete series geared to kids world.

***Product Differentiation continues:***

- **Designed Quality and Art Work:** Unlike thousands of other calendar products the Official Postal Service Calendar is designed to attract historians, stamp collectors, stamp enthusiasts, art collectors, a diverse America, educators and families from small town to metropolitan big cities.

- **Internet Web Site:** Exclusive Right to USPS trademark web site for the term of the contract with an automatic renewal clause. The calendar will have is own web site where browsers and shopper can explore the USPS calendars and its links to significant dates. Each date will be attached to volumes of information on the date subject.

- **Purchaser Authentication Registrar (PAR):** The PAR is a computer system based warehouse that will record registration data at the time of purchase, registration card mail back or registrar through the web page. The objective of the PAR is to provide collectors and enthusiasts with an origin of purchase. The PAR, for those registered collectors and enthusiasts that place their stamps and USPS history as invaluable records of time, can be assured that having a USPS Calendar in their collection will only endorse what is already a keepsake heirloom collection.

- **Collectable:** The calendar's uniqueness, public interest in the USPS, its historical and educational content and its USPS official designation will increase the collectible value. There are over 1 million historians, stamp collectors, stamp enthusiasts, and personal collectors who collect USPS stamps and stamp associated products.

- **Exclusive Rights:** SW&L will maintain "exclusive rights" to designs calendars using USPS stamps, through a licensing agreement with the USPS to produce calendars and the right to sell the product in 300 Philatelic Postal Centers and in the Philatelic catalogs.

- Special Advertising or Promotion: Advertising and promotion of the calendars will primarily be through point of sale and web site promotion. There will be some introductory and promotional marketing and advertising through national newspapers and radio media. The product's official USPS seal of authentication and collectible attributes will lend itself to sufficient advertising and promotion to meet and exceed sales projections. The calendar will also be available through more than 300 Philatelic Centers, the Philatelic quarterly catalog and USPS web pages. "Table top" advertising and promotion plans include several unveiling ceremonies sponsored by various Fortune 500 corporations.

**Cooperative Advertising Funds:** SW&L are in discussion with two national companies and the USPS to participate as cooperative promotion partners.

**ISBN and UPC Barcode:** See calendar back cover

**PROFESSIONAL CONSULTING GROUP**

**Product Distribution**

**J G Long**

**From:** Ilene Kent
**Sent:** Monday, September 17, 2001 9:18 AM
**To:** 'J G Long'
**Cc:** Robin Stemen
**Subject:** RE: Channel of Distribution

Hi JG – thanks again for your kind words.

Let's you and I plan to chat specifically about this. As we'd talked before, the USPS/philatelic channels were added to your agreement, but, as you point out, does not obligate the USPS to purchase these products – either for giveaway or for resale.

The USPS has also recently announced a reorganization, and the retail group is somewhat up in the air right now. I will be leaving at 3:15 today for the Jewish holiday (if you can call it a holiday at this tragic time) and will be back in the office on Thursday.

ibk

-----Original Message-----
**From:** J G Long [mailto:SWL@Long.net]
**Sent:** Saturday, September 15, 2001 4:19 PM
**To:** IKent@EquityManagementInc.com
**Subject:** Channel of Distribution

Good Morning, Ilene. I hope things are improving with you.

In your February 16, 2001 e-mail to me, relating to getting our product into the USPS Philatelic catalog USPS Philatelic centers, you suggested that we have a finished product before pursuing those channels. As you may be aware, given the past week, USPS/EMI has approved our finished product for manufacturing.

We are now in the process of finalizing our advertising and marketing promotions, including our web page, and would like to include the USPS Philatelic catalog and Philatelic centers as part of our channels of distribution, as per our License Agreement.

Before making our request to USPS, we would like to offer EMI an opportunity to express our desires to further promote USPS by way of our product presented in their specified locations and catalog. We are NOT asking or requesting that USPS purchase our product under any condition. All we are requesting is to market and sell our product through those USPS channels of distribution in our licensing agreement.

We would appreciate EMI's attention to this matter.

