licensed USPS product to be associated with USPS, the owner of the trademark, for which SW&L paid upfront a $50,000 minimum royalty guaranty for the first year alone.

Further evidence of the parties' intent is the fact that in Section 5, the word "Philatelic," which appears before "catalogs" and "centers," is capitalized, indicating that it is part of a proper noun referring to a specific item, as opposed to some general reference to any philatelic catalog or center. The only Philatelic catalogs or centers that were ever part of any discussion between SW&L and USPS or its agent, EMI, were the USPS Philatelic catalogs and centers.

In short, SW&L paid a substantial amount of money for more than just the use of USPS' trademark – it also paid for the critical right to market its officially licensed USPS products in USPS distribution channels. Display of the product through USPS was essential, not only for the sales that were expected to flow from USPS channels, but because sales through non-USPS channels would increase, given the direct association of the product with USPS. USPS was well aware of this fact, based on SW&L's marketing and sales strategy, as set forth in its proposals and license application, and the calculation of minimum royalties, which USPS/EMI knew was based on sales through USPS distribution channels.

On March 2, 2001, more than one month after execution of the Contract, Mr. Long and Sanford Loyd, CPA, contacted the contracting officer, H. Diane Fagan, by telephone to discuss the procedures for placing SW&L's licensed products in the USPS distribution channels. Ms. Fagan responded that SW&L could not place its products in any USPS distribution channels under any circumstances. Ms. Fagan asserted that the Contract terms permitting SW&L to market its products through USPS distribution channels were a "mistake" and "should never have been in the agreement."

Ms. Fagan's assertions were completely at odds with the facts. The terms permitting SW&L to market its licensed products in USPS distribution channels are in the Contract. Moreover, their inclusion was no mistake – to the contrary, those terms were specifically negotiated and agreed upon by the parties. The communications between SW&L, USPS, and USPS' agent, EMI, leading up to the execution of the Contract show without exception that the parties contemplated marketing the licensed products through USPS channels of distribution. SW&L is not aware of a single item of correspondence or other communication of any kind that would even suggest a possibility that any individual involved in the lengthy negotiations leading up to the Contract thought that "Philatelic catalogs, Philatelic centers and merchandise stores" referred to anything but USPS catalogs, centers and stores. The documentary evidence shows that SW&L made numerous explicit references to sales through USPS distribution channels and that USPS was aware that such sales were a critical component both of SW&L's sales forecast and of the calculation of the minimum royalty

payment. Before executing the Contract, USPS never questioned SW&L's marketing strategy and never gave any indication that the Contract would not permit SW&L to market its licensed products through USPS distribution channels.

## III. Contract Interpretation Principles

The government is bound by a contractor's reasonable interpretation of the contract where the government knows of that interpretation and fails to inform the contractor, prior to execution of the contract, that the government interprets the contract differently.[1] This settled rule stems from the principle of *contra proferentum*, which requires that an ambiguous contract to be construed against the drafter. The rule has particular application in government contracts. Thus, USPS, "as the author, has to shoulder the major task of seeing that within the zone of reasonableness the words of the agreement communicate the proper notions – as well as the main risk of a failure to carry that responsibility."[2] Moreover, the government is charged with constructive knowledge of the contractor's interpretation if a review of the material submitted by the contractor would have revealed the contractor's interpretation: "Government should not be able to escape a contractual liability simply by asserting that its officials had not read or reviewed documents the offeror was required to submit with its proposals. If allowed, this would create chaos in contractual arrangements, subjecting them to the whims of Government officials." [3] In addition, a contract must be interpreted in a manner that gives effect to all its terms and leaves no provision meaningless. [4]

---

[1] *See, e.g., KMP; Inc.*, PSBCA No. 1615, 88-1 BCA ¶ 20,461 (government bound by contractor's interpretation of provision the contract that was "non-cancelable by either party for the first three (3) months and thereafter may be canceled by either party within 60 days (60)" guaranteed a five (5), not a three (3), month minimum duration); *Midwest Transit, Inc.*, PSBCA No. 1504, 87-3 BCA ¶ 20,079 (government bound when it did not correct contractor's pre-award assertion that it was entitled to an adjustment to its proposal for vacation costs where contractor mistakenly interpreted the solicitation to include only costs forecasted for the first year, in which contractor had no vacation expense).

[2] *WPC Enterprises, Inc. v. United States*, 163 Ct. Cl. 1, 6-7, 323 F.2d 874, 877 (1963). *See also Peter Kiewit Sons' Company v. United States*, 109 Ct. Cl. 390 (1947) ("Where one of the parties to a contract draws the document and uses therein language which is susceptible of more than one meaning, and the intention of the parties does not otherwise appear, that meaning will be given the document which is more favorable to the party who did not draw it.").

[3] *Fairchild Industries, Inc.*, ASBCA Nos. 16302 and 16413, 74-1 BCA ¶ 10,567 (government bound to the contractor's interpretation of the solicitation when an examination of contractor's price proposal would have revealed that it considered certain items to be cost reimbursable where the government considered them to be part of the fixed price).

[4] *Coast Federal Bank, FSB v. U.S.*, 323 F.3d 1035, 1038 (Fed. Cir. 2003); *Metric Constructors, Inc. v. NASA*, 116 F.3d 747, 753 (Fed. Cir. 1999); *McAbee Construction, Inc. v. U.S.*, 97 F.3d 1431, 1435 (Fed. Cir. 1996); *United States v. Johnson Controls, Inc.*, 713 F.2d 1541, 1555 (Fed. Cir. 1983).

## IV. Analysis

Before and upon execution of the Contract, USPS and its agent, EMI, clearly were aware of SW&L's understanding that the Contract authorized SW&L to market its licensed products through the USPS distribution channels enumerated in the Contract. SW&L articulated its marketing and sales strategy through USPS distribution channels in its initial proposal and in its USPS trademark license application. The calculation and negotiation of the minimum royalty payment specifically included sales through USPS distribution channels. No other communication between the parties exists that would show any contrary understanding by either party. SW&L contends that no good-faith argument can be made that the Contract does not refer to USPS distribution channels.

Even if one indulges the unsupportable assumption that USPS interpreted the Contract differently than SW&L, USPS certainly was aware of SW&L's interpretation and therefore was obligated to inform SW&L, prior to executing the Contract, of USPS' different interpretation. USPS did not do so, however, and thus is bound by SW&L's reasonable interpretation.[5] Moreover, the Contract provision authorizing SW&L to market its licensed products through the referenced USPS distribution channels would be rendered meaningless if USPS may, as it has done, refuse to permit SW&L to use those distribution channels. Thus, any such *post hoc* interpretation by USPS is inconsistent with settled principles of law and cannot be enforced.[6]

The Contract authorizes SW&L to distribute its licensed products through the USPS distribution channels identified in the Contract. USPS' refusal to give SW&L access to those distribution channels is a breach of the Contract, which entitles SW&L to damages.

## V. Damages

The law of government contracts follows the common-law rule of damages for breach of contract, which is to place the injured party in as good a position as he or she would have been had the breaching party fully performed.[7] The goal is to award a sum which is the

---

[5] *See KMP, Inc., supra.*

[6] *See Metric Constructors, Inc. v. NASA, supra.*

[7] *Massachusetts Bay Transportation Auth. v. U.S.*, 129 F.3d 1226, 1232 (Fed. Cir. 1997); *San Carlos Iirrigation & Drainage Dist. v. U.S.*, 111 F.3rd 1557, 1562-63 (Fed. Cir. 1997).

equivalent of performance of the bargain – in making that determination, a court must assess gains prevented as well as losses suffered which would not have occurred had the contract been performed.[8] The non-breaching party is entitled to recover all damages which are the natural and probable consequence of the breach and those which, in the light of the facts of which they had knowledge, were in the contemplation of the parties.[9]

Mathematical precision is not a prerequisite in establishing damages, especially where the defendant's breach has caused the difficulty in obtaining proof.

> If a reasonable probability of damage can be clearly established, uncertainty as to the amount will not preclude recovery. ... The amount may be approximated if a reasonable basis of computation is afforded. ... All that the law requires is that such damage be allowed as, in the judgment of fair men, directly and naturally resulted from the breach of the contract for which the suit is brought.[10]

Where damages from lost sales result from the defendant's breach, courts and boards will look to a reasonable measure of unrealized sales that the parties contemplated when entering into the agreement.[11]

Based on these principles, SW&L claims damages for USPS' breach in the principal amount of $12,778,728.00. To determine the amount of its damages, SW&L consulted with professional economists trained and experienced in evaluating and calculating such damages. The total amount claimed by SW&L consists of the following elements:

1. $12,522,296.00 for lost profits that would have been realized from sales through USPS channels of distribution and sales through third-party channels, such as the Barnes & Noble and Borders national bookseller chain stores. An itemization of these

---

8 *Wells Fargo Bank v. U.S.*, 33 Fed. Cl. 233 (1995), *aff'd in part and rev'd in part on other grounds*, 88 F.3d 1012 (Fed. Cir.), *cert. denied*, 117 S.Ct. 1245 (1996).

9 *Wells Fargo, supra*, 33 Fed. Cl. at 242.

10 *Locke v. U.S.*, 151 Ct. Cl. 262, 267-268, 283 F.2d 521, 524 (1960).

11 *Locke v. U.S, supra* (lost sales from indefinite delivery, indefinite quantity typewriter contract derived from government purchases from competitors); *Travel Centre v. General Services Administration*, GSBCA No. 14,057, 99-2 BCA ¶ 30,521 (lost sales under an indefinite delivery, indefinite quantity travel services contract breached when government failed to identify the contractor as "preferred" were derived from government purchases from a competitor).

damages is set forth in Attachment F. Basically, these damages represent the anticipated revenues from USPS channels of distribution and from third-party channels that would have been realized, less the operating costs, production costs, and royalties that SW&L would have incurred, but for USPS' breach of the Contract.

These anticipated sales were mentioned specifically in the marketing plan attached to SW&L's trademark license application and were the basis of the minimum royalty guaranty paid to USPS. Thus, these sales were not only contemplated by the parties, but were quantified and used as the basis for payments to USPS. All forecasted sales through USPS distribution channels were eliminated, of course, due to USPS' breach. In addition, sales through other distribution channels were adversely impacted because the calendar did not enjoy the direct endorsement by USPS, as guaranteed by the Contract, that would come from display and sale in USPS distribution channels. All of these sales were contemplated by the parties before executing the Contract and their loss is a direct and probable consequence of USPS' breach.

2. $213,149.00 for expenses that SW&L would not have incurred but for USPS' breach of the Contract. SW&L contracted with Quebecor World USA, Inc., to print approximately 62,000 calendars for a total cost of $173,002. Because the cost of goods sold is reflected in SW&L's lost profits calculation, this expense is considered to be a total loss to SW&L. SW&L was not able to realize any revenue from the 62,000 calendars and, thus, was unable to fully pay Quebecor. As a result, Quebecor filed suit against SW&L, forcing the company to incur additional expenses consisting of the legal fees of SW&L to defend itself in that matter, as well as the additional fees and legal costs incurred by Quebecor and prejudgment interest for which, under the agreement between the two companies, SW&L would be liable. Thus far, SW&L has expended $2,500 in its own defense, and will be liable for an additional $37,647, for a total of $40,147. This figure is determined by taking the difference between the damages sought by Quebecor ($145,210) and what SW&L actually owed that company ($107,563). Thus, the total expenses comprising this component of SW&L's damages amount to $213,149 ($173,002 + $40,147).

3. $12,938.00 for interest expense incurred on loans obtained by SW&L to fund its operations in connection with the Contract. SW&L has been unable to pay down those loans due to the lack of cash flow caused by USPS' breach of the Contract.

4. $30,345.00 for claim preparation expenses. SW&L has had to utilize the services of an accountant and an economist to determine the damages caused by USPS' breach of the Contract. The costs incurred to-date are $22,345 for accounting services and $8,000 for consulting services rendered by the economist.

**VI. Conclusion**

On behalf of SW&L, I have certified SW&L's claim below in accordance with 41 U.S.C. § 605(c)(1). I am duly authorized to certify the claim on behalf of SW&L, and to bind SW&L with respect to the claim, in my capacity as its Chief Managing Officer, the senior company official having general authority over, and overall responsibility for, the conduct of SW&L's affairs and primary responsibility for SW&L's performance of the Contract.

SW&L requests that, within sixty (60) days of your receipt of this claim, you either issue a decision or notify SW&L of a reasonable time within which a decision will be issued. SW&L requests that you issue a final decision in writing stating the reasons for the decision reached.

I trust that this letter, along with its enclosures, provides sufficient information for you to evaluate and make a final decision on SW&L's claim. If you require additional information, please notify me immediately.

SW&L looks forward to your response.

Sincerely,

STERLING, WINCHESTER & LONG, LLC

J.G. Long
Chief Managing Officer

CERTIFICATION

Pursuant to 41 U.S.C. § 605(c)(1), I hereby certify, on behalf of the contractor, Sterling, Winchester & Long, LLC, that the claim asserted and described herein is made in good faith, that the supporting data are accurate and complete to the best of my knowledge and belief, that the amount requested accurately reflects the contract damages for which the contractor believes the government is liable, and that I am duly authorized to certify the claim on behalf of the contractor.

J.G. Long, Chief Managing Officer
Sterling, Winchester & Long, LLC

JGL:tbf
Enclosures
cc: Frederick L. Wright, Esq.

ATTACHMENT A

October 1999

# UNSOLICITED PROPOSAL

## Proposal

To develop an Official U.S. Postal Services Calendar collections and Accessories for commercial sale through the U.S. Postal Service (USPS) Departments, Post Offices, account representatives and through the USPS Official merchandise web site.

## Introduction:

The proposed Official U.S. Postal Service Calendar Collection will consist of five distinctive categories representing the U.S. Postal Service history. The first five categories will consist of 1) USPS Historical Collection, 2) National and State, 3) Black Heritage, 4) USPS Commemorative Stamps including a Children's Edition and 5) The Centuries/Decade Collection. All calendar series will include special events, historical portraits, and significant dates, buildings, and individuals that have served the USPS or that have been honored as a U.S. postal stamp. The calendar collection will be professionally developed with the USPS seal and a six-digit number identifying production sequence and authentication. Each month will highlight significant USPS dates, events, as well as holidays. The calendar collection will have a ten-year reproduction period with a continuing series number starting from the last calendar printed ten years earlier.

Each category collection will have its own exclusive design features representing USPS contributions. The front calendar cover will depict one of the five distinctive categories. The back section of the calendar contains a wealth of historical information, such as "Did You Know", VIP's, significant dates and

events, Address and Phone Number section, Post Offices data listed by states and regions.

## Calendar Collections:

1) **Historical Collection:** This collection will feature 12 months of historical photos including the early years, before it was called the U.S. Post Office or the West was won. Each photograph will display a significant event, building, or individual that contributed to the history of the Postal Service and will include a written account of its history and importance in shaping the USPS. Utilizing the USPS historical archive to gain the most accurate information, the Historical Collection will provide consumers of all ages with an education on the origin of the USPS and its significant contributions in shaping America.

2) **National & State Collections:** The National collections will be distinctively presented with national USPS factors from the earlier periods up today's USPS national contributions with the State collection following suite as an independent representation of USPS state heritage. The National calendar will feature 12 months of events, buildings, stamps and individuals that have contributed to the USPS from a national respective. Every chapter of the USPS hortory as told through people, places and things that represent the national pride and respect that comes will the USPS. The State collection will capture and remind American citizens of their state contributions to the USPS. The calendar will manifest state monuments of past and present, buildings and even battlefields where USPS men and women risked their lives, and sometime death delivering the mail to American soldiers. The focus of the State calendar is to be all inclusive of the United States as one nation yet individually contributing to the development of the USPS.

