# In the United States Court of Federal Claims

| | | |
|---|---|---|
| STERLING, WINCHESTER & LONG, L.L.C., Plaintiff, | * | No. 05-297C |
| v. | * | (Filed: July 17, 2008) |
| THE UNITED STATES, Defendant. | * | Trademark license agreement; contract interpretation; parol evidence; integration clause. |

*Frederick L. Wright*, Vaughn, Wright & Boyer LLP, Atlanta, Georgia, for plaintiff.

*Maame A. F. Ewusi-Mensah*, Trial Attorney, Commercial Litigation Branch, Civil Division, with whom were *Jeffrey S. Bucholtz*, Acting Assistant Attorney General, United States Department of Justice, Washington, D.C., and *Jeanne E. Davidson*, Director, for defendant. *Michael F. Kiely*, Law Department, United States Postal Service, Washington, D.C., of counsel.

## OPINION

MARGOLIS, *Senior Judge*.

This matter comes before the Court on plaintiff's motion for summary judgment. Plaintiff Sterling, Winchester & Long, LLC ("SWL") claims that the United States ("Defendant") materially breached a trademark license agreement executed between SWL and the United States Postal Service ("USPS"). The negotiations leading up to the agreement's execution were handled exclusively by Equity Management, Inc. ("EMI"), an agent of the USPS. Defendant filed a cross-motion for summary judgment, claiming there are no issues of material fact, that the trademark license agreement is clear and unambiguous, and that it did not breach the trademark agreement. Defendant also filed a counterclaim seeking recovery of unpaid royalties. Oral argument was held on the parties motions on May 22, 2008. After careful review of all the briefs and oral argument, this Court concludes there is no genuine issue of material fact, and the Defendant's motion for summary judgment and its counterclaim are **GRANTED**.

# FACTS

In October 1999, SWL submitted an unsolicited proposal to the USPS. SWL proposed to develop five official USPS calendars using USPS trademarked property such as stamps and names for a 2001 commemorative calendar. SWL was directed to Kaye DeShields, USPS Manager of Retail Products, because SWL's proposal related to a potential USPS retail product. DeShields contacted J.G. Long, CEO & Managing Officer of SWL, on December 1, 1999 to inform SWL that the USPS was not interested in the unsolicited proposal. However, by letter dated December 3, 1999, Barbara Tutt, USPS Unsolicited Proposals Coordinator, informed SWL that the proposal was not accepted as submitted. Tutt's letter explained that SWL needed to submit a signed Confidential Disclosure Waiver and comply with USPS Publication 131, which outlined the requirements for submitting unsolicited proposals.

SWL submitted a second proposal with a Confidential Disclosure Waiver and in accordance with USPS Publication 131 on March 8, 2000. Several months passed without a response from USPS on the status of SWL's unsolicited proposal. By letter dated May 22, 2000, SWL contacted USPS Governor LeGree Daniels to determine how SWL's proposal was progressing through the USPS review system. The USPS informed SWL that in order for SWL to sell products bearing USPS trademarks and copyrights, a license must be obtained, and EMI is the official licensing agent for USPS. SWL was also informed that the unsolicited proposal was being forwarded to EMI for further review. As of July 2000, SWL was negotiating with EMI the terms of the anticipated trademark license agreement.

After several months of negotiations with EMI, SWL executed a license agreement on January 4 and 31, 2001–USPS Contract No. 102592-01-U-1173. Def.'s Ex. 1 at A1, A5. The executed trademark license agreement was effective as of July 1, 2000. The trademark license agreement authorized SWL to distribute an annual series of up to five thematic USPS twelve-month calendars beginning in 2002 through Channels of Distribution:

> Wholesale to bookstores, speciality stores, Philatelic catalogs, Philatelic centers and merchandise stores; Retail via Licensee's website, subject to the conditions set forth in Paragraph 18(a).

Id. at A1. Additionally, SWL was required to pay a minimum of $50,000 in royalties to USPS for use of the USPS trademarked material for each contract period. Id. at A2. Contract period one started on July 1, 2000 and ended on December 31, 2002; contract period two started on January 1, 2003 and ended on December 31, 2003; contract period three started on January 1, 2004 and ended on December 31, 2004. SWL made the first royalty payment of $50,000 on July 14, 2000. Def.'s Ex. 5 at A50. SWL did not make any additional royalty payments.