J.G. Long

6/3/2002

SWL&L

# *Sterling, Winchester & Long, LLC*

*P.O. Box 211299*
*Martinez, Ga. 30907*
(706) 833-1668
(706) 261-5664 Fax

753 Broad Street
Suite 404
Augusta, Ga. 30901
*(706)262-2002*
SWL@Long.net

November 30, 2001

CONFIDENTIAL

CONGRESSIONAL COMPLIANT

United State Postal Service
Licensing Program/Stamp Development
475 L'Enfant Plaza SW, Rm 4474E
Washington, DC 20260-2437

**Agent:**
Equity Management Inc.
4365 Executive Dr. Ste. 1000
San Diego, CA 92121

**USPS Contract No. 102592-01-U-1173**

Sterling, Winchester & Long, LLC (SW&L), by signature date January 4, 2001, entered into a United States Postal Service (USPS) License Agreement, by USPS Contracting Officer signature date January 31, 2001.

Pursuant to section 5 of the licensing agreement, whereas the United States Postal Service by H. Diane Fagan, Contracting Officer signature, a duly authorized representative of the USPS entered into agreement with SW&L authorizing the USPS/USA Philatelic Catalog and Centers as channels of distribution for sale of SW&L USPS 2002 Calendar Series, the USPS by consistently denying SW&L said rights has breached its contractual obligation to SW&L.

By records dated February 16, 2001 and March 2, 2001 Equity Management Incorporation (EMI) and the USPS Contract Officer, respectively, denied SW&L the right to exercise their rights, per the licensing agreement, to utilize the USPS/USA Philatelic Catalog and Centers as channels of distribution for sale of SW&L USPS 2002 Calendar Series. Continued efforts by SW&L to gained access to the USPS/USA Philatelic Catalog and Centers as channels of distribution where denied by EMI and the USPS.

Whereas, Sterling, Winchester & Long, LLC, a small business located in Augusta, Georgia, in October of 1999, SW&L submission its idea to produce and sell USPS calendars under the USPS Unsolicited Proposal program for consideration. After what appeared to be careful (more than14 months) consideration of SW&L proposal to develop and sell USPS calendars, the USPS through its agent, EMI entered into a license agreement with SW&L, a Georgia small business company, to produce a series of USPS calendars. As part of the agreement, SW&L was charged by the USPS a $50,000 Royalty Guarantee fee and is now obligated by contract to pay USPS royalty percentage payments on revenue earned.

Whereas, SW&L based on the conditions setout in the USPS license agreement, SW&L made profession business decisions & commitments, financial obligations, increased staff /contract workers, used a high quality printing contractor, and went into personal debt ness and made substantial family sacrifices to honor its obligation to the USPS.

Whereas the Small Business Administration and other investors extended financial resources to Sterling, Winchester & Long, LLC based of the conditions set forth in the USPS/SW&L underline agreement.

Notwithstanding, SW&L Royalty Guarantee fee paid to the USPS, the required payment of quarterly royalty percentage of revenue earned, the potential earnings the USPS could gain without fronting a penny, SW&L financial exposure, SBA's commitment and the written license agreed that spells out SW&L rights to USPS controlled channels of distribution, the USPS have persistently, with possible intent to cause harm, denied SW&L the right to utilize its channels of distribution as prescribed in the licensing agreement.

**Resolution Seeking:**

- Immediate access, as per the license agreement, to the USPS Philatelic Catalog and USPS Philatelic Centers
- Compensation for damages for loss of sales and other associated cost during peak calendar selling season (Sept. Oct., Nov & Dec. 2001) for not having access to USPS Philatelic Catalog and USPS Philatelic Centers as authorized by the licenses agreement.
- A written commitment from the USPS the it will be fair and incompliance with our agreement going forward and that disputed issues should be immediately (within 20 days) dealt and communicated up to the Executive level management.

CONFIDENTIAL

SW&L

# Sterling, Winchester & Long, LLC

swl@long.net

753 Broad Street
Suite 404
Augusta, Ga. 30901
(706) 262-2002
(706) 261-5664 Fax

uspscalendar2002.com

March 1, 2002

Vice Chairman S. David Fineman
Board of Governors
United State Postal Service
475 L'Enfant Plaza SW
Washington, DC 20260

Dear Vice Chairman Fineman:

As you probably are aware, the United States Postal Service (USPS) has granted Sterling, Winchester & Long, LLC, a small business from Augusta, Georgia rights to develop the first official licensed United States Postal Service calendar series (http://www.uspscalendar2002.com) for distribution to the American public. Never before has the United States Postal Service authorized the publishing and sale of its many untold stories, facts, and contributions to this great nation through an official licensed calendar series.