855

3) **Black Heritage Collection:** The Black Heritage collection will be one of the most sought after collections from the five Calendar series. The 12 month calendar will feature historical portraits and documented records of African Americans who have been honored by the USPS in their series of Black Heritage stamps, listed in the USPS National register and those less known African American who have made significant contributions to the USPS

4) **Stamp Collection:** The Stamp Collection calendar will feature 12 commemorative USPS portrait stamps. Each portrait will include the history behind each selected stamp, how and when it came to be a commemorative US stamp. The Stamp Collection will be suitable for framing or as a limited edition stamps series for postal historians. The Collection will include important people, events, places and/or subjects of national appeal or significance to the USPS. Stamps of unexpected value and significance known only to Collectors to spectacular national heritage. Each year there will be at least three categories in limited editions of Official Commemorative Stamp Calendars for sale.

5) **The Centuries/Decade Collection:** The Century Collection will cover across section of important people and events that contributed and impacted the USPS. Each decade within the featured century (1700, 1800, 1900, etc.) will bring out the USPS history for that decade through documented accounts and thought provoking photos. This collection will pull its audience into the century/decade with a desire to take notice and learn more.

856

By: Sterling, Winchester & Long
USPS Presentation
Privilege & Confidential

## Marketing Approach

The vision to create and develop an Official United States Calendar came from visiting three Post Offices within the local metro area. The idea was sparked by the need, while in each Post Office, to identify days of the month for letter/package arrival, certification, postmark and other days, but could not find a calendar nowhere in any of the local facilities. From that the idea was born that the USPS could benefit from adding to their products and service an official calendar. The objective is to educated Americans and the free world about significant USPS contributions, communicate through art and photos, increase the USPS image as a high quality dedicated public services organization and most of all increase sales revenue.

For over three months a team of observers visited 50 US Post Offices throughout the southeast to see if there was a US postal calendar displayed in each Post Office and secondly, to observe customer activity (customer traffic, purchasing habits and heterogeneous grouping). In 82 percent of the USPS facilities visited, no calendars were visible for public use. In 18 percent of the Post Offices visited there was a variety of local commercial calendars, which included drug store advertisement to farming equipment sales calendars. There was no consistency or an identified purpose in those calendars representing the USPS.

After analyzing preliminary market data, Sterling, Winchester & Long conducted a more defined market study to ascertain customer desire and sales data. A ten-question questionnaire was develop to survey the individuals and businesses (see attachment I). The market analysis delineated potential customers that would purchase an Official USPS Calendar into four categories: 1) Families with school age children, 2) Historians and Collectors 3) Individuals and ethic groups, Commercial Businesses and Non-profit organizations and 4) Internet users that purchase products over the web. With the identification of market demographic research information was collected through telephone and face to face interviews and through the Internet.

All participants were asked the ten survey questions. The purpose of the market study was to determine if there was an interest for the subject product, USPS consumer habits and the price range consumers were willing to pay.

To gain a better understanding of consumer post office visits and purchase activity a five question survey was conducted with Post Masters and attendance in cities covering three southeastern states.

858

## Market Projection Analysis

The market survey analysis focused on **customer frequency visits to their local Post** Office, purchasing behavior (at local Post Office and on the web), consumer interest in an Official USPS Calendar and what value would consumers place on such a product.

Of the 250 individual surveyed 48 percent visited their local or a Post Office 2 to 3 times a week, 19.5 percent said that they visited the local Post Office 4 or more times a week. When asked what day of the week you are most likely to visit the Post Office 51 percent said Saturday and 38 percent said Monday was the most likely day they visited the Post Office. Only 33 percent of the individuals surveyed had made a merchandise display item purchase, such as Superman or Walt Disney Products.

Survey question 7 " From the four USPS items listed below, (1. USPS Key Chain and Pen, 2. Superman or Walt Disney Products, 3. Official 4 and US Postal Calendar. US Postal Service Monthly Magazine) which one would you purchase if available to the public" defines the purpose of conducting the market survey. Of the 250 individuals polled 153 or 61.4 percent selected item 3. **Official US Postal Calendar,** indicating that they would buy an Official US Postal Calendar if available. Without the benefit of having a visual picture of what an Official US Postal Calendar would look like 31 percent said that they would pay $10.00 or less and 18 percent indicated that they would pay $10.00 or more for such an official calendar.

859

Extrapolating from the market study information, the number of Post Offices in the US (28,000) and the estimated customer visitors per day, it is estimated that18,480,000 (Point of Sale (POS)) calendars would be sold during a twelve week peak period (Nov.15th thru. Feb. 15th). Taking a conservative approach, injecting a 15 percent error rate in the data provided and considering production volume (Limited Additions), 65 percent of the estimated POS number was used as a bases calculating annual revenue projections.

A recent independent study of home internet use by Price Water House revealed that 43 percent of US homes were internet users, a 60 percent increase from last year internet home usage. From the population we surveyed, 33 percent said that they would use the Internet to purchase USPS products. When the survey results were delineated by geographic location the Internet usage and willingness to purchase USPS products over the web percentage increase in large populated metro areas.

Based on preliminary market data (internet usage and an estimated 12,012,000 POS calendars sold in 2000), and the implementation of an aggressive calendar sales campaign, using the POS as a base, it is projected that 23.5 percent or 2,822,820 calendar will be sold over the Web in year 2000 (12/99 thru. 4/99). **In addition to calendars** hardback sales, electric USPS calendars and related Accessories will be sold over the Web.

Because of the limited time remainding introduce, market and produce the USPS year 2000 calendar, and considering that most commercial businesses have already budgeted and ordered year 2000 office calendars, Account Officer sales should be moderate at an estimated 100,000 for the year. After the market has been fully saturated with the product, Account Officer sales should increase by 50 percent in year 2001 and continue to rise thereafter.

**860**

ATTACHMENT B

# UNITED STATES POSTAL SERVICE TRADEMARK LICENSE APPLICATION

1. Company Name: Sterling, Winchester & Long Primary Contact Person: J.G. Long
Other Names Used (e.g., d/b/a's or a/k/a's):
Headquarters Street Address: 1022 Dunbarton Road
City, State, ZIP: Williston, South Carolina 29853
Telephone No.: (803) 266-2555 Facsimile No.: (706) 868-0216
Addresses of Other Locations (e.g., branches, warehouses): P.O. Box 211299
Martinez, Ga. 30907 (706) 231-5558
Years In Business: Five
Type of Business: (Corporation / Sole Proprietor, etc.) State of Incorporation if applicable South Carolina
Tax Identification Number: 57-1099225

2. Company's Sales Information: New Venture, no historical Sales data
Most Recent Years: 19___ 19___ 19___ 19___
Annual Gross Sales Volume: $___ $___ $___ $___
See Sales and Profitability Projections

3. Company's Advertising/Promotion Information:
Most Recent Years: 19___ 19___ 19___ 19___
Annual Advertising/Promotion Volume: $___ $___ $___ $___
See Product Bus. Plan

4. State the name and address of your advertising, promotional and/or public relations firm(s), if applicable:
Advertising and Promotion will done by retailer and USPS – See Advertising & Marketing Plan

5. Please indicate your estimated percent of sales by retail class:
Dept. Stores ___ Mass Merchants ___ Discount Stores ___ Specialty Stores 50 Club Stores ___ Direct Mail ___
Internet Sales 25 USPS Philatelic Catalog & Merchandise stores 25

6. List your five largest retail accounts (for example, chain stores, department stores, specialty stores, hardware stores, catalog companies, other direct mail companies), the name of primary/chief buyers at each account, and the estimated percent of your sales or business to such account. If you would prefer that we notify you before contacting any of those listed below, please indicate here: Yes ✓ No ___

Account Type and Firm Name: Barnes & Noble Buyer: Steve Anderson Sales:
Address: 122 5th Ave. New York, NY 10011 Telephone No.: ( )
Account Type and Firm Name: Barnes & Noble Buyer: Robert Bloom Sales:
Address: Local BookStore Telephone No.: (706) 860-2310
Account Type and Firm Name: Buyer: Sales:
Address: Telephone No.: ( )
Account Type and Firm Name: Borders BookStore Buyer: Sally Wilson Sales:
Address: 257 Robert C. Daniel Pkwy, Augusta Ga Telephone No.: (706) 737-6962
Account Type and Firm Name: Buyer: Sales:
Address: Telephone No.: ( )

7. Identify your current product liability carrier(s) and describe the types and limits of each coverage:
American Professional Liability INS. Under the General Liability Section this Product is Covered

A 100,000 rider will be obtain after trademark approval and product production agreement is complete, as part of Publisher Liability Coverage.

8. Identify the following credit information on your company:
Most Current D&B Rating: N/A
Bank or Financial Institution Reference(s): Patrick's Investment Group
Firm Name: Patrick's Investment Group Contact Person: Mr. Booker Patrick
Address: Route One 408-B, Blackville SC Telephone No.: (803) 793-5812
Firm Name: Robinson-Humphrey/Salomon Smith Contact Person: Charles May
Address: One 10th Street, Augusta, Ga Telephone No.: (706) 724-2601

9. Identify any current trademark licenses with other entities, including information about the license (for example, licensed products and trademarks, licensor contact persons with address and telephone number, geographical distribution area, annual unit sales volume and annual wholesale dollar sales): None
New Project

## PROPOSED LICENSED PRODUCT AND BUSINESS PLAN INFORMATION

10. Identify the trademark you wish to use and describe specifically each product you wish to use in association with that particular trademark.
Trademark applied for: Postal Seals From 1782-1993 (See Attached)
Product description(s): 100 USPS Stamps of African American Subject (see Attached)
See Attached

11. Submit samples of each product on which you would like to use a trademark. (Samples are required to evaluate quality standards, workmanship and material, etc.) The samples will be retained and not returned to applicant. If requested by applicant, a consideration will be made for special arrangements for evaluating very large or bulky product samples. Attached/enc.

12. Describe the anticipated timing for the marketing of each proposed licensed product: See Attached

13. Enclose catalogs, price lists, brochures, and promotional materials which illustrate or reference your company's products.
See Attached

14. Please describe your sales force/rep organization, as well as your distribution plans:
See Sales Section of Proposal Page 9.

15. Describe each of your current manufacturing and distribution facilities and/or capabilities and the number of years each facility or capability has been in operation: See Attached

16. Please provide us with a copy of your manufacturing processes/quality assurance and training programs, as well as any applicable regulatory agency history including documentation of any issue resolution for the past five years.

17. State the name and location of the manufacturer(s)/source of each proposed licensed product: See Attached

Product: ________ Manufacturer: ________ Address: ________

18. State your projected annual total gross wholesale sales for each proposed licensed product: See Attached

Proposed Licensed Product: ________
1st year: ________ Units: ________ 2nd year ________ Units: ________ 3rd year ________ Units: ________
$________ $________ $________

Proposed Licensed Product: ________
1st year: ________ Units: ________ 2nd year ________ Units: ________ 3rd year ________ Units: ________
$________ $________ $________

Proposed Licensed Product: ________
1st year: ________ Units: ________ 2nd year ________ Units: ________ 3rd year ________ Units: ________
$________ $________ $________

19. Please enclose any additional information you believe may be helpful in evaluating your license request, such as a copy of Your company's business activities and its financial condition, special promotional plans, specific customer interest, previous experience with similar properties or products, etc.

Note: This application does not constitute an offer or imply any obligation to grant a license in any category.

Submitted By (Signature): [signature]

(Printed Name): J. G. Long

Title: Project Manager

Company: Sterling, Winchester

Date: May 19, 2000

# United States Postage Stamps with African American Subjects

| *subject* | *denomination* | *year* |
|---|---|---|
| Booker T. Washington | 10¢ | 1940 |
| 13th Amendment | 3¢ | 1940 |
| Dr. George Washington Carver | 3¢ | 1948 |
| Centennial of Booker T. Washington | 3¢ | 1956 |
| Emancipation Proclamation | 5¢ | 1963 |
| Frederick Douglass | 25¢ | 1967 |
| W.C. Handy | 6¢ | 1969 |
| Henry Ossawa Tanner | 8¢ | 1973 |
| Paul Laurence Dunbar | 10¢ | 1975 |
| Salem Poor | 10¢ | 1975 |
| Harriet Tubman | 13¢ | 1978 |
| Dr. Martin Luther King, Jr. | 15¢ | 1979 |
| Benjamin Banneker | 15¢ | 1980 |
| Whitney Moore Young, Jr. | 15¢ | 1981 |
| Charles R. Drew, MD | 35¢ | 1981 |
| Jackie Robinson | 20¢ | 1982 |
| Ralph Bunche | 20¢ | 1982 |
| Scott Joplin | 20¢ | 1983 |
| Dr. Carter G. Woodson | 20¢ | 1984 |
| Roberto Clemente | 20¢ | 1984 |
| Mary McLeod Bethune | 22¢ | 1985 |
| Sojourner Truth | 22¢ | 1986 |
| Duke Ellington | 22¢ | 1986 |
| Matthew Henson | 22¢ | 1986 |
| Jean Baptiste Pointe DuSable | 22¢ | 1987 |
| James Weldon Johnson | 22¢ | 1988 |
| A. Philip Randolph | 25¢ | 1989 |
| Ida B. Wells | 25¢ | 1990 |
| Jesse Owens | 25¢ | 1990 |
| Jan E. Matzeliger | 29¢ | 1991 |
| W.E.B. DuBois | 29¢ | 1992 |
| American Music Series | | |
| Clyde McPhatter | 29¢ | 1993 |
| Otis Redding | 29¢ | 1993 |
| Dinah Washington | 29¢ | 1993 |
| Percy Lavon Julian | 29¢ | 1993 |
| Joe Louis | 29¢ | 1993 |
| American Music Series | | |
| Porgy & Bess | 29¢ | 1993 |
| Dr. Allison Davis | 29¢ | 1994 |
| Buffalo Soldiers | 29¢ | 1994 |
| American Music Series | | |
| Ethel Waters | 29¢ | 1994 |
| Nat 'King' Cole | 29¢ | 1994 |
| Bessie Smith | 29¢ | 1994 |
| 'Ma' Rainey | 29¢ | 1994 |
| Billie Holiday | 29¢ | 1994 |
| Howlin' Wolf | 29¢ | 1994 |

HISTORIAN
CORPORATE INFORMATION SERVICES
UNITED STATES POSTAL SERVICE
MARCH 1999

# Project 2001
# Official USPS Calendar

## Trademark Application Questions Response Sheet

12) We have developed, using our marketing team and outside marketing groups, draft/preliminary (table top) marketing plans for all five categories. As soon as we receive licensing for stamps that are included in this year's five categories are any of the five, we rollout our sales promotion. Our preliminary discussions with wholesalers include their sponsorship of introductory promotion and advertising. The level and timing of our marketing efforts depends partly on what and when products are approved for licensing.