In September 2001, J.G. Long sent an e-mail to Ilene Kent of EMI seeking to market and sell the commemorative calendars through a USPS controlled catalog and USPS controlled philatelic centers. Def.'s Ex. 27 at A386. Kent's response noted that the USPS was not

obligated to purchase the calendars. Id. On February 16, 2001 and March 2, 2001, SWL was denied the opportunity to market and sell the calendars to the USPS Philatelic Centers and through the quarterly USA Philatelic / USA Philatelic Catalog. Def.'s Ex. 28 at A387.

On November 30, 2001, SWL filed a Congressional Complaint against the USPS and EMI as USPS's agent. Id. SWL claimed that by denying SWL access to the license agreement distribution channels, USPS and EMI were in material breach of the license agreement. Id. SWL demanded immediate access to the distribution channels listed in the license agreement. Def.'s Ex. 28 at A388. In addition to the Congressional Complaint, SWL wrote USPS Board of Governors Vice Chairman S. David Fineman. Def.'s Ex. 29 at A389. SWL requested Vice Chairman Fineman's assistance in gaining access to the distribution channels listed in the license agreement. Id. The gravamen of SWL's claim for breach was that the license agreement distribution channels (Philatelic catalogs, Philatelic centers and merchandise stores) gave SWL a right of access to the USPS controlled USPS Philatelic Centers and the quarterly USA Philatelic / USA Philatelic Catalog ("USPS controlled channels of distribution"). Id.

On July 28, 2004, SWL filed a certified claim against the USPS for breach of the license agreement and claimed $12,778,728 in damages stemming from USPS's breach. Def.'s Ex. 30 at A394. SWL claimed that when the license agreement was executed the USPS knew that the license agreement distribution channels included access to USPS controlled channels of distribution. Id. at A395.

The defendant denies the license agreement granted SWL a right of access to the USPS controlled channels of distribution; moreover, the defendant filed a counterclaim against SWL for $100,000 in unpaid royalty payments.

## DISCUSSION

There are no genuine issues of material fact necessitating a trial in this case. Both the plaintiff and defendant agree that the terms of the trademark license agreement are clear and unambiguous. Therefore, the rules of contract interpretation will control the disposition of the cross-motions for summary judgment.

### 1. Contract Interpretation

Contract interpretation begins with the language of the written agreement. NVT Technologies, Inc. v. United States, 370 F.3d 1153, 1159 (2004). A contract must be considered as a whole and interpreted in such a way that a reasonable meaning is given to all the contract's terms. Id. Also, a contract should be read in such a way that an interpretation gives meaning to all parts of the contract rather than one that leaves a portion of the contract useless, inexplicable, void, or superfluous. Id. Therefore, contractual language controls and any subjective, unexpressed intent of one of the parties is ineffective. City of Oxnard v. United States, 851 F.2d 344, 347 (Fed. Cir. 1988). If the contract is clear and unambiguous on its face, the plain and

ordinary meaning of the contract controls, and the Court may not resort to extrinsic evidence to interpret it or change the terms of a contract. Coast Federal Bank, FSB v. United States, 323 F.3d 1035, 1040 (Fed. Cir. 2003). Interpretation of a contract provision is a question of law, and a contract provision is ambiguous only if the provision is susceptible to more than one reasonable meaning. Barron Bancshares, Inc. v. United States, 366 F.3d 1360, 1375 (Fed. Cir. 2004) citing Edward R. Marden Corp. v. United States, 803 F.2d 701, 705 (Fed. Cir. 1986); C. Sanchez and Son, Inc. v. United States, 6 F.3d 1539, 1544 (Fed. Cir. 1993).

When a document contains an integration clause, no additional terms may be added, whether consistent or inconsistent, through parol evidence. Rumsfeld v. Freedom NY, Inc., 329 F.3d 1320, 1329 (Fed. Cir. 2003); see also McAbee Construction, Inc. v United States, 97 F.3d 1431, 1434 (Fed. Cir. 1996) (there is a "strong presumption" that where a contract has an integration clause, the contract is in fact a fully-integrated agreement). Furthermore, the Federal Circuit in Rumsfeld v. Freedom NY, Inc. followed the traditional rule relating to integration clauses and consideration of extrinsic evidence–"an integration clause conclusively establishes that the integration is total unless (a) the document is obviously incomplete or (b) the merger clause was included as a result of fraud or mistake or any other reason to set aside the contract." Rumsfeld, 329 F.3d at 1329. The Federal Circuit has also emphasized that where the parties are both commercial entities or the government, integration clauses are given "particularly great weight." Id. The license agreement's integration clause in Exhibit B of the license agreement states:

> 22. **Miscellaneous:** This Agreement constitutes the *entire* Agreement and understanding between the parties hereto and terminates and supercedes any prior Agreement or understanding relating to the subject matter hereof between USPS and Licensee. USPS and Licensee are not relying upon any statements, warranties, or representations except those contained in this Agreement. The paragraph and other headings contained herein are for reference purposes only and will not affect the meaning of interpretation of this Agreement. None of the provisions of this agreement can be waived or modified except in writing signed by both parties, and there are no representations, promises, agreements, warranties, or undertakings other than those contained herein.
>
> 23. **No Reliance On Other Representations:** The parties have not relied on any representations, promises, warranties, covenants, statements, or undertakings by the other party or its counsel other than those contained in this Agreement.

Def. Ex. 1 at A27 (emphasis added).

The trademark license agreement before this Court is clear and unambiguous and is not susceptible to more than one interpretation. The channels of distribution outlined in the license agreement do not give SWL a right of access to the USPS Philatelic Centers or the USA

Philatelic / USA Philatelic Catalog. The agreement's language is clear:

> In this Agreement, USPS grants to Licensee a *license to use* certain names, trademarks, service marks, trade dress and/or copyrights in connection with the manufacture, distribution, advertising, promotion and sale of certain goods...

Def.'s Ex. 1 at A1 (emphasis added). There is no mention of a right of access in this trademark license agreement. The scope of this license agreement is limited to a right to use USPS trademarked property, nothing more.

The Channels of Distribution authorized by the trademark agreement are also outlined: "Wholesale to bookstores, specialty stores, Philatelic catalogs, Philatelic centers and merchandise stores; Retail via Licensee's website...." Def.'s Ex. 1 at A1. Aside from retail sales via SWL's website, there are no specifically named channels of distribution listed as part of wholesale sales. No specific bookstore or speciality store is mentioned in the agreement despite SWL's negotiations with Barnes & Noble, Borders, and BrownTrout Publishers as other possible channels of distribution. Def.'s Ex. 5 at A51. It is axiomatic that SWL could not take the executed agreement to any bookstore or other specialty store and require the store to display the calendar as an item for sale.

The terms–Philatelic catalogs and Philatelic centers and merchandise stores–are not the official names of the USPS controlled channels of distribution. The USPS publishes a quarterly catalog entitled USA Philatelic or USA Philatelic Catalog. The trademark license agreement does not mention either USA Philatelic or USA Philatelic Catalog in the agreement. The USPS controls philatelic centers called USPS Philatelic Centers, and there is no mention of USPS Philatelic Centers in the agreement.

The license agreement only gives SWL the right to use certain USPS names, trademarks, service marks, trade dress, and copyrights in conjunction with the sale and distribution of an annual series of thematic calendars. The clear and unambiguous language of the agreement does not mean anything else.

During oral argument, plaintiff stated that the agreement between USPS and SWL was unambiguous, integrated, and that the terms of the agreement can be properly construed without referring to post-execution dealings between the parties. Transcript of Oral Argument at 4-5 ("Tr. at #"). Despite agreeing that the agreement is complete and unambiguous, plaintiff contends that the agreement contains an implied right of access to USPS controlled channels of distribution. Tr. at 8-10, 12, 14. This assertion is without merit.[1] If an agreement contains an

---

[1] During oral argument, the defendant pointed out that the license agreement lacks any provisions regarding SWL's right of access to USPS controlled channels of distribution–namely, there was no information relating to the number of philatelic centers there are; how often the philatelic catalogue is produced; how SWL's product would be distributed to USPS controlled

integration clause, the language of the agreement is the only relevant consideration. Including an integration clause means there is nothing left to be implied from the language of the agreement–the agreement is the final expression of the parties. The integration clause in this case is valid because there is no evidence, and plaintiffs do not contend, that the agreement is incomplete or that the integration clause was the result of fraud, mistake or any other reason to set aside the entire agreement. As such, implied meanings have no place in this Court's analysis of the agreement.