This letter is to advise you that US Postal Service, has denied or blocked us from selling our calendars through USPS controlled distribution channels, such as the USPS controlled Philatelic centers, Philatelic catalogs and merchandise stores (US Post Offices, USPS Post Mart merchandise store and USPS quarterly catalog), as our contract agreement states. After signing the agreement, we incurred great expenses in hiring employees, contractors, printing the product and made many personal sacrifices to meet our contractual obligations. My family, personal friends, Regions Bank of South Carolina and Small Business Administration (SBA) have invested over $300,000 in this project based on a written contract drafted by the USPS. Our intent was clear from the beginning up to this date, we intended, as provided in the agreement, to sell this official licensed USPS product through the USPS channels of distribution.

Based on our projections the USPS had the potential of earnings of over $ 1million in royalty fees under the terms of the agreement, without ever investing one nickel, if USPS had allowed us to sell our calendars through the contractually agreed to channels of distribution.

To add to our problem of trying sell the first USPS calendar to the American public without the support of the USPS, our United States Postal Service, unknowing to us, developed a competing USPS calendar and is now selling its version of our original USPS calendar idea in those USPS channels of distribution they denied us from selling in.

In 1999 we proposed this idea to the USPS "Unsolicited Proposal" program to assist the USPS in raising revenue and to provide employment opportunity for the unemployed. As a small business, if I had known that I was paying the USPS $50,000 in franchising rights, "money I didn't have" for the USPS to compete against me, I never would have introduced this idea nor entered into contract with the USPS. We had no idea that our USPS would under cut us, knowing full well our status as a small business, could not compete with a giant. Denying us, a small business, our rights per the contract and directly competing against us in producing the same product we paid them for the rights to produce is not American.

Vice Chairman Fineman, I need your help. Based on the honor and respect we have for this great nation, there is some wrong with a US Government agent breaching a contract with a small business and then under cut the business by directly competing against that business. We are about to default on our printing agreement, (the same outside printing company the USPS uses: Quebecor World) and our SBA loan, all because the USPS denied us the right to sell our product through those contractually agreed to channels of distribution and because the USPS, using our original idea, directly competed against our product, after allowing us to entered into a $50,000 licensing agreement. We have little options left, other than bankruptcy protection. Please give this your immediate attention.

As a veteran of the Vietnam area and an American who want to see our country get back up from the September 11th terrorist attacks and the after mass that effected the men and women of USPS, I can't understand why the USPS has decided not to honor its contractual obligations. We can see no benefits or gains in what we have experience thus far in our relationship with the USPS. **"If we are to stand together as Americans, we must stand in support of each other."**

Respectfully,

J.G. Long,
Chief Managing Officer

Newspaper Articles

http://www.augustachronicle.com/stories/121501/bus_072-3590.000.shtml

Times and Democrats of Orangeburg, SC (Nov. 5th, and Feb several times)

Aiken Standard Jan.14th

Augusta Chronicle 11-10-01

Barnwell County Weekly Paper (Feb 11 & 18)

Bamberg County Weekly (Feb.)

# Sterling, Winchester & Long, LLC

753 Broad Street
Suite 404
Augusta, Ga 30901
(706) 262-2002
(706) 261-5664 Fax
swl@long.net

uspscalendar2002.com

March 1, 2002

Chairman Robert F. Rider
Board of Governors,
United State Postal Service
475 L'Enfant Plaza SW
Washington, DC 20260

Dear Chairman Rider:

As you probably are aware, the United States Postal Service (USPS) has granted Sterling, Winchester & Long, LLC, a small business from Augusta, Georgia rights to develop the first official licensed United States Postal Service calendar series (http://www.uspscalendar2002.com) for distribution to the American public. Never before has the United States Postal Service authorized the publishing and sale of its many untold stories, facts, and contributions to this great nation through an official licensed calendar series.