13) **Price Lists**

| Official USPS Calendar | Wholesale | Retail Sale | Quantity |
|---|---|---|---|
| USPS National and State History | $6.50 to $7.50 | $12.00 to $14.95 | % Discount |
| Black Heritage | $6.50 to $7.50 | $12.00 to $14.95 | % Discount |
| USPS Commemorative Stamps | $6.50 to $7.50 | $12.00 to $14.95 | % Discount |
| Kids World (Children's Edition) | $4.50 | $10.00 to $12.00 | |
| Celebrate the Century | $6.50 to $7.50 | $12.00 to 14.95 | % Discount |

# Trademark Application Questions Response Sheet

15) We have obtained production quotes and entered into a contingency production agreement with two national calendar printing companies (World Color-Quebecor World and Brown Trout Publishers). Both companies have over 15 years of experience in calendar production, with the capability to meet a production/printing request for 2 million calendars within 48 days. Our contingency production arrangement includes the availability of distribution across the United State, if necessary. We have established distributor relationships and the ability drop ship calendars to store locations (subject to buyers purchase agreement).

16) All calendar printing/production will be contracted outside to one or both of companies list in item 17. Upon entering into a final product printing agreement a manufacturing processing, quality assurance, training program, and any applicable regulation requirements will be provided.

17) 1) World Color-Quebecor World
4560 L.B. McLeod Road
Orlando, FL 32811

2) BrownTrout Publishers
P.O. Box 280070
San Francisco, Ca 94128

Product production assignment will be determined after trademark approval have been received and will be based on company's availability to meet production deadlines, distribution resources and product quality.



By: Sterling, Winchester & Long
Project 2001 USPS Presentation
Privileged & Confidential


Break-Even Analysis (200,000 Units)
Sales or Costs
$700,000
$600,000
$500,000
$400,000
$300,000
$200,000
$100,000
$-
0
10,000
20,000
30,000
40,000
50,000
60,000
70,000
80,000
90,000
Production, calendars/year
Break Even Point ($7)
(46,852 calendars)
Break Even Point ($6)
(51,376 calendars)
Sales @ $7
Sales @ $6
Costs

Mercury, a post rider, and now the eagle have symbolized the postal system in the United States at various times in its history.

In 1782, Postmaster General Ebenezer Hazard used the figure of Mercury, the messenger of the gods and the god of commerce and travel in Roman mythology. Mercury was shown riding on clouds, with winged feet and a staff in his right hand. A serpent-entwined staff was placed in Mercury's extended left hand by Postmaster General Gideon Granger in June 1808, until Postmaster General John McLean modified the seal again in 1824 by placing Mercury's right hand at shoulder height.

The official seal used by the Post Office Department from 1837 to 1970 featured, as directed by Postmaster General Amos Kendall, "a post horse in speed, with mail bags and rider, encircled by the words 'Post Office Department, United States of America.'" It is believed this seal was inspired by Benjamin Franklin. When Franklin was selected Postmaster General by the Continental Congress, he issued a circular letter throughout the colonies, bearing a rude woodcut of a post rider on horseback, with saddle bags behind him for carrying the mail.

On August 12, 1970, the day President Nixon signed into law the Postal Reorganization Act converting the Post Office Department into an independent establishment of the executive branch, the Postal Service announced adoption of a new seal. It featured a bald eagle poised for flight on a white field, above red and blue bars framing the words "U.S. Mail" and surrounded by a square border with the words "United States Postal Service" on three sides and nine five-pointed stars at the base. The stars carry no special symbolism.

### FLAG

The United States Postal Service flag is a five-color version of the new seal, placed on a white, rounded square background on an Old Glory blue flag base.




Postal seals, 1782-1993

869

# Project 2001
# Official USPS Calendar

## *Project Introduction*

The production plan for the 2001 calendar year is to produce the U.S. Postal Services Calendar in five collectable categories:

1) USPS National and State History
2) Black Heritage
3) USPS Commemorative Stamps
4) Kids World (Children's Edition)
5) Celebrate The Century

The USPS Official Calendar series will include special events, historical portraits, and significant dates, buildings, and individuals that have served the USPS or that have been honored on a U.S. postal stamp. The calendar collection will be professionally developed with the USPS seal and a seven-digit number identifying production sequence and authentication. Each month it will highlight significant USPS dates, events, as well as, holidays. The calendar collection will have a ten-year reproduction period with a continuing series number starting from the last calendar printed ten years earlier.

Each category will have its own exclusive design features representing USPS contributions. The Calendar cover will depict the quality of artwork and subject matter contained within each month. The back section of the calendar will contain a wealth of historical information, such as "Did You Know", VIP's, current and past Postmaster Generals, significant dates and events, address and phone number sections, state and regional post office locations.

# Project 2001
# Official USPS Calendar

## *Calendar Collection Categories*

1) **Historical, National & State Collections:** These collections will feature 12 months of historical photos. Each photograph will display a significant event, building, or individual that contributed to the history of the postal service on the national or state level. The photograph will include a written account of its history and its importance in shaping the USPS. Utilizing the USPS's historical archive to gain the most accurate documented information, consumers of all ages will be provided with an education about the origin of the USPS and its significant national and state contributions to United States. The State collection will capture and remind American citizens of their state's contributions to the USPS. The calendar will manifest state monuments of past and present, buildings, and even battlefields, where USPS men and women risked their lives to deliver the mail. The focus of the State calendar is to be all inclusive of the United States as one nation, yet credit each individual state's contributions.

2) **Black Heritage Collection:** This collection will feature four series of black heritage calendars dating back to the 1700s. Each series will introduce a segment of historical contributions to the USPS. Each year the featured series will approach the realities of life during that period from the prospective of: laborers to professionals; athletic to activist; scientist to seamstress; directors to doctors; and from slavery to superstars. The 12-month calendar will feature historical portraits and documented records of African Americans who have been honored by the USPS in their series of Black Heritage stamps, and listed in the USPS National register. The Black Heritage collection is projected to be one of the most sought after by culturally diverse historians, educators, business professionals, religious groups and the average lover of African Americans art and history.

3) **USPS Commemorative Stamps:** The stamp collection calendar will feature 12 commemorative USPS portrait stamps and personal attributes surrounding USPS commemorative honorees. All commemorative stamps featured in the calendar will be suitable for framing and as a keepsake for years to come. The Commemorative Stamp Collections will also feature men and women with celebrated achievements recognized by USPS. Each year there will be three Official Commemorative Stamp Calendar editions in limited production.

# Project 2001
# Official USPS Calendar

4) **USPS Kids World:** The Kids World edition will feature a collection of the Looney Tunes Series. The United States Postal Service youth program ambassador; Bugs Bunny will be the first edition cover page. Kids and parents alike will enjoy each month a different Looney Tunes character and learn all there is to know about the featured month character. The primary object of the Kids World collection is to delight children through portraits, while educating them on their level and introducing them to a world of history. Plans are to incorporate early leaner games audio and video cartoon animation on the internet so kids can enjoy the experience of surfing through the Kids World calendar. The Kids World edition will be reasonably priced within the average weekly allowance of a 12 year old.

5) **Celebrate The Century Collection:** The Celebrate The Century Collection will begin with the Millennium 2001 edition, which is destined to be this year's most sought after calendar collectable. It will serve as the USPS Official Calendar introductory calendar to the American public. The Millennium 2001 calendar will showcase a diverse America through the United States Postal Service, from the beginning of American mail service to the end of the 1900s. A highly skilled team of researchers and designers will be fully allocated to develop the Official USPS Millennium 2001 calendar. After the Millennium 2001 project is completed, the team will focus its efforts on the USPS Century and Decade Calendars. Most of the monthly illustrations from the Century and Decade Calendar will come from the six volumes of history bound in the Celebrate the Century Heirloom Editions.

## *Purchaser Authentication Registrar*

Purchasers will have the option to register their calendar by series/sequence number with the Purchaser Authentication Registrar (PAR). The PAR is a computer system based warehouse that will record registration data at the time of purchase and store data with an undisclosed security service provider. The objective of the PAR is to provide collectors and enthusiasts with an origin of purchase. In addition to the unique history, education content and official symbol it increase public interest in the USPS and its collectible value. Those registered collectors and enthusiasts that place their stamps and USPS history as invaluable records of time can be assured that having an official USPS Calendar in their collection will only endorse what is already a keepsake heirloom collection.

# Project 2001
# Official USPS Calendar

*Marketing*

For over a three-month period, a team of observers visited 50 US Post Offices in the southeastern part of the US to conduct a market study on postal customer's habits. The objective of the study was to determine how many post offices displayed calendars visible for customer use and what kind of calendar was being displayed. The study revealed that 82% of postal facilities visited did not display a calendar that was visible to the public and 18% of the postal facilities had a variety of non-postal service commercial calendars.

After analyzing preliminary marketing data, Sterling, Winchester & Long conducted a market study to ascertain customer desire and sales data. A questionnaire was developed to survey individuals and businesses (see Attachment I) on their USPS product and services.

Information was collected through telephone, face-to-face interviews, and Internet log-on questionnaires to determine the level of interest for the subject product and price range consumers were willing to pay. The market analysis delineated potential customers that would purchase an Official United States Postal Calendar into five categories:

**Families with school-age children**
**Ethnic groups**
**Organizations**
**Historians and collectors**
**Commercial**
**Internet Customers**

All participants were asked the same ten survey questions. The purpose of the market study was to determine consumer interest, habits and the price range consumers were willing to pay. From the data compiled the team went a step further and conducted an independent Market survey of USPS Post Masters or their designee to gain a better understanding of consumer post office visits and purchasing activities an Independent USPS Market Survey (attachment B). The study geographically covered three southeastern states (Georgia, South Carolina and Florida).

# Project 2001
# Official USPS Calendar

The market survey analysis focused on customer's frequency of visits to their local Post Office, purchase behavior (at local post offices and on the web), consumer interest in an Official USPS Calendar and the value consumer's placed on such a product.

From the 250 individuals surveyed, 48% visited a post office 2 to 3 times a week, and 19.5% visited the local post office 4 or more times a week. When asked: "What day of the week are you most likely to visit the post office?" 51% said Saturday and 38% said Monday. Only 33% of the individuals surveyed made a merchandise display item purchase, such as Superman or Bugs Bunny products.

**Survey question 7:** (*"From the four USPS items listed below, 1. USPS Key Chain and Pen, 2. Superman or Walt Disney Products, 3. Official USPS Calendar, and 4. USPS Monthly Magazine which one would you purchase if available to the public?"* - Attachment A).

This survey question defines the objective of the market survey concerning customer's interest in an official USPS calendar. Out of the 250 individuals polled, 153 or 61.4% selected item 3., the Official US Postal Calendar, indicating that they would buy an Official US Postal Calendar if available. Without the benefit of having a visual picture of what an Official US Postal Calendar would look like 31% said that they would pay $10.00 or less and 18% indicated that they would pay $10.00 or more for such an official calendar.

The calendar's first year market plan is to sell the product through one national bookstore chain. Our research indicates that the USPS calendar is a specialty item with everyday benefits with intrinsic value as a collectable heirloom for stamp enthusiasts and US Postal Service historians. We believe that limiting the number available for retail sales will increase the product demand, increase consumer interest in commemorative stamps and preserve the product's significance to American history.

We are in discussion, a waiting trademark licensing approval, with two national retail bookstore that has a combine total of 900 bookstores throughout the U.S. Our intent is to identify the best retail arrangement that meets our overall objectives of quality, value, service, product marketability, and promotion.

# Project 2001
# Official USPS Calendar

## *Internet Web Site*

A recent independent study of home internet use by Price Water House revealed that 43 % of US homes are Internet users, a 60% increase from last years' internet home usage. From the population we surveyed, 33% said that they would use the Internet to purchase USPS products. When the survey results were delineated by geographic location, the Internet usage and willingness to purchase USPS products over the web increased in large populated metro areas.

We are in the development stage of marketing and selling the calendar and other calendar accessories over the Internet. The preliminary plan is to provide users with complete information on the calendar and link viewers to calendar accessories and the USA Philatelic catalog and to "stampsonline.com". The primary objective is to sell the Official USPS calendar and associated stamps, with an emphasis on commemorative stamps featured in the calendar collection. The web will include audio and video presentations on the featured month, providing current and historical information, and suggested resources. A special added feature to the calendar online will be its hyper link to significant USPS days and individuals that provide detailed information in a documentary format.

Each calendar collection will have links to other sections of the calendar, accessories and provide the customer an opportunity to purchase. The purchase order form will request general merchandise purchasing data and the opportunity for gift purchases. After the purchase is completed the general data will automatically be stored in a Project 2001 web customer's file. The data will be used to conduct product and service research, product marketing, and for customer's priority calendar mailing list for future calendars.

# Project 2001
# Official USPS Calendar

## *Advertising*

Advertising and promotion of the Official USPS Calendar will primarily be done through wholesale buyers, point of sales in USPS merchandise stores and web site promotion. The Official USPS Calendar is anticipated to become a national symbol of the USPS in the 21st Century. As a postal service product each year postal service customers will come to expect and anticipate the extraordinary commemorative stamp illustrations and archives of information. The Official Calendar will increase customer loyalty and commemorative stamp sales and other accessories, while educating Americans on USPS history. For all 365 days of the year, millions of Americans will schedule their days, weeks, and months using the USPS Official Calendar. Furthermore, long after the last calendar day of the year, the Official USPS Calendar will be valued as a limited addition collectable.

Web usage in US homes in 1999 jumped 60% from the previous year to 43%, accounting for an estimated 30 million families. The product's uniqueness with an official seal of authentication, collectable value and distribution to 28,000 US Post Offices and USPS merchandise shops across the country will provide sufficient advertising and promotion to meet sales projections.

# Project 2001
# Official USPS Calendar

***Sales:***

It is projected that 225,000 calendars will be sold during the peak period (November 15 through February 15). Sales projections injected a 10 percent error rate in data analysis, production volume. One percent or 2,250 of sales projections will be used as advertisement gifts to schools and other institutions to penetrate the market and to promote the product educational value young learners. The actual sales estimate is 200,000 calendars for 2001, with a three year projected sales increase of 15 to 20 percent for each year.

In the last quarter of 1999, an independent study of home interest conducted by Price Waterhouse revealed that 43% of US homes were Internet users, and a 60% increase from last year's usage. From the population SW&L surveyed, 33% indicated Internet usage to purchase USPS products. When the survey results were delineated by geographic location, the Internet usage and willingness to purchase USPS products over the web percentage increased in the metro areas.

Preliminary marketing data indicates that through an aggressive retail sale calendar should be 50 percent of total sales, first year the calendar sale through the Philatelic catalog and merchandise stores is estimated at 25 percent, and internet sale should also account for 25 percent of total Project 2001 calendar sales.

**Sale Area:**

There are 28,000 US Post Offices and 300 merchandise stores in the U.S. The U.S. Post Office is one the most recognizable names in the world. The first post office was established in 1639 in Boston in Richard Fairbanks house. Hines began the life of the oldest American institution to survive through the Civil War, three World Wars Depression, Corporate Mergers and Acquisitions without interrupting the postal service basic mission and concept, mail delivery. We believe that the history attached to the USPS is so universal and has been a part of Americans culture that Americans will purchase this product at every corner within the United States of America.

# Project 2001
# Official USPS Calendar

## *Business Location*

Project 2001 administrative and development offices will be located in the Central Savannah River Area (CSRA), in Barnwell County of South Carolina or in Richmond County, Georgia near Augusta, Georgia. Preliminary location identification research is being conducted based on workforce skill levels, community partnering, technical resources, space availability and easy access to USPS distribution centers or major land (trucking) and air (airplane) transportation hubs.