## 2. Parol Evidence

When contracts are clear and unambiguous, parol or extrinsic evidence antecedent or contemporaneous to the contract is inadmissible to vary, contradict, or add terms to the contract. Nicholson v. United States, 29 Fed. Cl. 180, 193-94 (1993). Only when the terms of the contract are ambiguous should parol evidence be considered. Greco v. Department of the Army, 852 F.2d 558, 560 (Fed. Cir. 1988).

There is no need to consider either pre- or post-execution parol evidence in this case. The Federal Circuit has stated that when an agreement contains an integration clause, no parol evidence will be admitted. See Barron Bancshares, Inc., 366 F.3d at 1375 (The parol evidence "rule renders inadmissible evidence introduced to modify, supplement, or interpret the terms of an integrated agreement."); Sacramento Municipal Utility District v. United States, 63 Fed. Cl. 495, 506 (2005) ("The parol evidence [rule] precludes consideration of post-execution evidence.").

Plaintiff claims that discussions and actions that occurred post-execution should not be treated as parol evidence and should be admitted to shed light on how the agreement's terms should be interpreted. Tr. at 4-5. Precedent is clear; no extrinsic evidence will be considered when the agreement is unambiguous. McAbee Construction, Inc., 97 F.3d at 1435 (a court must not resort to extrinsic evidence if the contract is clear and unambiguous); Interwest Construction v. Brown, 29 F.3d 611, 615 (Fed. Cir. 1994) (extrinsic evidence should not be used to introduce ambiguity where no ambiguity exists); Beta Systems, Inc. v. United States, 838 F.2d 1179, 1183 (Fed. Cir. 1988) ("The general rule is that extrinsic evidence will not be received to change the terms of a contract that is clear on its face.") (internal citations omitted).

Plaintiff argues that USPS Publication 32 "Glossary of Postal Terms" ("the glossary") is evidence that the USPS knew that the term "philatelic center" included the USPS owned and operated philatelic centers. Plaintiff has offered no evidence indicating that the glossary was relied on at the time the contract was executed. The glossary is not referenced anywhere in the

---

channels of distribution; the time frame for SWL to get its product into the USPS controlled channels of distribution or limitations on volume; where SWL's product would be placed in the USPS controlled channels of distribution; and finally, what advertising methods would be used to market SWL's product. Tr. at 21. These important contract provisions are absent and cannot be implied from the language of the license agreement.

license agreement or in Exhibit B of the license agreement, where terms of the agreement are defined. See Def.'s App. Ex. 1 at A7. Also, the glossary is limited in scope because the glossary states that it "does not provide comprehensive or precise legal definitions." Def.'s App. Ex. 32 at A465. Because the license agreement is integrated, and the glossary is not meant to be a source of legal definitions, and because there is no reference to the glossary in the license agreement, the language of the license agreement is the only relevant inquiry.

### 3. Defendant's Counterclaim

SWL terminated the license agreement in May 2002. Prior to SWL's termination, SWL paid the royalty payment of $50,000 for contract period one (July 1, 2000 through December 31, 2002). SWL did not make any royalty payments for contract period two (January 1, 2003 through December 31, 2003) or contract period three (January 1, 2004 through December 31, 2004). SWL claims USPS materially breached the license agreement by denying SWL access to USPS controlled distribution channels.

For a party to recover under a breach of contract theory, the party must not commit the first material breach. E. Allen Farnsworth, *Farnsworth on Contracts* § 8.15, at 439 (1990); see also Christopher Village, L.P. v United States, 360 F.3d 1319, 1334 (Fed. Cir. 2004). Contrary to SWL's assertion, USPS did not commit the first material breach of the license agreement. SWL committed the first material breach when J.G. Long gave notice to USPS that SWL intended to terminated the contract in May 2002. USPS was not obligated, as previously discussed, to allow SWL access to USPS controlled distribution channels under the license agreement. Therefore, SWL committed the first material breach and must pay USPS a total of $100,000 for unpaid royalties that were due for contract periods two and three.

## CONCLUSION

Defendant's cross-motion for summary judgment is **GRANTED**, and the plaintiff's motion for summary judgment is **DENIED**. The clerk will dismiss the complaint and enter judgment for the defendant in the amount of $100,000 on its counterclaim. Each party shall bear their own costs.

s/Lawrence S. Margolis
LAWRENCE S. MARGOLIS
Senior Judge, U.S. Court of Federal Claims

July 17, 2008