This letter is to advise you that US Postal Service, has denied or blocked us from selling our calendars through USPS controlled distribution channels, such as the USPS controlled Philatelic centers, Philatelic catalogs and merchandise stores (US Post Offices, USPS Post Mart merchandise store and USPS quarterly catalog), as our contract agreement states. After signing the agreement, we incurred great expenses in hiring employees, contractors, printing the product and made many personal sacrifices to meet our contractual obligations. My family, personal friends, Regions Bank of South Carolina and Small Business Administration (SBA) have invested over $300,000 in this project based on a written contract drafted by the USPS. Our intent was clear from the beginning up to this date, we intended, as provided in the agreement, to sell this official licensed USPS product through the USPS channels of distribution.

Based on our projections the USPS had the potential of earnings of over $ 1million in royalty fees under the terms of the agreement, without ever investing one nickel, if USPS had allowed us to sell our calendars through the contractually agreed to channels of distribution.

To add to our problem of trying sell the first USPS calendar to the American public without the support of the USPS, our United States Postal Service, unknowing to us, developed a competing USPS calendar and is now selling its version of our original USPS calendar idea in those USPS channels of distribution they denied us from selling in.

In 1999 we proposed this idea to the USPS "Unsolicited Proposal" program to assist the USPS in raising revenue and to provide employment opportunity for the unemployed. As a small business, if I had known that I was paying the USPS $50.000 in franchising rights, "money I didn't have" for the USPS to compete against me, I never would have introduced this idea nor entered into contract with the USPS. We had no idea that our USPS would under cut us, knowing full well our status as a small business, could not compete with a giant. Denying us, a small business, our rights per the contract and directly competing against us in producing the same product we paid them for the rights to produce is not American.

Chairman Rider, I need your help. Based on the honor and respect we have for this great nation, there is some wrong with a US Government agent breaching a contract with a small business and then under cut the business by directly competing against that business. We are about to default on our printing agreement, (the same outside printing company the USPS uses: Quebecor World) and our SBA loan, all because the USPS denied us the right to sell our product through those contractually agreed to channels of distribution and because the USPS, using our original idea, directly competed against our product, after allowing us to entered into a $50,000 licensing agreement. We have little options left, other than bankruptcy protection. Please give this your immediate attention.

As a veteran of the Vietnam area and an American who want to see our country get back up from the September 11[th] terrorist attacks and the after mass that effected the men and women of USPS, I can't understand why the USPS has decided not to honor its contractual obligations. We can see no benefits or gains in what we have experience thus far in our relationship with the USPS. "If we are to stand together as Americans, we must stand in support of each other."

Respectfully,

J.G. Long,
Chief Managing Officer

Newspaper Articles

http://www.augustachronicle.com/stories/121501/bus_072-3590.000.shtml

Times and Democrats of Orangeburg, SC (Nov. 5th, and Feb several times)

Aiken Standard Jan.14th

Augusta Chronicle 11-10-01

Barnwell County Weekly Paper (Feb 11 & 18)

Bamberg County Weekly (Feb.)

Mar 02 02 08:06p S ling Winchester&Long

# Sterling, Winchester & Long, LLC

swl@long.net

753 Broad Street
Suite 404
Augusta, Ga. 30901
(706) 262-2002
(706) 261-5664 Fax

uspscalendar2002.com

March 1, 2002

Governor John F. Walsh
USPS Board of Governors
United State Postal Service
475 L'Enfant Plaza SW
Washington, DC 20260

Dear Governor Walsh:

As you probably are aware, the United States Postal Service (USPS) has granted Sterling, Winchester & Long, LLC, a small business from Augusta, Georgia rights to develop the first official licensed United States Postal Service calendar series (http://www.uspscalendar2002.com) for distribution to the American public. Never before has the United States Postal Service authorized the publishing and sale of its many untold stories, facts, and contributions to this great nation through an official licensed calendar series.