## *Production and Distribution*

All calendar research, design, layout and development will be done at the Project 2001/SW&L corporate office and research facility and linked electronically with contracted printing production sites throughout the country. After production and Q&A approval calendars will be shipped directly to a regional USPS distribution center or to district warehouses for direct internet order processing or local distribution to regional postal facilities. Project 2001 production and distribution center will be online in real time, with specialized transportation system for efficiency circulation of calendars to USPS merchandise stores and other facilities. A centralized computer mainframe will monitor calendar sales activity at each sales location including Philatelic Catalog distribution centers to provide online restocking information to the nearest distribution center for an immediate response.

Project 2001
Proposed Licensed
Product List

| | A | B | C | D | E | F |
|---|---|---|---|---|---|---|
| 1 | Scott | | | | | |
| 2 | Catalog | | | | | |
| 3 | Number | | Description | | | Date of Issue |
| 4 | | | | | | |
| 5 | 2359a | | Const. Bicentennial Issue | | | |
| 6 | 2360 | | Signing of the Consititution | | | 08/28/1987 |
| 7 | 2137 | | Mary Mclead Bethurne | | | 09/17/1987 |
| 8 | 2105 | | E. Rooseverlt | | | 03/05/1985 |
| 9 | 1094 | | US Flag | | | 10/11/1984 |
| 10 | 418 | | Benjamin Franklin | | | 07/04/1957 |
| 11 | 873 | | Booker T. Washington | | | 2/12 |
| 12 | 893 | | Alexander Graham Bell | | | 04/07/1940 |
| 13 | 998 | | United Confederal Vet. | | | 10/28/1940 |
| 14 | 1408 | | Stone Mountain | | | 05/30/1951 |
| 15 | 1595 | | Liberty Bell | | | 09/19/1970 |
| 16 | 1687 | | The Declaration of Indep. | | | 10/31/1975 |
| 17 | 3087 | | Centennial Olympic | | | 05/29/1976 |
| 18 | 1770 | | Robert F. Kennedy | | | 07/11/1996 |
| 19 | 2782a | | 4 Sheet National Postal Museum | | | 01/12/1979 |
| 20 | 2975 | | Civil War | | | 07/30/1993 |
| 21 | UX143 | | Picture Side White House | | | 06/29/1995 |
| 22 | 3137 | | Bugs Bunny | | | 09/17/1987 |
| 23 | 3306 | | Daffy Duck | | | 05/22/1997 |
| 24 | 3136 | | Dinasaurs | | | 09/17/1987 |
| 25 | 3204b | | Sylvester & Tweety | | | 05/01/1997 |
| 26 | 335 | | George Washington | | | 04/27/1998 |
| 27 | 561 | | T. Jefferson | | | 12/8 |
| 28 | 1499 | | Truman | | | 01/15/1923 |
| 29 | 1503 | | L. Johnson | | | 05/08/1973 |
| 30 | 1950 | | F. Roosevelt | | | 08/27/1973 |
| 31 | 2219 | | Presidents - sheet of 9 | | | 01/30/1982 |
| 32 | 2218 | | Presidents - sheet of 9 | | | 05/22/1986 |
| 33 | 2217 | | Presidents - sheet of 9 | | | 05/22/1986 |
| 34 | 2216 | | Presidents - sheet of 9 | | | 05/22/1986 |
| 35 | 2955 | | R. Nixon | | | 05/22/1986 |
| 36 | | | | | | 04/26/1995 |
| 37 | | | | | | |
| 38 | | | | | | |
| 39 | | | | | | |
| 40 | | | | | | |
| 41 | | | | | | |
| 42 | | | | | | |
| 43 | | | | | | |
| 44 | | | | | | |
| 45 | | | | | | |
| 46 | | | | | | |
| 47 | | | | | | |
| 48 | | | | | | |

Sterling, Winchester Long
Privilage Confidential

Project 2001
Proposed Licensed
Product List

| | A | B | C | D | E | F |
|---|---|---|---|---|---|---|
| 49 | | | | | | |
| 50 | | | | | | |
| 51 | Insects & Spiders | | 10/01/1999 | | | |
| 52 | Holiday Traditional | | 10/18/1999 | | | |
| 53 | | | | | | |
| 54 | | | | | | |
| 55 | | | Great American Women | | | |
| 56 | | | Volume One | | | |
| 57 | | | Jane Addams | | | |
| 58 | | | Susan B. Anthony | | | |
| 59 | | | Virginia Apgar | | | |
| 60 | | | Clara Barton | | | |
| 61 | | | Ruth Benedict | | | |
| 62 | | | Pearl Buck | | | |
| 63 | | | Rachel Carson | | | |
| 64 | | | Mary Cassatt | | | |
| 65 | | | Bessie Coleman | | | |
| 66 | | | Emily Dickinson | | | |
| 67 | | | Patricia Roberts Harris | | | |
| 68 | | | Juliette Gordon Low | | | |
| 69 | | | Mary Lyon | | | |
| 70 | | | Annie Oakley | | | |
| 71 | | | Alice Paul | | | |
| 72 | | | Harriet Quimby | | | |
| 73 | | | Ayn Rand | | | |
| 74 | | | Sojourner Truth | | | |
| 75 | | | Marth Washington | | | |
| 76 | | | | Scott | | |
| 77 | | | | Catalog | Date of | |
| 78 | | | Celebrate the Century | Number | Issue | |
| 79 | | | 1900 | 3182 | 02/03/1998 | |
| 80 | | | 1910 | 3183 | 01/02/1998 | |
| 81 | | | 1920 | 3184 | 02/03/1998 | |
| 82 | | | 1930 | 3185 | 09/10/1998 | |
| 83 | | | 1940 | 3186 | 02/12/1999 | |
| 84 | | | 1950 | 3187 | 05/26/1999 | |
| 85 | | | 1960 | | 09/17/1999 | |
| 86 | | | 1970 | | 11/18/1999 | |
| 87 | | | 1980 | | | |
| 88 | | | 1990 | | | |

Sterling, Winchester Long
Privilage Confidential

ATTACHMENT C

44-125

# USPS PROPOSED TERMS SHEET

**LICENSE TYPE** New Business

**LICENSOR** United States Postal Service

**EMI SALES REP** Marcie Chick

**PROSPECTIVE LICENSEE**

Sterling, Winchester & Long, a South Carolina Corporation
Tax ID #: 57-1099225
Department of Labor Code: Small Minority Owned Business
Contact: J.G. Long
1022 Dunbarton Road
Williston, SC 29853-1718
Phone: 803-266-2555
Fax: 706-868-0216

**LICENSED MARKS**

Those words, logos and related trade dress of LICENSOR as set forth in SCHEDULE B

**LICENSED PRODUCTS**

US Postal Service 12-month Calendars including, but not limited to, a series of calendars such as USPS National and State History, Black Heritage, USPS Commemorative Stamps, Kids World, and Celebrate the Century.

**LICENSE TYPE**

Non-Exclusive

**LICENSED TERRITORY**

United States, its territories and possessions.

**DISTRIBUTION CHANNEL**

Wholesale to bookstores, specialty stores, Philatelic catalogs and merchandise stores; and Retail via Licensee's web site.

**INITIAL TERM**

Contract Length: 3 1/2 years

Effective Date: 7/1/2000 End Date: 12/31/2003

Contract Period 1 shall begin 7/1/2000 and shall end 12/31/2001. Each consecutive twelve-month period thereafter shall be deemed a Contract Period.

rv\ls\usps\

**RENEWAL TERM**

See attached **SCHEDULE C.**

**ADVANCE ROYALTY** $50,000.00 (payable upon signing this Terms Sheet)

**EARNED ROYALTY PERCENTAGE (based on Net Sales)**

8% on Licensed Products sold at wholesale price for wholly owned and jointly owned stamp designs; and 5% on Licensed Products sold at retail price for wholly owned and jointly owned stamp designs.

**MINIMUM ROYALTY GUARANTEE**

Minimum Guarantees shall be paid on a quarterly basis as follows:

| Initial Term | Dates | Minimum Guarantee |
|---|---|---|
| Contract Period 1 | 7/1/2000-12/31/2001 | $50,000.00 |
| Contract Period 2 | 1/1/2002-12/31/2002 | $50,000.00 |
| Contract Period 3 | 1/1/2003-12/31/2003 | $50,000.00 |

**ADVERTISING** The Minimum Advertising Requirement for each Contract Period shall be: Not Applicable

**INSURANCE** Not less than $1,000,000.

**COMMERCIALIZATION BY LICENSEE**

| | |
|---|---|
| Deadline for prototypes to Licensor: | ~~7/15/2000~~ 7/31/2000 |
| Deadline for initial manufacturing run: | ~~8/15/2000~~ 9/12/2000 |
| Deadline for submission of advertising and promotion materials: | 10/1/2000 |
| Initial sale to Distribution Channel: | 11/1/2000 |

**SPECIAL TERMS AND CONDITIONS**

Licensee acknowledges and agrees that some stamp designs are owned by USPS and a Joint-Owner(s) and as such will require a separate contract between the Licensee and Joint-Owner(s). It is the Licensee's sole responsibility to obtain all necessary agreements with Joint-Owners prior to design and production of Licensed Articles.

USPS, at its option and in its sole discretion, may terminate the license as to any Jointly-Owned stamp design at any time upon ten (10) days' written notice.

rv\ls\usps\

ACKNOWLEDGEMENT

Prospective Licensee understands that this Terms Sheet does not constitute a license agreement and that no such agreement shall be deemed to have been reached until a final license agreement has been executed by the parties. In the event that Licensor elects not to execute either this Terms Sheet or if in the event both parties fail to execute the final license agreement for any reason, then Prospective Licensee may obtain a full refund of the Advance Royalty submitted herewith immediately upon written demand.

This Terms Sheet supersedes all prior and/or contemporaneous oral or written agreements, representations, and understandings of EMI, Licensor, and Prospective Licensee regarding the subject matter of this Terms Sheet. Licensor and Prospective Licensee acknowledge that no other party nor any agent of any other party, has made any express or implied promise, representation, or warranty whatsoever, which is not contained herein and which concerns the subject matter of this Terms Sheet and that neither party has executed or authorized the execution of this instrument in reliance upon any promises, representations, or warranties not contained herein. No supplement, modification, or amendment of this Terms Sheet or any representations concerning the subject matter of this Terms Sheet shall be binding unless executed in writing and signed by both Parties.

Prospective Licensee may use the Licensed Marks for the sole purpose of developing conceptual products and/or collateral materials for Licensor's preliminary approval. No products and/or collateral materials shall be sold or otherwise distributed until a formal License Agreement has been fully executed and Licensor has provided express written approval of the particular products and materials. All use of the Licensed Marks shall inure to the benefit of the Licensor.

| STERLING, WINCHESTER & LONG | UNITED STATES POSTAL SERVICE |
|---|---|
| BY: [signature] | BY: |
| NAME: J. G. Long | NAME: |
| TITLE: Managing Officer | TITLE: |
| DATE: 7/12/00 | DATE: |

rv\ts\uspsl

# SCHEDULE B

## LICENSED PROPERTY/TRADEMARKS

"Licensed Properties" shall mean the following United States Postal Service trademarks, service marks, and copyrights:

Postal Seals (1782 – 1993)

The USPS Corporate Signature

Postmark USA brand

All wholly owned USPS stamp designs to which the USPS holds the copyright.

All jointly owned USPS stamp designs to which the USPS holds the copyright.

Licensee acknowledges that some stamp designs are jointly owned, and that it is Licensee's sole responsibility to obtain appropriate permission to use such designs.

rv\ls\usps\

# SCHEDULE C

## RENEWAL TERMS

**TYPE OF RENEWAL** Automatic

**RENEWAL HURDLE MINIMUM**

Licensee must earn a minimum of $60,000 in earned royalties during the four quarters beginning 9/30/02 through 9/30/03 to qualify for an automatic renewal.

**NUMBER OF RENEWALS** One

**RENEWAL TERM** Three Years

**SPECIAL RENEWAL CONDITIONS**

Not Applicable

**RENEWAL TERM EARNED ROYALTY PERCENTAGES (based on Net Sales) & MINIMUM ROYALTY GUARANTEES**

Minimum Guarantees shall be paid on a quarterly basis as follows:

| First Renewal Term | Dates | Royalty Rate | Minimum Guarantee |
|---|---|---|---|
| Contract Period 4 | 1/1/2004-12/31/2004 | 8% | *See Below |
| Contract Period 5 | 1/1/2005-12/31/2005 | 8% | |
| Contract Period 6 | 1/1/2006-12/31/2006 | 8% | |

*During the Renewal Term, Minimum Guarantees will be as follows:

| | | |
|---|---|---|
| Contract Period 4 | 1/1/2004 – 12/31/2004 | The greater of $60,000 or 75% of the royalties due for Contact Period 3. |
| Contract Period 5 | 1/1/2005 – 12/31/2005 | The greater of $70,000 or 75% of the royalties due for Contract Period 3. |
| Contract Period 6 | 1/1/2006 – 12/31/2006 | The greater of $80,000 or 75% of the royalties due for Contract Period 3. |

rv\ls\usps\

Project 2001
List of Stamps For
2001 Calendar Series

| | A | B | C | D | E | F |
|---|---|---|---|---|---|---|
| 1 | Scott | | | | | |
| 2 | Catalog | | | | | Date of |
| 3 | Number | | Description | | | Issue |
| 4 | | | | | | |
| 5 | 2359a | | Const. Bicentennial Issue | | | 8/28/87 |
| 6 | 2360 | | Signing of the Constitution | | | 9/17/87 |
| 7 | 873 | | Booker T. Washington | | | 4/7/40 |
| 8 | 230 — | 245 | Columbian Exposition Issue | | | 1/2/93 |
| 9 | | | | | | |
| 10 | 1595 | | Liberty Bell | | | 10/31/75 |
| 11 | | | | | | |
| 12 | UX143 | | Picture Side White House | | | 9/17/87 |
| 13 | 3137 | | Bugs Bunny | | | 5/22/97 |
| 14 | 3306 | | Daffy Duck | | | 9/17/87 |
| 15 | 3136 | | Dinosaurs | | | 5/1/97 |
| 16 | 3204b | | Sylvester & Tweety | | | 4/27/98 |
| 17 | 3185f | | Superman | | | |
| 18 | 561 | | T. Jefferson | | | 1/15/23 |
| 19 | 1499 | | Truman | | | 5/8/73 |
| 20 | 3185h | | Snow White | | | |
| 21 | 1950 | | F. Roosevelt | | | 1/30/82 |
| 22 | 2219 | | Presidents - sheet of 9 | United State I | | 5/22/86 |
| 23 | 2218 | | Presidents - sheet of 9 | United State II | | 5/22/86 |
| 24 | 2217 | | Presidents - sheet of 9 | United State III | | 5/22/86 |
| 25 | | | | | | |
| 26 | 1686 | | The Surrender of Lord Cornwalls at Yorktown | | | 5/29/76 |
| 27 | 1687 | | The Declaration of Independence, 4 July 1776 | | | 5/29/76 |
| 28 | 1688 | | Washington Crossing the Delaware | | | 5/29/76 |
| 29 | 1689 | | Washington Reviewing His Ragged Army | | | 5/29/76 |
| 30 | 1694a | | The Declaration of Independence, Strip of 4 | | | 7/4/76 |
| 31 | | | | | | |
| 32 | | | Voyages of Christopher Columbus Sheets | | | |
| 33 | 2623a | | First Voyage of Christopher Columbus | | | 4/24/92 |
| 34 | 2624 | | First Sighting of Land | | | 5/22/92 |
| 35 | 2625 | | Claiming a New World | | | 5/22/92 |
| 36 | 2626 | | Seeking Royal Support | | | 5/22/92 |
| 37 | 2627 | | Royal Favor Restored | | | 5/22/92 |
| 38 | 2628 | | Reporting Discoveries | | | 5/22/92 |
| 39 | 2629 | | Christopher Columbus | | | 5/22/92 |
| 40 | Insects & Spiders | | | | | 10/1/99 |
| 41 | Holiday Traditional | | | | | 10/18/99 |
| 42 | | | | | | |
| 43 | | | | | | |
| 44 | | | | | | |
| 45 | | | | | | |
| 46 | | | | | | |
| 47 | | | | | | |

Sterling, Winchester Long
Privilege and Confidential

Project 2001
List of Stamps For
2001 Calendar Series

| | A | B | C | D | E | F |
|---|---|---|---|---|---|---|
| 48 | | | | | | |
| 49 | | | | | | |
| 50 | | | | | | |
| 51 | | | Black Heritage | | | |
| 52 | | | | | | |
| 53 | | | Ernest E. Just | | | |
| 54 | | | Whitney Moore Young | | | |
| 55 | | | Ralph Bunch | | | |
| 56 | | | Harriet Tubman | | | |
| 57 | | | Frederick Douglass | | | |
| 58 | | | Booker T. Washington | | | |
| 59 | | | Carter G. Woodson | | | |
| 60 | | | Bill Pickett | | | |
| 61 | | | Ida B. Wells | | | |
| 62 | | | Sojourner Truth | | | |
| 63 | | | Benjamin Banneker | | | |
| 64 | | | James Weldon Johnson | | | |
| 65 | | | Dr. George Washington Carver | | | |
| 66 | | | Benjamin O. Davis, Sr. | | | |
| 67 | | | Scott Joplin | | | |
| 68 | | | Jim Beckwiurth | | | |

Sterling, Winchester Long
Privilege and Confidential

ATTACHMENT D

**From:** Ilene Kent [mailto:IKent@EquityManagementInc.com]
**Sent:** Monday, September 17, 2001 9:18 AM
**To:** 'J G Long'
**Cc:** Robin Stemen
**Subject:** RE: Channel of Distribution

Hi JG -- thanks again for your kind words.