This letter is to advise you that US Postal Service, has denied or blocked us from selling our calendars through USPS controlled distribution channels, such as the USPS controlled Philatelic centers, Philatelic catalogs and merchandise stores (US Post Offices, USPS Post Mart merchandise store and USPS quarterly catalog), as our contract agreement states. After signing the agreement, we incurred great expenses in hiring employees, contractors, printing the product and made many personal sacrifices to meet our contractual obligations. My family, personal friends, Regions Bank of South Carolina and Small Business Administration (SBA) have invested over $300,000 in this project based on a written contract drafted by the USPS. Our intent was clear from the beginning up to this date, we intended, as provided in the agreement, to sell this official licensed USPS product through the USPS channels of distribution.

Based on our projections the USPS had the potential of earnings of over $ 1million in royalty fees under the terms of the agreement, without ever investing one nickel, if USPS had allowed us to sell our calendars through the contractually agreed to channels of distribution.

To add to our problem of trying sell the first USPS calendar to the American public without the support of the USPS, our United States Postal Service, unknowing to us, developed a competing USPS calendar and is now selling its version of our original USPS calendar idea in those USPS channels of distribution they denied us from selling in.

In 1999 we proposed this idea to the USPS "Unsolicited Proposal" program to assist the USPS in raising revenue and to provide employment opportunity for the unemployed. As a small business, if I had known that I was paying the USPS $50,000 in franchising rights, "money I didn't have" for the USPS to compete against me, I never would have introduced this idea nor entered into contract with the USPS. We had no idea that our USPS would under cut us, knowing full well our status as a small business, could not compete with a giant. Denying us, a small business, our rights per the contract and directly competing against us in producing the same product we paid them for the rights to produce is not American.

SCANNED

July 28, 2004

VIA CERTIFIED MAIL – RETURN RECEIPT REQUESTED
RECEIPT NO. 7004 0550 0001 3223 7133

Ms. Robin R. Pacheco
Contracting Officer
United States Postal Service
Purchasing and Materials Service Center
P.O. Box 867190
Dallas, Texas 75266-7190

Re: Contract No. 102592-01-U-1173 between
USPS and Sterling, Winchester & Long, LLC

842

Dear Ms. Pacheco:

Sterling, Winchester & Long, LLC ("SW&L") contends that the United States Postal Service ("USPS") breached Contract No. 102592-01-U-1173 ("the Contract") by barring SW&L from distributing, promoting, and selling its products in USPS Philatelic catalogs, Philatelic centers, and merchandise stores. SW&L further contends that, as a result of USPS' breach, SW&L has suffered damages in the sum of $12,778,728.00. Accordingly, SW&L hereby submits its claim against USPS for breach of the Contract and demands payment from USPS in the sum of $12,778,728.00 plus interest from the date you receive this claim until payment is made.

This letter, along with its enclosures, sets forth factual and legal grounds for SW&L's position that USPS has breached the Contract and is liable to SW&L for the sum demanded.

## I. Summary of SW&L's Position

The Contract expressly and specifically authorizes SW&L to distribute products licensed under the Contract through USPS Philatelic catalogs, Philatelic centers, and merchandise stores. SW&L's right to sell its licensed products through those USPS distribution channels was an essential factor in the marketing and sales plans discussed by SW&L with USPS, and was a material term of the Contract without which SW&L would not have agreed to the minimum royalty amounts in the Contract. By barring the products from

these distribution channels, USPS breached the Contract. USPS' breach of the Contract caused SW&L to incur substantial damages, the most obvious of which are lost revenues that would have been realized from sale of the products in the USPS distribution channels. In addition, USPS' breach adversely affected sales through other authorized distribution channels, including Internet sales, due to the products' lack of a direct association with USPS from the viewpoint of consumers and SW&L's potential business partners. SW&L also has incurred other costs and expenses for which USPS is liable as a result of its breach of the Contract.