Let's you and I plan to chat specifically about this. As we'd talked before, the USPS/philatelic channels were added to your agreement, but, as you point out, does not obligate the USPS to purchase these products -- either for giveaway or for resale.

The USPS has also recently announced a reorganization, and the retail group is somewhat up in the air right now. I will be leaving at 3:15 today for the Jewish holiday (if you can call it a holiday at this tragic time) and will be back in the office on Thursday.

ibk

-----Original Message-----
**From:** J G Long [mailto:SWL@Long.net]
**Sent:** Saturday, September 15, 2001 4:19 PM
**To:** IKent@EquityManagementInc.com
**Subject:** Channel of Distribution

Good Morning, Ilene. I hope things are improving with you.

In your February 16, 2001 e-mail to me, relating to getting our product into the USPS Philatelic catalog and USPS Philatelic centers, you suggested that we have a finished product before pursuing those channels. As you may be aware, given the past week, USPS/EMI has approved our finished product for manufacturing.

We are now in the process of finalizing our advertising and marketing promotions, including our web page, and would like to include the USPS Philatelic catalog and Philatelic centers as part of our channels of distribution, as per our License Agreement.

Before making our request to USPS, we would like to offer EMI an opportunity to express our desires to further promote USPS by way of our product presented in their specified locations and catalog. We are NOT asking or requesting that USPS purchase our product under any condition. All we are requesting is to market and sell our product through those USPS channels of distribution in our licensing agreement.

We would appreciate EMI's attention to this matter.

J.G. Long

ATTACHMENT E

Project 2001
Profitability Analysis

| Year | 0 | 1 | 2 | 3 | 4 | 5 | | |
|---|---|---|---|---|---|---|---|---|
| 1. Fixed Capital Investment | $ 246,000 | | | | | | 1. | |
| 2. Working Capital | $ 284,500 | | | | | | 2. | |
| 3. Total Capital Investment (1 + 2) | $ 530,500 | | | | | | 3. | |
| 4. Sales | | $ 1,300,000 | $ 1,365,000 | $ 1,433,250 | $ 1,504,913 | $ 1,580,158 | 4. 5% annual increase | |
| 5. Other Revenue | | | | | | | 5. 5% annual increase | |
| 6. Total Product Cost | | $ 530,500 | $ 599,530 | $ 621,738 | $ 644,910 | $ 669,090 | 6. | |
| 7. Operating Income (4 + 5 - 6) | | $ 769,500 | $ 765,470 | $ 811,512 | $ 860,003 | $ 911,068 | 7. | |
| 8. Depreciation | | | | | | | 8. | |
| 9. Profits Before Tax (7 - 8) | | $ 769,500 | $ 765,470 | $ 811,512 | $ 860,003 | $ 911,068 | 9. | |
| 10. Income Tax (25%) | | 192,375 | 191,368 | 202,878 | 215,001 | 227,767 | 10. | |
| 11. Profits After Tax (9 - 10) | | $ 577,125 | $ 574,103 | $ 608,634 | $ 645,002 | $ 683,301 | 11. | |
| 12. Net Annual Cash Income (11 + 8) | | $ 577,125 | $ 574,103 | $ 608,634 | $ 645,002 | $ 683,301 | 12. | |
| | | | | | | | | |
| **13. Net Annual Cash Flow (3 + 12)** | **$ 530,500** | **$ 577,125** | **$ 574,103** | **$ 608,634** | **$ 645,002** | **$ 152,801** | | |
| | | | | | | | | |
| Expected Units Sold | 200,000 | | | | | | | |
| Sales Price per calendar | $ 6.50 | | | | | | $ 3,088,165 | |
| | | | | | | | | |
| | | | | | | | NPV | |
| Net Present Value (15%) | $ (530,500) | $ 501,848 | $ 434,104 | $ 400,187 | $ 368,782 | $ 339,721 | $ 1,514,142 | 15% |

892

| | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | | |
|---|---|---|---|---|---|---|---|
| I. Manufacturing Cost | | | | | | | |
| A. Direct Production Costs | | | | | | | |
| 1. Printing Production | $ 199,500 | $ 205,485 | $ 211,650 | $ 217,999 | $ 224,539 | | (3% annual increase) |
| 2. Patents & Royalties | $ 65,000 | $ 68,250 | $ 71,663 | $ 75,246 | $ 79,008 | | (5% of expected sales) |
| | $ 264,500 | $ 273,735 | $ 283,312 | $ 293,245 | $ 303,547 | | |
| B. Fixed Charges | | | | | | | |
| 1. Depreciation | | | | | | | |
| 2. Rent | | $ - | $ - | $ - | $ - | | run out of home |
| 3. Insurance | $ 1,000 | $ 1,050 | $ 1,103 | $ 1,158 | $ 1,216 | | |
| | $ 1,000 | $ 1,050.00 | $ 1,103 | $ 1,158 | $ 1,216 | | |
| C. Officer Compensation & Benefits | | | | | | | |
| | | $ - | $ - | $ - | $ - | | (5% annual increase) |
| | $ 265,500 | $ 274,785.00 | $ 284,415 | $ 294,402 | $ 304,762 | | |
| | | | | | | | |
| II. [illegible] | | | | | | | |
| A. [illegible] Staff Salaries | $ - | $ - | $ - | $ - | $ - | | defer salaries to 2nd year |
| B. Research & Development Costs | $ 50,000 | 52,500 | 55,125 | 57,881 | 60,775 | | (5% annual increase) |
| C. Marketing & Advertising Costs | $ 20,000 | $ 20,200 | $ 20,402 | $ 20,606 | $ 20,812 | | (1% annual increase) |
| D. Professional Services | $ 10,000 | $ 10,300 | $ 10,609 | $ 10,927 | $ 11,255 | | (3% annual increase) |
| E. Travel Expenses | $ 5,000 | $ 5,200 | $ 5,408 | $ 5,624 | $ 5,849 | | (4% annual increase) |
| F. General & Administration Costs | $ 170,000 | $ 178,500 | $ 187,425 | $ 196,796 | $ 206,636 | | (5% annual increase) |
| [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | | [illegible] |
| H. Warehouse & Shipping | $ 10,000 | 10,300 | 10,609 | 10,927 | 11,255 | | (3% annual increase) |
| | $ 265,000 | $ 324,745 | $ 337,323 | $ 350,507 | $ 364,329 | | |
| | | | | | | | |
| III. [illegible] | $ 530,500 | $ 599,530 | $ 621,738 | $ 644,910 | $ 669,090 | | |
| | | | | | | | F. General & Administrative Costs |
| **Units Produced** | **200,000** | | | | | | 1. Office Furniture |
| | | | | | | | 2. Computers & Software |
| | | | | | | | 3. Supplies & Equipment |
| **BREAK-EVEN ANALYSIS** | | | | | | | 4. Fax, Internet, Phone & Wireless |
| | Wholesale | Wholesale | | | | | 5. Miscellaneous / Contingencies |
| Direct Costs Per Calendar | $ 1.32 | | | | | | **Total** |
| Indirect Costs | $ 266,000 | | | | | | |
| Sales Price | $ 6.50 | $ 7.00 | | | | | |
| Units Produced | 200,000 | | | | | | |

ATTACHMENT F

Table 4

## Projection of Lost Profits for Sterling, Winchester & Long (2002 - 2007) - Growth 40%, Present Value 25%

| | 2002 | 2003 | 2004 | 2005 (3 YEAR CONTRACT EXTENSION) | 2006 (3 YEAR CONTRACT EXTENSION) | 2007 (3 YEAR CONTRACT EXTENSION) | |
|---|---|---|---|---|---|---|---|
| **Retail Sales** | | | | | | | |
| (1) Projected Retail units sold @ 20% per annum | 184,138 | 238,390 | 310,461 | 434,645 | 608,503 | 851,905 | |
| (2) Gross Revenues @ $14.99 per unit | $2,760,231 | $3,573,460 | $4,653,808 | $6,515,332 | $9,121,464 | $12,770,050 | |
| (3) Projected Signature Series units sold * | 2,002 | 2,003 | 2,004 | 2,005 | 2,006 | 2,007 | |
| (4) Gross Revenues @ Series price * | $40,080 | $40,120 | $40,160 | $40,200 | $40,240 | $40,280 | |
| (5) Gross revenue retail sales: | $2,800,311 | $3,613,580 | $4,693,969 | $6,555,532 | $9,161,705 | $12,810,331 | |
| less: | | | | | | | |
| (6) COGS @ 15.7% of revenue | ($439,649) | ($567,332) | ($736,953) | ($1,029,219) | ($1,438,388) | ($2,011,222) | |
| (7) 49% total operating costs (of revenue) ^ | ($1,372,152) | ($1,699,828) | ($2,119,721) | ($2,841,958) | ($3,812,917) | ($5,118,145) | |
| (8) Total costs net retail sales : | ($1,811,801) | ($2,267,160) | ($2,856,674) | ($3,871,177) | ($5,251,304) | ($7,129,367) | |
| (9) Subtotal [(5) - (8)]: | $988,510 | $1,346,420 | $1,837,294 | $2,684,355 | $3,910,401 | $5,680,964 | |
| less: | | | | | | | |
| Royalties @ 5% of net retail sales | ($49,425) | ($67,321) | ($91,865) | ($134,218) | ($195,520) | ($284,048) | |
| Net revenue retail sales [(9) - (10)]: | $939,084 | $1,279,099 | $1,745,430 | $2,550,137 | $3,714,880 | $5,396,916 | |
| **Wholesale Sales** | | | | | | | |
| (1) Projected Wholesale units sold @ 20% per annum | 13,860 | 38,808 | 77,615 | 108,661 | 152,126 | 212,976 | |
| (2) Gross Revenues @ $8.50 per unit | $117,809 | $329,865 | $659,729 | $923,621 | $1,293,069 | $1,810,297 | |
| (3) Gross revenue wholesale sales: | $117,809 | $329,865 | $659,729 | $923,621 | $1,293,069 | $1,810,297 | |
| less: | | | | | | | |
| (4) COGS @ 15.7% of revenue ^ | ($18,496) | ($51,789) | ($103,578) | ($145,009) | ($203,012) | ($284,217) | |
| (5) 49% total operating costs (of revenue) ^ | ($57,726) | ($155,168) | ($297,923) | ($400,409) | ($538,149) | ($723,273) | |
| (6) Total costs net wholesales sales : | ($76,222) | ($206,957) | ($401,501) | ($545,417) | ($741,161) | ($1,007,490) | |
| (7) Subtotal [(3) - (6)]: | $41,587 | $122,908 | $258,229 | $378,204 | $551,908 | $802,808 | |
| less: | | | | | | | |
| (8) Royalties @ 7.5% of net wholesale sales ** | ($3,119) | ($9,218) | ($19,367) | ($28,365) | ($41,393) | ($60,211) | |
| Net revenue wholesale sales [(7) - (8)]: | $38,468 | $113,690 | $238,861 | $349,838 | $510,515 | $742,597 | |
| Loss of net revenues - retail & wholesale sales | $977,552 | $1,392,788 | $1,984,291 | $2,899,976 | $4,225,396 | $6,139,513 | $17,619,515 |
| Present value of loss: | | | | | | | Totals |
| Past years | $977,552 | $1,392,788 | $972,303 | | | | $3,342,643 |
| Future years @ 25% | | | $1,011,988 | $2,319,981 | $2,704,253 | $3,143,431 | $9,179,653 |
| Total Loss | | | | | | | $12,522,296 |

* We assume that repeat Signature Series calendars are sold each year throughout the forecast period. The production run is limited to the numerical calendar year. For example, year 2002 (2002 units produced), year 2003 (2003 units produced) and so forth through year 2007. Similarly, the price per Signature Series calendar corresponds to the particular calendar year, $20.02, $20.03, $20.04, and so on through year 2007 ($20.07).

^ We assume that the Company would have experienced declines in operating expenses of 4.0% beginning in year 2003 and extending through year 2007.

** Wholesale royalties contractually based upon the number of wholly owned (USPS owned) and non-wholly owned stamp designs that would have been sold. [SOURCE: Confidential License Agreement, USPS Contract No. 102592-01-U-1173.] The royalty would have varied between 6 and 8% of net sales. The wholesale royalty would then have been a weighted average royalty based upon sales of wholly owned and non-wholly owned stamp designs sold during that year. For purposes of this report, we assume a fixed wholesale royalty of 7.5%. The retail net sales royalty amounted to 5%.

# REPRESENTATION AGREEMENT

This AGREEMENT between the U.S. Postal Service ("Client") and Equity Management Inc. ("EMI") is dated this 1st day of January, 2000.

## 1. APPOINTMENT/EMI RESPONSIBILITIES.

(a) Client appoints EMI, and EMI accepts such appointment, as Client's exclusive representative and grants EMI the exclusive worldwide right to promote, negotiate and transact agreements, as well as administer and manage relationships, for the rights to use the Intellectual Property. "Intellectual Property" shall be defined as the trademarks, service marks, trade names, service names, and related trade dress of Client and/or its affiliated companies, subsidiaries, and the like, as provided in attached Exhibit A hereto. "Licensee(s)" shall be defined as those parties which (i) have existing License Agreements with Client or (ii) enter into License Agreement(s) with Client through EMI's efforts under this Agreement (as such license agreements may be renewed, reinstated, extended or modified at any time by Client). "Licensed Product(s)" shall be defined as those products or services of Licensees which use the Intellectual Property. "License Agreement" shall be defined as the written agreement between Client and a Licensee relating to the Licensed Product(s).