## II. <u>Factual Background</u>

On or about January 31, 2001, USPS and SW&L entered into the Contract (SW&L having signed the Contract earlier on January 4, 2001). The initial term of the Contract extends through December 31, 2004, and SW&L has the option to renew the Contract for an additional three-year period. The Contract grants to SW&L "a license to use certain [USPS] names, trademarks, service marks, trade dress and/or copyrights in connection with the manufacture, distribution, advertising, promotion and sale of certain goods ... on the terms and conditions specified" in the Contract. The "certain goods" are identified as an annual series of up to five (5) thematic USPS 12-month calendars, commencing with calendar year 2002 ("Licensed Articles"). The Contract authorizes SW&L to market the Licensed Articles through the following "Channels of Distribution":

> Wholesale to bookstores, specialty stores, *Philatelic catalogs, Philatelic centers and merchandise stores*; Retail via Licensee's web site, subject to the conditions set forth in Paragraph 18 (a) below. (emphasis added)

At the time the Contract was executed, USPS knew that "Philatelic catalogs, Philatelic centers and merchandise stores" referred to USPS distribution channels.

From the beginning, SW&L communicated clearly to USPS its proposal to license USPS intellectual property in exchange for the right to market licensed products through USPS channels of distribution. On October 7, 1999, J.G. Long hand carried an unsolicited proposal to the offices of Peter Steel, then-Manager of the Unsolicited Proposal Section, and Kaye DeShields, Manager of Retail Products, at USPS Headquarters offices in Washington, D.C. (Attachment A). On the first page, the proposal states that its purpose is: "To develop an Official U.S. Postal Services Calendar collection and Accessories for commercial sale through the U.S. Postal Service (USPS) Departments, Post Offices, account representatives and through the USPS Official merchandise web site." The proposal also described research based on foot traffic through USPS post offices, which clearly reflected that sales through USPS were contemplated.

USPS directed SW&L to Equity Management, Inc. ("EMI"), licensing agent for USPS. SW&L's communications with EMI were similarly clear that SW&L intended to market licensed products through USPS distribution channels. On May 19, 2000, SW&L submitted to EMI a completed USPS Trademark License Application form and attached a summary of its proposal (Attachment B). On first page of the application, SW&L stated that twenty-five percent (25%) of estimated sales were to be through "USPS Philatelic catalog and merchandise stores." The proposal that SW&L attached to the application reiterated SW&L's market research of USPS post office consumers. The Advertising section of the proposal stated, "Advertising and promotion of the Official USPS Calendar will primarily be done through wholesale buyers, *point of sales in USPS merchandise stores* and web site promotion ... . The product's uniqueness with an official seal of authentication, collectible value *and distribution to 28,000 US postal offices and USPS merchandise shops across the country* will provide sufficient advertising and promotion to meet sales objectives." (emphasis added)

A comparison between an early draft term sheet that was being negotiated between SW&L and USPS' agent, EMI, and the final contract signed by the USPS contracting officer indicates that the parties negotiated changes to the terms explicitly to include USPS Philatelic centers, which further broadened the intended sales through USPS. For example, a draft term sheet, dated July 12, 2000, identifies the distribution channels as including "Philatelic catalogs and merchandise stores," but not Philatelic centers (Attachment C). EMI's Director of Marketing subsequently confirmed that these distribution channels refer to USPS Philatelic catalogs, Philatelic centers, and merchandise stores. For example, in an e-mail to Mr. Long on September 17, 2001, Ilene Kent of EMI stated as a follow-up to a conversation with Mr. Long: "As we'd talked before, the USPS/philatelic channels were added to your agreement ... ." (Attachment D).

When executing the Contract, USPS clearly was on notice of SW&L's understanding that the Contract permitted SW&L to market its licensed products through the listed USPS distribution channels, as well as SW&L's intent to do so. In developing the terms of the Contract, both parties were operating under the clear understanding that SW&L would pay USPS a minimum royalty amount based, in part, on projected sales through USPS distribution channels. As discussed above, the USPS Trademark License Application submitted by SW&L included an attachment which forecasted sales of 200,000 calendars in the first year. Twenty-five percent (25%) of the sales were to be through USPS distribution channels. SW&L also submitted to EMI a profitability analysis in Excel format that calculated a five percent (5%) royalty based on these sales (Attachment E). That analysis was the basis for negotiating the $50,000 minimum royalty guaranty for the first year. In addition, USPS and EMI knew from the attachment to SW&L's application that, reflective of SW&L's limited resources as a small business, an essential factor in SW&L's marketing and sales strategy was for its officially