EMI will provide its licensing expertise to Client in developing and managing the approved Licensing Plan (as defined herein) in the following areas: strategic planning of the licensing program, relationship management, licensing development and assistance to execute licenses, field sales, product administration, royalty collection, and legal assistance. The "Licensing Plan" shall be defined as the written strategic plan of action identifying the goals and objectives, time frames for action, and overall direction for the licensing program. The Licensing Plan shall be developed by EMI, and reviewed and approved by Client.

EMI shall provide the following:

1) strategic planning to define the objectives, strategies, tactics and operating procedures to be defined in the Licensing Plan provided to and approved by the Client. EMI will submit to Client, for its approval, product categories and product concept descriptions as part of the Licensing Plan. Product concept descriptions shall outline the basic product type, form, and other distinguishing characteristics such as unique distribution or manufacturing characteristics. EMI and Client will work together to develop specific lists of prospective licensees for each approved product category and product category description for Client's pre-approval;

2) quarterly status reports and periodic updates as appropriate, necessary and agreed to with Client covering EMI strategic development, product administration, legal, sales and other project activities;

3) sales efforts to secure license relationships within the approved Licensed Product categories through the EMI Sales Department. EMI will pursue the development of licensing partners per the licensing plan. EMI will develop, from the information provided from Client, the selling materials and information required to interest prospective licensees;

PLAINTIFF'S EXHIBIT 44

SWL 215

4) negotiate licensing proposals with potential licensees and present those proposals to Client for approval with a rationale and background on why the company and licensing proposal should be approved;

5) assistance to Client in coordinating Client's internal approval process, including the development of and administration of approval forms, the submission of materials from proposed licensees, preliminary review of submissions and, where appropriate, recommendations to Client regarding Client approval of products, packaging, marketing materials and other submissions required by the license agreements;

6) consultation with EMI's Legal Department regarding the licensing process and other matters related to the Intellectual Property, including EMI taking a primary role (with Client's active assistance and cooperation) in developing standard form license agreements, and reviewing and discussing the negotiation, drafting and execution of license agreements with Client;

7) check the accuracy of reporting and payment by Licensees; and as appropriate, recommend an auditing program to examine Licensees' books to further promote accuracy in reporting and payment of royalties;

8) management of the on-going relationships with Licensees and support of the Licensees' and Client's efforts, where appropriate, to maximize the success of the license business; and,

9) if requested and approved by Client in accordance with Section 4(b), execute or have executed, original research to further define the equity of the Intellectual Property and its licensing potential.

2. TERM/RENEWAL.

(a) Term. The Initial Term of this Agreement shall be from January 1, 2000 (the "Effective Date") through December 31, 2004 (the "Expiration Date"). Each consecutive twelve-month period during the Initial Term (or the Renewal Term as defined below) beginning on the Effective Date and ending on an anniversary of the Effective Date shall be referred to as a "Contract Period".

(b) Renewal. This Agreement shall be renewed for an additional five (5) year term (the "Renewal Term"), provided that during the Initial Term, EMI has performed satisfactorily under this Agreement as determined by the performance evaluation provisions set forth below in Section 2(b)(i), 2(b)(ii), and 2(b)(iii). EMI's performance under this Agreement shall be reviewed and evaluated as follows:

(i) Licensing Program Management. EMI's performance in the areas of service and management of the Licensing Program shall be evaluated annually according to the criteria contained in Exhibit C. The five annual evaluations shall be totaled at the end of the Initial Term and averaged.

(ii) Attainment of Financial Objectives. The Gross Royalties earned during the Initial Term shall be totaled. This amount shall receive a score, as provided in Exhibit D.

(iii) Attainment of Marketing Objectives. The Marketing Benefits achieved during the Initial Term shall be totaled. This amount shall receive a score as provided in Exhibit E.

EMI's Overall Performance Evaluation shall equal the average of the above three evaluation scores. If EMI's Overall Performance Evaluation is 3.0 or greater for the Initial Term, this Agreement shall be renewed for an additional five-year term.

3. **COMPENSATION**.

(a) Sharing Rate. Except as otherwise provided herein, EMI's Compensation for its services hereunder shall equal thirty percent (30%) of "Gross Revenues" arising from "New Licensees" and fifteen percent (15%) of "Gross Revenues" arising from Existing Licensees. "Gross Revenues" shall be defined to include all monies paid to Client by Licensees; provided, however, that EMI may charge prospective licensees a $250 license application administration fee in connection with the submission of a Trademark License Application which fee shall be retained 100% by EMI. Existing Licensees shall be defined as vendors identified in Exhibit ____ hereto that have license agreements in place with the Client prior to January 1, 2000. New Licensees shall be defined as vendors who execute license agreements (including renewals, amendments and extensions for Existing Licensees) with Client on or after January 1, 2000.

(b) Foreign Licensing. Due to the complexity of licensing outside of the United States, and notwithstanding anything contained herein to the contrary, for all New Licensees domiciled outside of the United States, EMI's Compensation shall be fifty percent (50%) of Gross Revenues throughout the Term and Renewal Term, if applicable. Both parties understand and agree that foreign licensing representatives with particular licensing expertise and knowledge of local laws, customs, and procedures in their own country(ies) may be used, as deemed necessary by EMI, and at EMI's sole expense.

4. **EXPENSES**.

(a) Out-of-Pocket Expenses. To promote the Licensing Plan and licensing program, EMI shall be reimbursed (in accordance with Client's Handbook F-15, Travel and other applicable Client policies) for reasonable, out-of-pocket expenses incurred during the Term (and Renewal Term, if applicable) for the development, administration, marketing, sales, and management of the licensing program, including, but not limited to travel, long distance telephone, copying and printing, and overnight mail charges. Client's obligation to reimburse EMI for such expenses incurred shall not exceed $30,000 per year, unless Client approves in writing such additional reimbursement. Expenses reimbursable under this section shall not include EMI's routine office expenses such as local phone expense, rent, and office supplies.

EMI shall be reimbursed for its out-of-pocket expenses at the end of each month during the Term and Renewal Term, if applicable. EMI shall provide verification and documentation to Client of such expenses. EMI shall invoice Client for the total of such expenses which invoice shall be payable within ten (10) days of its receipt by Client.

(b) Special Expenses. There may be certain additional special project and/or activity expenses not covered by Section 4(a) above which EMI may suggest be incurred and paid by Client (e.g., development and production of licensing sales materials and brochures, special research and related materials, graphics, artwork, printing, market research, pertinent association dues, purchases of special materials and publications for the licensing program). Client shall have sole discretion to approve or disapprove such expenses. EMI will submit written estimates for these expenses, for Client's prior express written approval. If so approved, EMI shall be reimbursed for such expenses incurred, in the same manner as provided in Section 4(a) above.

5. ROYALTY REPORTS AND RECORDS.

(a) EMI shall make quarterly reports to Client of Licensed Product sales, royalties and related sales information with respect to each license agreement. EMI shall maintain accurate and up-to-date books and records with respect to its licensing program activities, including each license agreement that it administers and/or manages for Client. With respect to such books and records, Client shall have the right to conduct an audit during normal business hours at EMI's offices at Client's expense and with at least five days advance written notice, to verify the royalty reports generated by EMI hereunder. Such audits may be conducted no more than once each Contract Period.

(b) Reconciliation. If so directed by Client, EMI shall prepare a quarterly reconciliation and remit to Client within forty-five days of the end of each Quarter all Net Revenues actually received by EMI during such Quarter. "Quarter" shall be defined as a calendar quarter beginning on January 1, April 1, July 1, and October 1 of each Calendar Year during the term. "Net Revenues" shall be defined as Gross Revenues less EMI's Compensation and expense reimbursements. After receipt of all Gross Revenues, EMI shall promptly deposit them into one or more interest bearing accounts at federally insured banks or financial institutions. The interest earned on such accounts shall be included as part of Gross Revenues. All payments under this Section to Client shall be accompanied by a statement of account.

6. ASSISTANCE FROM CLIENT.

(a) Client recognizes its role in contributing to the success of the licensing program. Accordingly, Client agrees to assist and support EMI in the licensing program development, to the extent reasonable, appropriate, and necessary by providing appropriate marketing strategy and research background information; assistance in the area of art work, development and review of sales brochures; explanation of criteria Client will use in connection with the approval of Licensees and Licensed Products; and timely approval of Licensee(s), Licensed Product(s), the Licensing Plan, and License Agreements.

Client agrees to refer all inquiries about licensing the Intellectual Property as contemplated under this Agreement to EMI. Client also agrees to: (i) develop with EMI the appropriate forms to use in developing and implementing the licensing program; (ii) provide EMI with the necessary guidance and approvals to develop the Licensing Plan; (iii) create an internal environment among departments involved in the licensing program that is open to and supportive of the licensing program; and (iv) protect the Intellectual Property through federal trademark registrations in the appropriate classes and pursuit of infringement as may be necessary and prudent.

(b) Category Approvals. Upon execution of this Agreement, Client agrees to approve product categories (as specified in Exhibit B hereto) in which EMI is directed and permitted to develop license opportunities. At Client's discretion, additional categories may be approved throughout the Initial Term (and the Renewal Term, if applicable) and Exhibit B will be amended from time to time to reflect such additions. Client agrees that if it has given EMI approval of any product category, or a proposed Licensee, or a proposed Licensed Product, it will not reject or withdraw that approval unless: (i) the material terms of a proposed License have changed since deal terms were approved by Client and such revised terms are no longer acceptable to Client; or (ii) the Licensee is unable to develop and/or manufacture Licensed Products that meet Client's established product quality and manufacturing standards.

(c) EMI's Presence at Management Meetings. Client shall allow EMI to participate, as necessary and appropriate, at Client's management meetings to present proposed license relationships developed by EMI. Client shall work with EMI to obtain the necessary approvals required of Client. Due to the importance of Client's senior management involvement in decisions regarding the usage of the Intellectual Property and EMI's experience and expertise in such matters, Client agrees to provide regular opportunities for EMI to attend meetings with Client's senior management to address the Licensing Plan, proposed Licensees or Licensed Product categories and matters related thereto.

7. **EXPIRATION AND TERMINATION**.

(a) Compensation Upon Expiration. Upon expiration of this Agreement, EMI shall be entitled to continue to receive the EMI Compensation relating to all New Licensees, as provided in Section 3(a) above, from agreements with such New Licensees generated by EMI's efforts hereunder (as such may be renewed, reinstated, modified or extended with the licensee at any time before or after termination or expiration of this Agreement) beginning on the date of expiration and continuing throughout the period during which such revenues are generated.

(b) "For Cause" Termination. This Agreement may be terminated prior to its expiration by either party only in the event of a material breach by the other party, provided the terminating party gives ninety (90) days advance written notice to the breaching party, and provided further that the breaching party fails to cure the alleged breach within the ninety (90) day period. If the alleged breach cannot reasonably be cured within said ninety (90) day period, but the breaching party is continuously working in good faith to cure or satisfy the breach within said period, then, with written notice to the non-breaching party, the breaching party shall be allowed reasonable additional time necessary to cure such breach.

(c) Post-Termination Compensation. Notwithstanding the foregoing, if this Agreement is terminated by Client pursuant to Section 7(b) above, for any reason other than the fraud or illegal conduct of EMI, EMI's Compensation shall be equal to thirty percent (30%) of Gross Revenues generated subsequent to the termination date from License Agreements with New Licensees generated from EMI's efforts hereunder (as such may be renewed, reinstated, modified or extended by the Licensee(s) at any time before or after termination) beginning on the date of termination and continuing for the period during which such revenues are generated. Such compensation shall terminate after five (5) years from the effective date of the termination of this Agreement.

If this Agreement is terminated by Client pursuant to Section 7(b) above as a result of fraud or illegal conduct by EMI (after such is established and proven), EMI shall not be entitled to any additional compensation arising after the effective date of the termination, but shall be entitled to EMI's Compensation for all Gross Revenues generated prior to the effective date of the termination.

(d) Manner of Payment/Audit Right. After expiration or termination of this Agreement, Gross Revenues shall be collected by Client and any EMI Compensation owed EMI pursuant to the terms of this Agreement shall be paid by Client in the manner set forth in Section 7(a) and 7(c), above within forty-five (45) days after the end of each Quarter, together with a report thereof including a complete statement of account.

EMI shall close the Client account maintained hereunder upon termination or expiration of this Agreement, with a statement of account. EMI shall have the right to obtain, upon reasonable prior written notice during normal business hours, information from Client's books and records pertaining to licensing revenues received by Client as may be reasonably necessary for EMI to verify the proper payment of the EMI Compensation pursuant to the terms of this Agreement.

EMI shall be allowed to audit Client's pertinent records, no more than once per calendar year through the continuation of EMI's right to any EMI Compensation and for three (3) years thereafter. Such audits shall be completed during Client's normal business hours, at Client's offices and upon five (5) days prior written notice. Client shall keep such records in a manner to facilitate such audit. All pertinent records shall be kept for at least one year after EMI's audit right has expired.

(e) Licensee Procurement. If, during the term of this Agreement and in the ordinary course of EMI providing the services as contemplated hereunder, EMI has identified a specific opportunity with a prospective licensee who has expressed a bona fide interest in a product or service category approved by Client for licensing (a "Bona Fide Opportunity"), but such Bona Fide Opportunity is rejected or not executed for any reason, and if within twenty-four (24) months after the termination or expiration of this Agreement, Client and the prospective licensee identified by EMI enter into an agreement to proceed with the Bona Fide Opportunity, EMI shall be entitled to receive the applicable EMI Compensation relative to such relationship as provided under this Agreement.

8. **INDEPENDENT CONTRACTORS.**

It is understood that the relationship between the parties shall be that of independent contractors, that neither party shall have any right or power to obligate, bind, or commit the other to any expense, liability, or matter other than as expressly provided and authorized in this Agreement, and that the officers, employees, servants, and agents or other representatives of one party shall not be deemed, expressly or impliedly, the officers, employees, servants, or agents of the other. Specifically, EMI and Client acknowledge that EMI has no authority to bind Client to any licensing commitments to any potential licensees, and all such commitments are only binding upon Client pursuant to a fully executed License Agreement.

9. MISCELLANEOUS.

(a) Waiver. No waiver of any breach, privilege or provision hereunder shall be construed as a waiver of any future breach, privilege or provision.

(b) Validity of Agreement. In case any term of this Agreement shall be held invalid, illegal or unenforceable in whole or in part, neither the validity of the remaining part of such term nor the validity of any other terms shall be affected thereby.

(c) Choice of Law. This Agreement shall be governed by, and construed in accordance with, the laws of the State of California, except any such law directing the application of the laws of another jurisdiction.

(d) Prior Agreements. This Agreement replaces and supersedes all prior agreements and understandings between the parties regarding the specific subject matter hereto and, when signed, may be amended only by an express writing signed by both parties hereto.

(e) Indemnification. Client agrees to indemnify, defend and hold harmless EMI, its officers, shareholders, employees and agents against any and all claims, obligations, losses, suits, demands, judgments, interest, penalties, fines, costs damages, liabilities and expenses of any kind whatsoever (including reasonable attorneys' fees and court costs) that may arise from any matter arising out of or related to this Agreement, the Intellectual Property, Client products, and/or EMI's efforts as directed by Client, including, but not limited to, claims of product liability, personal injury, infringement, or other claims related to any License Agreement or proposed License Agreement involving the Intellectual Property; provided, however, this provision shall not apply to the extent such claims, obligations, losses, suits, demands, judgments, interest, penalties, fines, costs, expenses, damages, or liabilities arise solely from the illegal or fraudulent conduct of EMI.

With respect to the defense of any claim or litigation to which this indemnity provision may apply, Client (at its own expense) shall have the right to select counsel of its own choice and direct and control the defense of the action and any settlement as it deems proper, provided, however, that no such defense or settlement may include any admission of liability or wrongdoing on the part of EMI without the express written consent of EMI. EMI shall give Client prompt written notice in the event of the receipt or knowledge of any claim or cause of action against EMI to which it believes this indemnity provision applies. EMI shall cooperate with and provide reasonable assistance to Client in the defense of such claim or cause of action.

(f) Notices, Statements and Payments. All notices, statements or payments to be made hereunder shall be given to or made at the respective addresses of the parties as set forth below unless written notification of a change of address is given to the other party. All notices hereunder shall be given by addressing them as indicated below and by delivering them as overnight, certified or registered mail, return receipt requested, postage prepaid and shall be effective as of the date of receipt of such notice by the other party.

As to Client:

**U.S POSTAL SERVICE**
Headquarters Purchasing
475 L'Enfant Plaza, SW, Room 4541
Washington, D.C. 20260-6237
Attn: H. Diane Fagan, Purchasing Specialist

with a copy to:

As to EMI:

**EQUITY MANAGEMENT INC.**
4365 Executive Drive, Suite 1000
San Diego, CA 92121
Attention: Chief Executive Officer

with a copy to:

**EQUITY MANAGEMENT INC.**
4365 Executive Drive, Suite 1000
San Diego, CA 92121
Attention: General Counsel

(g) Headings. The headings contained in this Agreement are for convenience only, and shall not be used to interpret or construe any substantive provisions hereof.

(h) Force Majeure. If either party is prevented from performing any obligation hereunder by reason of an Act of God, insurrection, fire, explosion, strike, labor dispute, casualty accident, lack or failure of transportation facilities, failure of suppliers or other third parties, flood, war, civil commotion, or any law, order or decree of any government or subdivision thereof or any other cause beyond its reasonable control ("Force Majeure"), then such party shall be excused from performance hereunder to the extent and for the duration of such Force Majeure and such amount of time reasonably necessary to recover, provided the party notifies the other party of the existence of the Force Majeure. In the event either party declares such Force Majeure, the performance criteria (as set forth in Section 2(b) hereof) shall be adjusted accordingly to recognize the duration and scope of such Force Majeure.

(i) Representations and Warranties. Each party represents and warrants that it has the ability and authority to enter into this Agreement, and all approvals and rights granted hereunder shall have gone through all necessary internal corporate or division level approval processes prior to being directed or granted to the other party. Client represents and warrants that: (i) it has not granted and will not grant during the term of this Agreement representation rights or privileges which are the same as, or are substantially similar to, those granted to EMI under this Agreement, nor have such rights been granted to any party which would conflict with or impair the rights, privileges, duties and responsibilities of EMI under this Agreement; (ii) the Intellectual Property is the exclusive property of Client; (iii) Client knows of no material claims which may affect the ownership or validity of the Intellectual Property; and (iv) Client has the requisite authority as of the Effective Date to license the Intellectual Property as contemplated hereunder.

(j) Confidentiality. All information made available by one party to the other party will be on a "need to know" basis. This information, including but not limited to sales, revenue or expense data, marketing or merchandising plans, and marketing research studies, and certain other proprietary or confidential information made available to each party by the other (including, but not limited to, the form and terms of this Agreement and the proprietary analytical and research techniques and marketing research studies of EMI), shall be considered confidential to the disclosing party (hereafter referred to as "Confidential Information"). Neither 222

party shall acquire any right or interest in the Confidential Information of the other. All Confidential Information shall be maintained in the strictest confidence, and neither party shall use or disclose the Confidential Information of the other in any manner inconsistent with, or in violation of, this Agreement. Upon termination or expiration of this Agreement, except as otherwise required herein, all Confidential Information of a party in the possession of the other shall be returned to its owner, or at the owner's option, expense, and specific direction, be destroyed (per owner's request) with such destruction evidenced by sworn affidavit of the destroying party. These confidentiality duties and obligations shall survive any termination or expiration of this Agreement. These confidentiality duties and obligations shall not apply to any information which is specifically known to or in possession of the recipient at the time of disclosure, or which is or ever becomes public domain information other than through disclosure by the non-owning party to this Agreement.

(k) Client's Non-Solicitation of EMI Employees and Consultants. Client agrees that neither it, nor any of its affiliates or subsidiaries shall, during the Initial Term (or the Renewal Term, if applicable) and for a period of two years after the termination or expiration of this Agreement, solicit or hire (including retaining as a consultant or independent contractor) any employee of, or consultant to, EMI without the express written consent of EMI. Such restriction upon Client shall apply to any employees and/or consultants of EMI during the employee(s)' and/or consultant(s)' relationship with EMI and for a period of six months after the termination or expiration of the employee(s)' or consultant(s)' relationship with EMI.

**U.S. POSTAL SERVICE**

______________________________

Name: ____________________

Title: ____________________

Date: ____________________

____________________

**EQUITY MANAGEMENT INC.**

______________________________

Name: ____________________

Title: ____________________

Date: ____________________

____________________

**EXHIBIT A**

The "Intellectual Property" shall include those marks relating to the products and/or services of Client, including but not limited to:

# EXHIBIT B

## PRODUCT/SERVICE CATEGORY APPROVALS

From time to time, items may be added to this Exhibit B upon request of EMI or Client and with the prior express written approval of Client.

## EXHIBIT C

## LICENSING PROGRAM MANAGEMENT

## ANNUAL REVIEW

| CRITERIA | RATING[1] Lowest Score | | | | Highest Score |
|---|---|---|---|---|---|
| 1. Comprehension of Business and Licensing Direction<br>Has EMI understood Client's objectives for the Licensing Program and worked effectively to implement the Program in concert with such objectives? | ☐ 1 | ☐ 2 | ☐ 3 | ☐ 4 | ☐ 5 |
| 2. Achievement of Goals/Objectives<br>Has the Program proceeded in a direction consistent with the Licensing Plan and made appropriate progress toward the realization of agreed upon objectives? | ☐ 1 | ☐ 2 | ☐ 3 | ☐ 4 | ☐ 5 |
| 3. Effort<br>Does EMI use the effort necessary to provide effective licensing representation? | ☐ 1 | ☐ 2 | ☐ 3 | ☐ 4 | ☐ 5 |
| 4. Trademark Knowledge/Respect<br>Has EMI shown a proper understanding of the imagery of the trademarks and exercised its responsibilities with an appropriate understanding of the trademarks' values? | ☐ 1 | ☐ 2 | ☐ 3 | ☐ 4 | ☐ 5 |

(1) Rating:
5 = Outstanding 4 = Excellent 3 = Satisfactory 2 = Less than Satisfactory 1 = Unsatisfactory

ANNUAL REVIEW (continued)

| CRITERIA | RATING[1] Lowest Score → Highest Score |
|---|---|
| 5. Proactive Contribution: Does EMI give adequate business counsel on licensing and actively work to improve the Licensing Program? | ☐ 1 ☐ 2 ☐ 3 ☐ 4 ☐ 5 |
| 6. Salesmanship: Is EMI creating sales opportunities in a way that will advance the Licensing Program? | ☐ 1 ☐ 2 ☐ 3 ☐ 4 ☐ 5 |
| 7 Licensing Expertise: Does EMI possess the necessary expertise to provide effective licensing representation? | ☐ 1 ☐ 2 ☐ 3 ☐ 4 ☐ 5 |
| 8. Marketing Benefits: Is the Licensing Program being developed so as to generate valuable and important marketing benefits such as exposure of the trademarks on appropriate Licensed Products? | ☐ 1 ☐ 2 ☐ 3 ☐ 4 ☐ 5 |
| 9. Communication Quality: Is Client management informed on a periodic basis of Licensing Program needs and progress via both oral and written communication? | ☐ 1 ☐ 2 ☐ 3 ☐ 4 ☐ 5 |

(1) Rating:
5 = Outstanding 4 = Excellent 3 = Satisfactory 2 = Less than Satisfactory 1 = Unsatisfactory

ANNUAL REVIEW (continued)

| CRITERIA | RATING[1] Lowest Score … Highest Score |
|---|---|
| 10. Stewardship<br>Are business tasks and reports handled in a responsible and timely manner? | ☐1 ☐2 ☐3 ☐4 ☐5 |
| 11. License Administration<br>Is EMI organized and accurate in its systems and management of license agreements? | ☐1 ☐2 ☐3 ☐4 ☐5 |
| 12. Royalty Administration<br>Does EMI provide thorough, timely, and accurate administration and reports of Licensee sales and royalties? | ☐1 ☐2 ☐3 ☐4 ☐5 |
| 13. Product Development and Administration<br>Does EMI effectively manage the submission and approval of Licensed Products? | ☐1 ☐2 ☐3 ☐4 ☐5 |
| 14. Creativity<br>Does EMI exhibit creativity and marketing insight in the presentation of Licensing Program recommendations and proposals to prospective licensees? | ☐1 ☐2 ☐3 ☐4 ☐5 |

(1) Rating:
5 = Outstanding 4 = Excellent 3 = Satisfactory 2 = Less than Satisfactory 1 = Unsatisfactory

ANNUAL REVIEW (continued)

| CRITERIA | RATING[1] Lowest Score | | | | Highest Score |
|---|---|---|---|---|---|
| 15. Trademark Protection/Anti-Infringement — Has EMI cooperated, assisted, and worked effectively with Client or its legal counsel to enhance the protection and control of Client's Trademarks? | 1 | 2 | 3 | 4 | 5 |
| 16. License Feedback — Has EMI established satisfactory working relationships with Licensees? | 1 | 2 | 3 | 4 | 5 |
| 17. Recommendations — Are EMI's recommendations regarding proposed licenses and Licensed Products thorough and indicative of good judgment? | 1 | 2 | 3 | 4 | 5 |

Evaluation completed by: ______________________

Title: ______________________

Date: ______________________

Evaluation verified by: ______________________

Title: ______________________

Date: ______________________

From time to time, items may be added to or deleted from this Exhibit C upon request of EMI and Client, and with the prior express written approval of both parties. The amended Exhibit will be signed and dated by both parties.

(1) Rating:
5 = Outstanding 4 = Excellent 3 = Satisfactory 2 = Less than Satisfactory 1 = Unsatisfactory

# EXHIBIT D

## FINANCIAL PERFORMANCE CRITERIA

The Cumulative Financial Objective for the Initial Term shall be cumulative Gross Revenues (from both Existing Licensees and New Licensees) of $10,000,000.

| Cumulative Gross Revenues | Numerical Score |
|---|---|
| $10,000,000 & over | 5 |
| $8,000,000 - $9,999,999 | 4 |
| $6,000,000 - $7,999,999 | 3 |
| $4,000,000 - $5,999,999 | 2 |
| $3,999,999 - & less | 1 |

For purposes of this Exhibit D, Financial Benefits shall mean the aggregate of: (i) Gross Revenues from both Existing Licensees and New Licensees, as defined in Paragraph 3, plus (ii) any gross royalties guaranteed or reasonably projected (based on the then-current term of the then-existing License Agreements with both Existing Licensees and New Licensees) of all License Agreements, plus (iii) any guarantees and advances offered by bona fide prospective licensees in approved Product Categories that Client rejects during the Initial Term.

**EXHIBIT E**

**MARKETING BENEFITS**

The Cumulative Marketing Benefits Objective for the Initial Term shall be $9,000,000.

| Cumulative Marketing Benefits | Numerical Score |
|---|---|
| $9,000,000 & over | 5 |
| $7,200,000 - $8,999,999 | 4 |
| $5,400,000 - $7,199,999 | 3 |
| $3,600,000 - $5,399,999 | 2 |
| $3,599,999 - & less | 1 |

"Marketing Benefits" shall be determined as follows::

Advertising, promotion and marketing expenditures by Existing Licensees and New Licensees; plus,

Product impressions, valued by multiplying the total number of units of Licensed Product times the average of 10 impressions/unit times the value of $0.05/impression.

# Glossary of Postal Terms — Contents

Publication 32, May 1997
Updated With Postal Bulletin Revisions Through November 4, 1999

Transmittal Letter

Glossary of Postal Terms

Abbreviations and Acronyms

UNITED STATES
POSTAL SERVICE®

# Glossary of Postal Terms

Publication 32 May 1997

**A. Purpose.** This glossary defines words and phrases that are unique to, or have special meanings within, the U.S. Postal Service. Automatic data processing terms that are specific to the Postal Service have also been incorporated. This glossary does not provide comprehensive or precise legal definitions. In any contradiction between a term in this glossary and a Postal Service directive, the directive supersedes the definition.

**B. Requisition.** To obtain additional copies submit Form 7380, *MDC Supply Requisition,* to your material distribution center.

**C. Questions and Comments.** Questions and comments, including suggestions for a term that you wish to be included in future editions, should be sent to:

PUBLICATION 32 EDITOR
CORPORATE PUBLISHING & INFORMATION MANAGEMENT
US POSTAL SERVICE
475 L'ENFANT PLZ SW RM 2800
WASHINGTON DC 20260-1540

**D. Cancellations.** All previous issues of Publication 32 and Publication 32-A are obsolete.

**E. Effective Date.** This publication is effective May 1997.

*Richard D. Weirich*
*Vice President*
*Information Systems*

# Glossary of Postal Terms

Publication 32, *Glossary of Postal Terms,* defines words and phrases that are unique to, or have special meanings within, the U.S. Postal Service. This glossary does not provide comprehensive or precise legal definitions. In any contradiction between a term in this glossary and a current USPS directive, the directive supersedes the definition. Publication 32-A, *USPS Glossary of ADP Terms,* is now obsolete. Postal-specific automatic data processing terms have been incorporated into this version of Publication 32.

This glossary was first published in 1974 and has been updated several times since then to reflect the changing terminology and technology within the USPS. Most obsolete terms have been deleted, but others that might still appear in print are retained and cross-referenced to the current term. Moreover, many new terms have been added.

If you wish to suggest a term to be included in future editions, send the term and definition to:

PUBLICATION 32 EDITOR
CORPORATE PUBLISHING & INFORMATION MANAGEMENT
US POSTAL SERVICE
475 L'ENFANT PLAZA SW RM 2800
WASHINGTON DC 20260-1540
Fax (202) 268-2839

## Capitalization

Terms that are the equivalent of proper names or represent code words are capitalized; terms that are general — applying to a group or category — are not capitalized. For example, the proper names of specific systems, services, and computer programs are capitalized herein, as are the names of specific committees and boards. However, most entries

ending in office, center, facility, or unit, and various descriptive terms ending in delivery and mail, are considered general and are not capitalized.

Position titles are not capitalized, whether the position is held by many (such as clerk) or by few (such as vice president). Organizational unit names, however, are capitalized to distinguish them from the same function (compare Finance with finance).

Trademarks and terms whose registration is pending are always capitalized when used as nouns. (Check *Domestic Mail Manual* G013 for a current list.) Moreover, the abbreviated or acronym form is always capitalized; for example, COD for the term “collect on delivery.”

## Abbreviations and Acronyms

Commonly used acronyms are found in parentheses next to the term they represent. In addition, a list of acronyms and the respective terms are found on page 129.

## Forms

Forms referenced herein are U.S. Postal Service forms unless otherwise noted.

# P

**philatelic center** — A retail outlet or designated location in a postal lobby that sells select stamp stock of various plate number positions and a complete line of philatelic products for stamp collectors. (Also called *Postique,* which is a USPS trademark.)

**Philatelic Fulfillment Service Center** — A postal unit that supplies philatelic product orders (stamps and other products) by subscription or mail/telephone order. It also handles orders for personalized imprinted stamped envelopes and applies the first-day-of-issue stamp and other special cancellations. It is located in Kansas City, MO.

**philately** — The collection and study of the postage stamp and postal stationery for pleasure and profit.

**pickup service** — A service available for a fee from designated post offices for Parcel Post (if scheduled); Priority Mail at single-piece rates; and certain types of Express Mail.

**pickup table** — (See *facing table.*)

**pictorial cancellation** — (See *hand-stamped cancellation.*)

**pie cart/pie rack** — (informal) (See *tray cart.*)

**piece** — An individually addressed mailpiece. This definition also applies when piece is used in eligibility standards. Quantities indicated for optional or required sortations always refer to pieces unless specifically excepted.

**piece count** — A calculation of mail volume that provides the actual number of mailpieces processed. It is generated by machine meter, machine printouts, or actual counts. If these methods are not feasible, the weights, number of containers, or linear feet of mail are multiplied by a national conversion factor to determine the number of mailpieces.

**piece rate** — In bulk mail, the postage charged for each mailpiece in addition to the pound rate charge, if applicable, for the entire mailing.

**pigeonhole** — One opening or section for sorting mail into a distribution case.

**piggyback** — To move a single tractor-trailer onto a special rail flatcar. (Also called *trailer-on-flatcar service.*)

# 18 Philatelic

## 18-1 General Information

Employees should familiarize themselves with the national announcements governing the release, sale, and discontinuance of postage stamps and postal stationery. Commemorative stamps and postal stationery (postal cards, embossed stamped envelopes, and aerogrammes) depict the cultural and historical heritage of the United States. These polices are established and governed by Stamp Services at Headquarters. Uniform application of these polices provide a high degree of integrity to the entire program. All employees and contractors must comply with these policies and procedures.

To accommodate stamp collectors and their purchasing needs, philatelic centers provide collectors with a retail location where they can personally review and select stamps and stamp products for their collections.

## 18-2 Definitions

The term “philatelic center” is most frequently used to describe the centers in the philatelic network. A philatelic center may be referred to as a “Postal Shoppe,” “Stamp Shoppe,” or “Postique®.” Additionally, philatelic centers may be called “philatelic windows”.

## 18-3 Philatelic Centers

Philatelic centers generally have a retail selling area in a self-contained facility. Philatelic centers are normally separate from lobby window positions, have special display units, and sell all current stamps, postal stationery, and philatelic products.

## 18-4 Philatelic Window

A philatelic window is a designated retail window that sells stamps and philatelic products to stamp collectors. The window is identified clearly so that customers will not go to it for other postal services. Dedicated philatelic windows are maintained in Post Offices having high philatelic revenue

potential, but lack sufficient display space as required in a philatelic center. All current stamps, postal stationery items, and philatelic products are sold at philatelic windows.

# 18-5 Important Reference Tools

## 18-5.1 Stamps and Postal Stationery Announcement

This announcement includes a schedule of issuance dates for upcoming stamps and stationery items and includes the format that they will be issued. The Stamps and Postal Stationery Announcement is updated every 2–3 months in the *Postal Bulletin*.

## 18-5.2 USA Philatelic Catalog

The *USA Philatelic Catalog* features the stamps, stationery items, and philatelic products currently available for sale through mail order at the Stamp Fulfillment Service Center, Kansas City, Missouri. One copy of the catalog should be posted prominently in the philatelic center service area and marked to indicate only those products available at that center. The catalog is published six times a year.

Customers who are interested in receiving a catalog should call 800-STAMP-24 to order a free catalog.

## 18-5.3 Postal Bulletin and Other Reference Materials

While a majority of Post Offices nationwide have computers and use e-mail, Postal Link, Direct Line, and other electronic messaging as their main source of news and information, some Post Offices still rely on hard copies of the *Postal Bulletin* and other printed materials as their main source of news and information.

For current and updated information on the stamps and stationery program, all Post Offices and philatelic centers should refer to the *Postal Bulletin*, "Philately Section" on a biweekly basis. Retail associates and postmasters are responsible for providing customers with current and correct information on all aspects of stamps and the stamped stationery program. Also, information on the stamp program can be found in *The Postal Service Guide to U.S. Stamps*, which is published annually. The F-1 Handbook and *Domestic Mail Manual* are also good sources for obtaining additional information.

# 18-6 Service to Customers

Stamp collectors purchase a wide variety of stamps and stamp-related products. Since stamp collectors save the stamps, stationery items, and stamp products they purchase, and generally never use the stamps and stamp products for mailing purposes, a majority of the revenue from these sales is retained as profit. To serve the unique needs and requirements of stamp collectors, the Postal Service established philatelic centers. See below for guidelines for operating philatelic centers.

# 18-7 Hours of Operation

Philatelic centers should be open for business during the hours which are most convenient for their customers. The hours of operation for the philatelic center should be posted for public information.

# 18-8 Community Role

Philatelic and retail associates should familiarize themselves with the stamp collectors and the stamp clubs within their communities. Whenever possible, dates and locations of stamp club meetings should be posted and members should be encouraged to display selected collections in Post Offices in accordance with space and security requirements.

# 18-9 Requirements for Philatelic Centers

## 18-9.1 Establishment Criteria

To increase the effectiveness of the philatelic center network, proposed centers must meet one of these two standards:

- Be located in a city having at least 50,000 residents; or
- Be the single designated philatelic center within a district which does not have a city with a population of at least 50,000.

Cities with populations greater than 100,000 may be considered for more than one center. The number of centers approved for such cities will depend on total population and revenue potential.

Exceptions: Since some sparsely populated areas have large and active philatelic communities, exceptions to these criteria may be warranted. Requests should be submitted to the district retail manager with a written statement justifying the need. Such a statement, describing feasibility and revenue potential of proposed site, must be approved by the area retail manager who is responsible for notifying the manager of Customer Services Operations in Washington, DC, and the local Stamp Distribution Office (SDO/SSC) that supplies the stamp stock.

## 18-9.2 Request to Establish a Philatelic Center

Requests to establish a philatelic center should be forwarded directly from the area retail manager to the manager of Customer Services Operations at Headquarters in Washington, DC. The request should include the following:

- Complete name, address, and finance number of the Post Office where the philatelic center will be located. Indicate whether the center is at the main Post Office or in a station or branch.
- The establishment criterion the center meets (i.e., whether it has a population of at least 50,000, it is the only designated center in the district, or it is an exception which deserves consideration).
- A statement forecasting revenue potential.

## 18-9.3 Approval Process

If approval is granted, the manager of Customer Services Operations at Headquarters in Washington, DC, will notify the area retail manager who must send written notification to the local SDO.

The local SDO will send to the following address written notification of the approval. Once Stamp Acquisition and Distribution has been notified, the newly approved center will be placed on a master list of philatelic centers authorized to receive automatic distribution of position stamp stock and special-edition philatelic products.

MANAGER OF STAMP ACQUISITION AND DISTRIBUTION OFFICE
475 L'ENFANT PLAZA SW RM 5670
WASHINGTON DC 20260-2436

## 18-9.4 Physical Location Criteria

The physical location of a philatelic center is important both for customer convenience and for efficient and profitable operation.

All proposed philatelic centers must be easily accessible via main and traffic arteries, and have ample customer parking within walking distance (accessibility for handicapped persons is important).

Philatelic centers must have sufficient space to display available stamps and philatelic products.

Dedicated philatelic windows should be located in heavy traffic areas of the lobby, convenient to customers.

## 18-9.5 Hours of Operation/Developing the Schedule

The postmaster must determine the schedule of operation (i.e., days and hours a philatelic center will be open) based on the following factors:

- Customer traffic.
- Staffing requirements.
- Regular office hours at the proposed site.

Days/hours changes must be reported to the district finance number control master (FNCM) coordinator at least 7 days prior to change.

## 18-9.6 Uniform Days and Hours

Although the schedule of operation is determined at the local Post Office level, uniform days and hours must be selected. A uniform schedule of operation allows customers to schedule their visits. Erratic, early, or unscheduled closings of philatelic outlets must be avoided since many collectors travel long distances to obtain the products and services provided exclusively at these centers. Whenever possible, these hours should conform to those of the office. Additionally, they must be stated clearly on signs in high traffic areas in the lobby, and periodically published in local newspapers, employee publications, and in brochures sent to customers about local postal services.

## 18-9.7 Customer Convenience

Major emphasis must be placed on having the outlet in operation during hours that are most convenient for our customers.

All offices with philatelic windows should ensure that other windows have access to philatelic items in the event the philatelic window is closed.

## 18-9.8 Posting Assignments

Assignments are to be posted in accordance with the terms of the national agreement. Employees who work in this position must currently hold a retail associate's position or qualify by successfully completing the SSA course.

It is desirable to have employees who have knowledge and are enthusiastic about stamp collecting assigned to philatelic centers.

Duty assignments posted for such positions should include a statement identifying the assignment as one primarily "dedicated" to philatelic sales. It should also include a statement that "Stamp collectors and others who have a working knowledge or have an enthusiastic attitude toward a stamp collecting hobby are encouraged, if otherwise eligible, to bid for this position."

Retail associates assigned to philatelic centers report to the designated manager.

## 18-9.9 Closing Philatelic Centers

When the manager of Customer Services Operations approves closing of a philatelic center, the area retail manager is responsible for notifying the district and the local SDO/SSC.

The SDO/SSC will send written notification to the manager of Stamp Acquisition and Distribution. Written notification must be provided so that automatic distribution of the position stamp stock may be discontinued.

### 18-9.10 Philatelic Center Database

When new philatelic centers are opened or philatelic centers are closed, address information must be updated on the nationwide philatelic center database. This database provides information to the National Call Center and *www.usps.com*.

## 18-10 Products and Services

### 18-10.1 Products

#### 18-10.1.1 Stamp Stock

Authorized philatelic centers will be automatically furnished with select position stamp stock from various stamp printers. Offices will automatically receive a minimum of 8,000 commemorative and definitive stamps in position format as they are issued. Stamp quantities may vary based on the number of positions used during the printing process.

Stamp quantities have been established to meet an average 60-day supply demand. Adjustments of minimum quantities can be made by sending a memorandum to your local SDO/SSC. The SDO/SSC will notify the manager of Stamp Acquisition and Distribution Office of any quantity adjustments. Establish position stock quantities for commemoratives and definitive stamps:

| Positions | Quantities |
|---|---|
| 4 Position Press | 8,000 |
| 6 | 12,000 |
| 8 | 16,000 |
| 10 | 20,000 |
| 12 | 24,000 |

Additional amounts must be expressed in increments of 2,000 for 20 stamps per pane for commemoratives; and 10,000 for 100 per pane for definitive stamps. Changes to automatic distribution must be stated in these quantities.

#### 18-10.1.2 Position Stamp Stock

Since many collectors are interested in position stamp stock, all philatelic centers must have it available. Position stamp stock features matched plate numbers in each of the appropriate positions of the sheet whenever possible.

Stamp stock is distributed automatically to all Post Offices having philatelic centers. Whenever additional quantities are needed, include a memorandum with a requisition requesting additional position stock to your SDO/SSC.

## 18-10.1.3 Required Inventory

Philatelic centers are required to carry the line of stamps, postal stationery items, and philatelic products that are available from their SDO/SSC. These items are listed in the *USA Philatelic Catalog* along with other products that are only available for sale through the catalog.

Philatelic centers do not sell all items listed in the philatelic catalog; (e.g., American Commemorative Panels, American Commemorative Collection, American Commemorative Cancellations, and collector binders).

All philatelic centers must have these current stamps and stationery items available for sale (all items not officially called offsale in the *Postal Bulletin*):

- Stamps in sheet, coil, and booklet formats (commemoratives, definitives, precancels) in all denominations, varieties, and formats in which they are produced.
- Position stamp stock.
- Souvenir sheets.
- Stationery items (stamped cards, embossed stamped envelopes in all sizes — with and without windows — and aerogrammes) in all denominations, sizes, and formats.
- Migratory bird hunting and conservation stamps (three most recent issues).
- Commemorative Year Book (three most recent issues).
- The Postal Service Guide to U.S. Stamps.
- Special philatelic products (available in limited quantities).

Local precancels may be made available at philatelic centers that have them on hand or have a hand stamp for precanceling purposes. Philatelic centers may not acquire a precancel hand stamp solely to meet philatelic demand. More information can be found in the *Domestic Mail Manual* (DMM).

## 18-10.1.4 Available Stamps, Stationery, and Philatelic Products

A complete list of available stamps, stationery items, and philatelic products may be requested from your SDO/SSC.

Announcement and instructions on items being withdrawn from sale are published in the *Postal Bulletin* quarterly.

## 18-10.1.5 Other Products

Only Postal Service–issued products can be sold in philatelic centers.

To sell other products, written authorization must be granted from Retail Marketing at Headquarters, your area retail manager, the district retail manager, and the manager of Stamp Acquisition and Distribution. When additional products have been authorized, full product details, including sales price, merchandising, etc., should be announced in the *Postal Bulletin*.

### 18-10.1.6 Sales Policies/Definitions

All philatelic centers should have available for sale any and all newly released stamps, stationery items, and philatelic products. The *Postal Bulletin* contains all updated information regarding the issuance and sale dates of all new stamps.

### 18-10.1.7 Commemorative Stamps

Philatelic centers may keep individual items on sale until notice is published in the *Postal Bulletin* to remove the stamps from sale. To allow for effective inventory management, this notice will appear in the *Postal Bulletin* one month prior to the official removal date. At that time, excess stock should be returned to the vault on PS Form 17, *Stamp Requisition/Stamp Return*, and reallocated to regular windows to be sold as postage.

### 18-10.1.8 Plate Blocks

Plate blocks are usually the four corner stamps (one design or block of four designs) with the printing plate number in the margin (selvage) of the pane. If the stamp issue consists of more than four stamps, like the *Space Achievement* issue of 1981, which consisted of eight different designs for a plate block of eight, the plate block would contain one of each of the eight designs.

### 18-10.1.9 Floating Plate Blocks

A floating plate number is one that floats or appears at different intervals along the margin. Most issues utilizing floating plate numbers only have selvage on the right and left sides of the pane.

The plate numbers and other marginal markings move progressively up and down the selvage on a pane-to-pane basis as a result of each full rotation of the press cylinders. If a single number floats, collectors may save it in the centers of the collectible, which is a block of six.

### 18-10.1.10 Plate Blocks and Marginal Markings

Plate number blocks and other marginal markings (i.e. copyright) that may be accumulated from previous sales are sheets that are broken in the normal course of business.

Sheets of stamps should not be broken specifically to provide plate blocks or marginal markings to customers. A new sheet may be broken to sell a plate block only if there are no stamps remaining from previously broken sheets. It is more advantageous to sell marginal inscriptions as strips, two stamps wide, rather than as blocks.

Blocks will be sold on a first-come basis only. Each customer may buy one matched set of four marginal strips for any stamp in stock. There are no limitations on the sale of plate blocks of stamps having denominations from $1.00 to $10.00. See *USA Philatelic Catalog.*